IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| **YASHICA ROBINSON, M.D.,** *et al.,* )<br>)<br>    **Plaintiffs,** )<br>)<br>**v.** )<br>)<br>**STEVEN MARSHALL, in his official** )<br>**capacity as Alabama Attorney General,** )<br>)<br>    **Defendant.** ) | **CASE NO. 2:19-cv-00365-MHT-SMD** |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

## I. Introduction

This case is about whether the Constitution forbids Alabama from protecting human life. At the Framing, the common law criminalized many abortions, and by the time the Fourteenth Amendment was adopted, "at least 28 of the then-37 States and 8 Territories" protected unborn human life through "statutes banning or limiting abortion." *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 952 (1992) (Rehnquist, C.J., concurring in the judgment and dissenting in part). Earlier this year, Alabama enacted the Alabama Human Life Protection Act, which reflects the judgment of the State that each human life, from the moment of conception, is worthy of protection from lethal violence. The Act makes it a felony to intentionally abort a child at any age, except when done to prevent a serious health risk to the

1

child's mother or end a pregnancy when the child suffers from a condition that would lead to his or her death shortly after he or she is born.

By any plausible interpretation of the Constitution, the Act should be upheld. After all, "(1) the Constitution says absolutely nothing about [abortion], and (2) the longstanding traditions of American society have permitted it to be legally proscribed." *Casey*, 505 U.S. at 980 (1992) (Scalia, J., concurring in the judgment and dissenting in part). But the Supreme Court, in *Roe v. Wade*, found "in the penumbras of the Bill of Rights" a "fundamental" right to abortion. 410 U.S. 113, 152 (1973). *Roe* was subject to immediate criticism by scholars and jurists;[1] its standard proved unworkable; *see Casey*, 505 U.S. at 876 (plurality op.) (recognizing inadequacy of *Roe*'s trimester framework); and numerous parties, including the United States at least six times, have asked the Court to overrule *Roe*. *See id.* at 844. But in *Casey*, the Supreme Court jettisoned much of *Roe*'s reasoning while purporting to uphold the decision on stare decisis grounds.

The plurality opinion in *Casey* set viability as the crucial moment when States could begin protecting human life by prohibiting its termination through abortion. Before "viability ... the woman has a right to choose to terminate her pregnancy," *id.*

---

[1] *See, e.g.*, Laurence H. Tribe, *The Supreme Court, 1972 Term—Foreword: Toward a Model of Roles in the Due Process of Life and Law*, 87 Harv. L. Rev. 1, 7 (1973) ("One of the most curious things about *Roe* is that, behind its own verbal smokescreen, the substantive judgment on which it rests is nowhere to be found."); *see also* John Hart Ely, *The Wages of Crying Wolf: A Comment on* Roe v. Wade, 82 Yale L.J. 920, 935-937 (1973).

at 870, but once the unborn child is capable of surviving outside the womb, the State can protect it from abortion, unless abortion "is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 879.

As numerous Justices have recognized, "[t]he standard set forth in the *Casey* plurality has no historical or doctrinal pedigree." *Stenberg v. Carhart*, 530 U.S. 914, 982 (2000) (Thomas, J., dissenting). Rather, that "standard is a product of its authors' own philosophical views about abortion, and it should go without saying that it has no origins in or relationship to the Constitution and is, consequently, as illegitimate as the standard it purported to replace." *Id.* Indeed, even one the authors of the *Casey* plurality has recognized that "[t]he choice of viability as the point at which the state interest in *potential* life becomes compelling is no less arbitrary than choosing any point before viability or any point afterward." *City of Akron v. Akron Center for Reprod. Health, Inc.*, 462 U.S. 416, 461 (1983) (O'Connor, J., dissenting).

Even so, that arbitrary line is currently the law. Under *Casey*, the State can protect human beings on one side of the viability line, but not those on the other. Because Alabama's Human Life Protection Act would protect life on both sides of that line, the Act is inconsistent with *Casey* by prohibiting abortion of unborn children who cannot yet survive apart from their mothers. To that extent, Plaintiffs are likely to prevail before this Court and should be granted a preliminary injunction.

But the Act should not be enjoined in full. For those unborn children who are viable, the State may "regulate, or even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Casey*, 530 U.S. at 879. The Act does not prohibit abortions performed to preserve the life or health of the mother. *See* Act § 3(1), (6). Thus, any injunction should not prohibit the Attorney General from enforcing the Act against anyone who violates it with respect to a viable unborn child.

Attorney General Marshall notes that limiting a preliminary injunction to pre-viability abortions does not change the nature of this case. Plaintiffs' motion is directed to pre-viability abortions. *See* Doc. 51 at 1 (citing *Roe* for the proposition that "the State may not ban abortion before the point of viability."). Moreover, since 2011, Alabama has prohibited abortions at 20 or more weeks after fertilization (*i.e.*, 22 weeks after the last menstrual period), except when necessary to preserve the life or health of the mother. Ala. Code § 26-23B-5. Plaintiffs do not assert that they are performing post-viability abortions, and they thus lack standing to seek an injunction against application of the Act to post-viability abortions.

## II. Plaintiffs' Request For A Preliminary Injunction

To obtain a preliminary injunction Plaintiffs must show (1) a substantial likelihood of success on the merits; (2) a substantial threat irreparable injury will occur absent issuance of the injunction; (3) the threatened injury outweighs the

potential damage the requested injunction may cause the non-moving parties; and (4) the injunction would not be adverse to the public interest. *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).

Because the Supreme Court's abortion precedents are binding on this Court, Plaintiffs' challenge to the Act as applied to abortions of unborn children who have not reached viability is likely to succeed in this Court. Attorney General Steve Marshall will show that these cases were wrongly decided, as they rest on (1) an improper and incomplete history of the protection afforded fetal human life under the common law and state statutes from the mid-nineteenth century up until *Roe v. Wade*, 410 U.S. 113 (1973), (2) the arbitrary "viability" line for which neither the constitutional text nor structure provide any support, and (3) the demonstrably false proposition that it is unclear whether a fetus is a human life. *See id*. at 159 ("We need not resolve the difficult question of when life begins. When those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer."). But while Attorney General Marshall will ask the Supreme Court to overrule these obviously and tragically wrong decisions, until those decisions are overruled, Plaintiffs are likely to prevail on their challenge to the Act as applied to abortions of pre-viability children.

When viewed through the distorted lens of *Roe* and *Casey*, the balance of the equities also supports a preliminary injunction as applied to pre-viability abortions. Attorney General Marshall's response to Plaintiffs' motion is, therefore, that the Supreme Court's current abortion jurisprudence regrettably requires that it be granted with respect to the operation of the Act pre-viability. As to the application of the statute to abortions post-viability, Plaintiffs have *not* demonstrated a likelihood of success on the merits. In fact, Plaintiff's Memorandum in Support of Their Motion for Preliminary Injunction focuses exclusively on *Roe* and its progeny "unequivocally hold[ing] that the State may not ban an abortion before the point of viability." Doc. 51 at 1; *Id*. at 8 (citing *Roe* for the proposition that "prior to viability, the State has no interest sufficient to justify a ban on abortion"); *Id*. at 9, 11 (same). Plaintiffs thus have failed to meet their "burden of establishing an entitlement to the extraordinary remedy of a preliminary injunction under Rule 65." *GOS Operator, LLC v. Sebelius*, 843 F. Supp.2d 1218, 1240-41 (S.D. Ala. 2012).

Plaintiffs make three arguments in their Memorandum that demand specific responses. First, Plaintiffs contend that Alabama's law prohibiting abortion unless necessary to preserve the life or health of the mother is "unprecedented." Doc. 51 at 1. When viewed in the context of both the protection afforded fetal human life under the common law and statutory prohibitions of abortion that long pre-dated

6

*Roe*, the Act is nothing of the sort. What is unprecedented is the alleged right to abortion on demand that the Supreme Court invented in *Roe*.

The result in *Roe* is not supported by any plausible argument from constitutional text, structure, or history. Unfettered abortion was not traditional at the time of the Founding. As James Wilson—one of George Washington's Supreme Court appointees and a signatory to the Constitution—wrote: "With consistency, beautiful and undeviating, human life, from its commencement to its close, is protected by the common law." 2 James Wilson, THE WORKS OF JAMES WILSON, 596-97 (R.G. McCloskey ed., 1967). Similarly, Samuel Farr confirmed in his *Elements of Medical Jurisprudence* (1787) that at the founding, life was thought to begin at conception and "nothing but the arbitrary forms of human institutions can make it otherwise." *Id.* at 4. In fact, as Farr explained, "there is no doubt" that "abortions, or the destruction of those unborn embryos which were never brought into the world … ought to be considered a capital crime." *Id.* at 69.

Nor was abortion-on-demand "precedented" when the Fourteenth Amendment was ratified or when *Roe* was decided:

> At the time of the adoption of the Fourteenth Amendment, statutory prohibitions or restrictions on abortion were commonplace; in 1868, at least 28 of the then–37 States and 8 Territories had statutes banning or limiting abortion. J. Mohr, Abortion in America 200 (1978). By the turn of the century virtually every State had a law prohibiting or restricting abortion on its books. By the middle of the present century, a liberalization trend had set in. But 21 of the restrictive abortion laws in effect in 1868 were still in effect in 1973 when *Roe* was decided, and

7

> an overwhelming majority of the States prohibited abortion unless necessary to preserve the life or health of the mother. *Roe v. Wade*, 410 U.S., at 139-140, n.2 (Rehnquist, J., dissenting). On this record, it can scarcely be said that any deeply rooted tradition of relatively unrestricted abortion in our history supported the classification of the right to abortion as "fundamental" under the Due Process Clause of the Fourteenth Amendment.

*Casey*, 505 U.S. at 952-53 (Rehnquist, C.J., concurring in the judgment and dissenting in part). Given all of the state regulations of abortion in place when the Fourteenth Amendment was ratified, that Amendment could not have transferred state power over abortion to the federal judiciary. Rather, "[t]he only conclusion possible from this history is that the drafters did not intend to have the Fourteenth Amendment withdraw from the States the power to legislate with respect to this matter." *Roe*, 410 U.S. at 177 (Rehnquist, J., dissenting); *see also Thornburgh*, 476 U.S. at 796 (White, J., dissenting) ("Abortion is a hotly contested moral and political issue. Such issues, in our society, are to be resolved by the will of the people, either as expressed through legislation or through the general principles they have already incorporated into the Constitution they have adopted…. As I have argued, I believe it is clear that the people have never—not in 1787, 1791, 1868, or at any time since—done any such thing.").

Second, Plaintiffs repeatedly cite "forty-six years of Supreme Court precedent, beginning with *Roe v. Wade*, 410 U.S. 113 (1973), which unequivocally holds that the State may not ban abortion before the point of viability." Doc. 51 at

8

1. This line of precedent, however, has hardly been consistent. Rather than create a consistent and clear body of law, the Court has repeatedly changed the applicable standards to prop up a poorly reasoned and unworkable opinion, "jury-rigging new and different justifications to shore up the original mistake." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 379 (2010) (Roberts, C.J., concurring).[2] In other words, no one can plausibly contend that *Roe* "is a well-reasoned decision that has caused no serious practical problems in the four decades since" it was decided. *Franchise Tax Bd. of California v. Hyatt*, 139 S. Ct. 1485, 1506 (2019) (Breyer, J., dissenting).

Without any evidentiary record at all, *Roe* introduced a complex trimester-based scheme and concluded that a woman has a right to terminate her pregnancy up to the point of viability. *Roe* held open the possibility that States might have the authority to regulate abortion pre-viability and even to ban abortion post-viability (subject to a life or health exception), but the Court's subsequent abortion cases

---

[2] It is little wonder that the standard is ever-changing when viability itself, as multiple Justices have noted, is an entirely arbitrary line that finds no basis in the Constitution. *See, e.g., City of Akron*, 462 U.S. at 461 (O'Connor, J., dissenting); *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists,* 476 U.S. 747, 794-795 (1986) (White, J., dissenting) ("[T]he Court's choice of viability as the point at which the State's interest becomes compelling is entirely arbitrary…. The State's interest is in the fetus as an entity in itself, and the character of this entity does not change at the point of viability under conventional medical wisdom."). The Court introduced the viability standard without providing any justification for having this be the constitutionally mandated point before which States cannot prohibit abortions. *Roe* simply asserted that a State's interest in potential life becomes compelling at viability "because the fetus then presumably has the capability of meaningful life outside the mother's womb." 410 U.S. at 163. As Professor Ely properly noted, however, rather than give an argument, the *Roe* Court "mistakes a definition for a syllogism." John Hart Ely, *The Wages of Crying Wolf: A Comment on* Roe v. Wade, 82 Yale L.J. 920, 924 (1973).

struck down most State efforts to regulate abortion. The plurality in *Casey*, therefore, felt obligated to dramatically alter the constitutional analysis—rejecting strict scrutiny and the trimester framework, overturning *City of Akron* and *Thornburgh*, and instituting a new "undue burden" standard. But this standard also proved to be problematic, so the Supreme Court adjusted the test yet again, adopting a "large fraction" test. *Fargo Women's Health Organization v. Schafer*, 507 U.S. 1013, 1014 (1993) (O'Conner, J., concurring). And when this still failed to provide lower courts and States with predictability and certainty, the Supreme Court fashioned another new interpretation of what constitutes an undue burden, introducing a benefits-and-burdens balancing test—even though *Casey* never engaged in any such balancing. *See Whole Women's Health v. Hellerstedt*, 136 S.Ct. 2292, 2324 (2016) (Thomas, J., dissenting) ("[T]he majority's free-form balancing test is contrary to *Casey*. When assessing Pennsylvania's recordkeeping requirements for abortion providers, for instance, *Casey* did not weigh its benefits and burdens…. Contrary to the majority's statements, *Casey* did not balance the benefits and burdens of Pennsylvania's spousal and parental notification provisions, either.").

Third, Plaintiffs cite *Casey* for the proposition that "abortion is constitutionally protected because it involves one of 'the most intimate and personal choices a person may make in a lifetime.'" Doc. 51 at 1. But as *Casey*

10

acknowledges, abortion is a "unique act." 505 U.S. at 852. It is different from the privacy cases on which the *Roe* Court purportedly relied[3] because abortion, unlike other privacy rights, ends the life of another human being. And contrary to *Roe*'s unsupported assertion, there is no doubt that the fetus is a human life—not mere tissue, not "potential life," and not "the product of conception." The *Roe* Court's failure to recognize this biological fact, a wrong turn that it made with no record and without the benefit of the adversarial process,[4] led it to invent a right to extinguish another life based on a line of victimless privacy cases. Given that the decision whether to carry a fetal human life to term is *sui generis*, these cases are inapposite and have caused courts to give short shrift to the State's profound interests in maternal health and the protection of fetal human life.

These are just some of the reasons that *Roe* and *Casey* should be overturned and why regulation of abortion should be returned to the States, where the people resolve such weighty questions through their elected representatives. *See Thornburgh,* 476 U.S. at 787 (White, J., dissenting) ("But decisions that find in the

---

[3] *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Skinner v. Oklahoma*, 316 U.S. 535 (1942); *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Loving v. Virginia*, 388 U.S. 1 (1967); *Eisenstadt v. Baird*, 405 U.S. 438 (1972).

[4] *See* Brief of State of Connecticut, Amicus Curiae, in Support of Petitions for Rehearing Filed by the States of Georgia and Texas, No. 70-18, *Roe v. Wade*, and No. 70-40, *Doe v. Bolton*, 1973 WL 159525 at *2-3 (U.S. Feb. 15, 1973) (seeking rehearing on the grounds that (1) Connecticut's "case (No. 72-730) is believed to be the only one involving the constitutional issue of abortion wherein an evidentiary record has been made," (2) "The evidence in the Connecticut case demonstrates that an unborn child is an alive, separate and distinct human being from the time the child is conceived," and (3) "This evidence was wholly uncontradicted.").

Constitution principles or values that cannot fairly be read into that document usurp the people's authority, for such decisions represent choices that the people have never made and that they cannot disavow through corrective legislation."); *Casey*, 505 U.S. at 979 (Scalia, J., dissenting) ("The permissibility of abortion, and the limitations upon it, are to be resolved like most important questions in our democracy: by citizens trying to persuade one another and then voting."). States may (and do) reach different conclusions on these difficult questions, but that is where the authority lies under the Constitution as properly interpreted.

For now, though, this Court is bound by *Roe* and *Casey*, and these cases require that Plaintiffs' motion for a preliminary injunction be granted with respect to the Act's ban on pre-viability abortions.

### III. Plaintiffs' Standing To Raise The Rights Of Third Parties

In addition to challenging *Roe* and its progeny, Attorney General Marshall also intends to challenge precedents providing uniquely relaxed standing rules in the area of abortion. In *Singleton v. Wulff*, 428 U.S. 106, 118 (1976), a plurality of the Supreme Court fashioned a blanket rule allowing third-party standing in abortion cases. Unlike any other area of the law, this rule allows abortion clinics and abortion doctors to assert constitutional claims (the purported right to an abortion) that do not belong to them.

When it comes to standing, as with many issues related to abortion, "there is constitutional law and then there is the aberration of constitutional law relating to abortion." *West Alabama Women's Center v. Williamson*, 900 F.3d 1310, 1314 (11th Cir. 2018). Any assumption of a close connection between women and abortionists that might support an inference of commonality of interests is unproven at best. The Supreme Court's "precedents encourage abortion providers to sue—and our cases then relieve them of any obligation to prove what burdens women actually face." *Whole Women's Health v. Hellerstedt*, 136 S. Ct. 2292, 2323 (2016) (Thomas, J., dissenting). "There should be no surer sign that our jurisprudence has gone off the rails than this: After creating a constitutional right to abortion because it 'involve[s] the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy,' *Casey*, [505 U.S.] at 851 (majority opinion), the Court has created special rules that cede its enforcement to others." *Id.* Those abortion-specific rulings should be overruled.

Respectfully submitted,

Steve Marshall
  *Attorney General*

*s/* Edmund G. LaCour Jr.
Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*
James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*
Brad A. Chynoweth (ASB-0030-S63K)
  *Assistant Attorney General*

Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
elacour@ago.state.al.us
jimdavis@ago.state.al.us
bchynoweth@ago.state.al.us

***Counsel for Attorney General Steve Marshall***

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of August, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a copy to all counsel of record.

*s/* Edmund G. LaCour Jr.
Counsel for Attorney General Steve Marshall