**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| YASHICA ROBINSON, M.D., et al., | |
| Plaintiffs, | |
| v. | CIVIL ACTION |
| STEVEN MARSHALL, in his official capacity as Alabama Attorney General, et al., | Case No. 2:19-cv-365-MHT-JTA |
| Defendants. | |

## PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs Yashica Robinson, M.D., Alabama Women's Center, Reproductive Health Services, and West Alabama Women's Center, on behalf of themselves and their patients, their clinic administrators, physicians, and staff, hereby respectfully move this Court for an emergency temporary restraining order ("TRO") pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure, blocking enforcement of the State Public Health Officer's March 27, 2020 "Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19" against pre-viability abortions.

**Immediate injunctive relief is necessary to prevent imminent and irreparable harm: If this Court does not enter an injunction by 8:00 p.m. today (March 30, 2020), Plaintiffs will be forced to start canceling the more than twenty abortions scheduled for tomorrow alone (March 31, 2020), including at least one patient who will be pushed past the legal limit for abortion in Alabama if she does not obtain an abortion *this week*.** *See* Decl. of Yashica Robinson, MD. in Support of Pls.' Mot. for a TRO and Prelim. Inj., attached hereto as

Ex. 1, ¶ 7. Plaintiffs have additional patients scheduled for the remainder of this week, and absent emergency relief from this Court, they will ultimately be forced to cancel and turn away hundreds of additional patients. *Id.* at ¶¶ 7–8, 55; *see also* Decl. of Gloria Gray in Support of Pls.' Mot. for a TRO and Prelim. Inj., attached hereto as Ex. 2, ¶¶ 17–20; Decl. of Jane Doe in Support of Pls.' Mot. for a TRO and Prelim. Inj., attached hereto as Ex. 3, ¶¶ 10–17.

Plaintiffs also seek a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, blocking enforcement of the March 27 Order, to protect current and future patients from imminent and irreparable harm to their health, safety, and constitutional right to decide whether and when to bear a child.

The issuance of a temporary restraining order without a hearing and without notice to Defendants or providing them an opportunity to respond is warranted. **First,** Plaintiffs have set forth specific facts in sworn declarations,[1] attached hereto, showing that immediate and irreparable injury, loss or damage will result to Plaintiffs' patients before Defendants can be heard in opposition: Specifically, that at least one of Plaintiffs' patients scheduled for an abortion tomorrow will be permanently deprived of their ability to obtain a legal abortion in Alabama, and, in the midst of a global pandemic, either forced to carry their pregnancy to term against their will or forced to attempt to travel to another state in order to exercise their constitutional right to abortion. *See* Fed. R. Civ. P. 65(b)(1)(A); *see also Cooper v. City of Dothan*, No. 1:15-

---

[1] Although Federal Rule of Civil Procedure 65(b)(1) requires the request for an *ex parte* TRO set forth specific facts in "an affidavit or verified complaint," a sworn declaration pursuant to 28 U.S.C. § 1746 is considered equivalent to an affidavit under federal law. *See* 28 U.S.C. § 1746; *accord Spencer v. Donohue*, No. 19-12346, 2019 WL 5680810, at *2 (E.D. Mich. Aug. 30, 2019), *report and recommendation adopted*, No. 19-12346, 2019 WL 4254085 (E.D. Mich. Sept. 9, 2019) ("Such a verification [for an ex parte TRO pursuant to R. 65(b)] must comply with 28 U.S.C. § 1746, which authorizes litigants to provide unsworn declarations in lieu of affidavits under oath, providing in pertinent part that such unsworn declaration or verification be subscribed in writing as true under penalty of perjury, dated, and in substantially the following form: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature).")

CV-425-WKW, 2015 WL 10013003, at *1–2 (M.D. Ala. June 18, 2015) (granting *ex parte* TRO

in case challenging undifferentiated bond amounts for misdemeanor offenses resulting in

minimum 3-day jail sentence); *Ellis v. Jackson Nat'l Life Ins. Co..* No. 2:11-CV-1064-WKW,

2011 WL 6300608, at *2 (M.D. Ala. Dec. 15, 2011) (granting *ex parte* TRO to prevent

distribution of proceeds of life insurance policy before dispute over beneficiaries could be

resolved).

        **Second**, Plaintiffs have made multiple attempts to contact counsel for the Alabama

Department of Public Health ("ADPH") and the Attorney General by phone and email—on

March 27, 28, and 29—to resolve this matter without litigation, and have expressly informed

Defendant that Plaintiffs would be seeking emergency relief if the matter could not otherwise be

resolved. These efforts to resolve the matter have been unsuccessful. *See* Decl. of Randall

Marshall in Support of Pls.' Mot. for a TRO and Prelim. Inj., attached hereto as Ex. 4, ¶¶ 2–15.

This is more than sufficient to meet Plaintiffs' obligations to give notice and, given the threat of

imminent and irreparable harm, no further notice should be required. *See* Fed. R. Civ. P.

65(b)(1)(B); *see also Jackson Nat'l Life Ins. Co.*, 2011 WL 6300608 at *1–2 (finding single

phone call to nonmovant's counsel sufficient to grant *ex parte* TRO).

        As detailed more fully in the accompanying Memorandum of Law, Plaintiffs satisfy the

remaining requirements for a TRO and subsequent preliminary injunctive relief.  *See*

*McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).  Because the application

of the March 27 Order to previability abortions contravenes binding Supreme Court precedent

and because forcing pregnant people to remain pregnant against their will does not maintain

social distancing or otherwise preserve health care resources in the midst of the COVID-19

crisis, Plaintiffs have established a substantial likelihood of success on the merits of their claim

that the March 27 Order violates Plaintiffs' patients' right to privacy under the Fourteenth Amendment to the U.S. Constitution.  Further, Plaintiffs have established that enforcement of the Ban will inflict irreparable constitutional, medical, emotional, psychological, and other harms on Plaintiffs' patients for which there is no adequate remedy at law.  The balance of equities likewise weighs firmly in Plaintiffs' favor and the relief Plaintiffs have requested will further the public interest.

Finally, Plaintiffs respectfully request this Court exercise its discretion to waive the Federal Rule of Civil Procedure 65(c) security requirement.  *See BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005).

Accordingly, and for the reasons set forth in the accompanying Memorandum of Law, Plaintiffs respectfully request this Court:

(1) Issue a TRO without notice or hearing enjoining Defendants from enforcing the March 27 Order against previability abortions;

(2) Issue a preliminary injunction enjoining Defendants from enforcing the March 27 Order against previability abortions prior to the expiration of the TRO.

If the Court wishes to schedule a hearing prior to issuing a TRO, Plaintiffs respectfully request that the Court schedule the hearing as soon as possible. Plaintiffs' counsel will make themselves available for a telephonic or video conference hearing at the Court's earliest convenience.

Dated: March 30, 2020

Respectfully submitted,

/s/Alexa Kolbi-Molinas
Alexa Kolbi-Molinas*
New York State Bar No. 4477519

4

Meagan Burrows*
New York State Bar No. 5341904
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
akolbi-molinas@aclu.org
mburrows@aclu.org
(212) 519-7845

Randall C. Marshall
ASB-3023-A56M
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-1747
rmarshall@aclualabama.org
*Attorneys for Plaintiffs Yashica Robinson, M.D.,
Alabama Women's Center, Reproductive Health
Services, and West Alabama Women's Center*

*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2020, I electronically filed the foregoing with the Clerk of Court for the United States District Court for the Middle District of Alabama using the CM/ECF system, thereby serving all counsel of record, and served the State Public Health Officer, Proposed Defendant Scott Harris, by and through his attorneys through the email addresses below:

- Brian Hale, brian.hale@adph.state.al.us

- Dana Billingsly, dana.billingsley@adph.state.al.us

/s/ Randall Marshall
Randall Marshall

*Attorney for Plaintiffs Yashica Robinson, M.D., Alabama Women's Center, Reproductive Health Services, and West Alabama Women's Center*

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

|  |  |
|---|---|
| YASHICA ROBINSON, M.D., et al., | |
| Plaintiffs, | CIVIL ACTION |
| v. | Case No. 2:19-cv-365-MHT-JTA |
| STEVEN MARSHALL, et al., | |
| Defendants. | |

**DECLARATION OF YASHICA ROBINSON, M.D., IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY**
**INJUNCTION**

I, Yashica Robinson, M.D., declare and state as follows:

1.      I am a board-certified obstetrician-gynecologist (OB/GYN) with more than a decade of experience providing comprehensive reproductive health care to women, including abortion. I graduated from Talladega College, in Alabama, in 1998; from Morehouse School of Medicine, in Atlanta, in 2004; and completed my residency in OB/GYN at the University Of Alabama School Of Medicine, Birmingham, in 2008.

2.      Over the past eleven years, I have worked in private practice as an OB/GYN and have also provided abortion services to women in Alabama at a number of different abortion clinics throughout the state. As a National Health Service Corps Scholar, I committed to spending at least four years of my practice in a health professional shortage area—an area or population designated by the federal government with a shortage of primary care medical, dental, or mental and behavioral health providers. I served that commitment in Opelika, and continued

to practice as an OB/GYN in that community until 2015. Throughout this time, I also provided abortions in Huntsville, Birmingham, and Mobile.

3.     I opened my private OB/GYN practice in Huntsville in 2013, and from 2013-15, I maintained private OB/GYN practices in both Opelika and Huntsville. Today, I split my time between my private practice in Huntsville, where I provide a spectrum of gynecological and obstetric care (except for abortion), and the Alabama Women's Center (AWC), the sole abortion clinic in Huntsville, where I serve as the Medical Director and provide abortion care.

4.     AWC has provided safe and legal abortions in Huntsville, Alabama, for nearly two decades. AWC sues on behalf of its patients, clinic administrator, physicians, and staff.

5.     I submit this declaration in support of Plaintiffs' motion for a temporary restraining order followed by a preliminary injunction, which seeks to enjoin the application of Alabama State Health Officer Scott Harris's March 27, 2020 Order (the "March 27 Order") to prohibit pre-viability abortions. I am familiar with the March 27 Order. Although I read its terms to permit medication and procedural (also known as surgical) abortions, I understand that the Alabama Department of Public Health (which licenses AWC), and the Attorney General (who could prosecute me for each violation of the Order) take the position that some—perhaps most— pre-viability abortions are prohibited. Therefore, absent an order from this Court, I cannot risk performing abortions, except in extremely narrow circumstances.

6.     The facts I state here are based on my personal experience, information obtained in the course of my duties at AWC and in my private OB/GYN practice, and personal knowledge that I have acquired through my service at AWC and at my private OB/GYN practice. The opinions in this declaration are my expert opinions as an ob-gyn and abortion provider. My expert opinions are based on my education, training, professional experience, and review of

relevant medical literature. All of my opinions in this declaration are expressed to a reasonable degree of medical certainty. If called and sworn as a witness, I could and would testify competently thereto.

7.     Absent an order from this court by Monday, March 30, 2020 at 8:00 P.M. preventing  the March 27 Order from being applied to prohibit performing pre-viability abortions in Alabama, I will be forced to cancel the appointments of 21 abortion patients currently scheduled for Tuesday, March 31.  Three of these patients are already nearing or on the verge of reaching the limit for obtaining an abortion in Alabama right now (18.5 weeks LMP, 20.3 weeks LMP and 21.4 weeks LMP) and, if forced to delay care until April 18, will no longer be able to obtain an abortion at all. Indeed, the patient who will be 21.4 weeks LMP on Tuesday, and will lose her ability to obtain a legal abortion in Alabama altogether unless she is seen on Thursday at the latest. Two more of these patients (one at 15.6 weeks and the other at 16.4 weeks), will be nearing the limit by April 18; if the Order is extended, or they face logistical barriers (scheduling, transit, finances) after April 18 that further delays their access to care, they may also be pushed past the legal limit.

8.     Moreover, between now and April 17, 2020 5:00 pm (the date the Order is set to expire, if not extended), AWC has 45 patients currently scheduled. And this is a drastic underestimate of the number of patients AWC will—if it is able—actually end up caring for between now and April 17, as our schedule fills up quickly as the week progresses. All of these patients—and the many other patients who will be unable to schedule any appointment until at least April 18, if not for much longer—will be seriously and irreparably harmed as a result.

**Legal Abortion in the United States and Alabama & AWC's Provision of Abortion Care**

9.     Legal abortion is one of the safest medical procedures in the United States and is substantially safer than continuing a pregnancy through to childbirth.[1] Complications from abortion are rare, and when they occur they can usually be managed in an outpatient clinic setting, either at the time of the abortion or in a follow-up visit. Major complications—defined as complications requiring hospital admission, surgery, or blood transfusion—occur in less than one-quarter of one percent (0.23%) of all abortion cases:  in 0.31% of medication abortion cases, in 0.16% of first-trimester in-clinic abortion cases, and in 0.41% of in-clinic cases in the second trimester or later.[2] Abortion-related emergency room visits constitute just 0.01% of all emergency room visits in the United States.[3] Abortion is also extremely common; approximately one in four women in this country will have an abortion by age forty-five.[4]

10.     There are two main methods of abortion: medication abortion and surgical abortion. Both methods are safe, effective means to terminating a pregnancy.[5] Medication abortion involves a combination of two pills: mifepristone and misoprostol.[6] The patient takes the mifepristone in the clinic and then, typically twenty-four to forty-eight hours later, takes the misoprostol at a location of their choosing, most often at their home, after which they expel the contents of the uterus in a manner similar to a miscarriage. Medication abortion is neither a

---

[1] Nat'l Acads. of Scis. Eng'g & Med., The Safety & Quality of Abortion Care in the United States 77–78, 162–63 (2018).

[2] Ushma Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecol. 175 (2015).

[3] Ushma Upadhyay, et al., *Abortion-related Emergency Room Visits in the United States: An Analysis of a National Emergency Room Sample*, 16:88BMC Med. 1, 1 (2018).

[4] *See* Guttmacher Inst., Abortion Is a Common Experience for U.S. Women, Despite Dramatic Declines in Rates (Oct. 19, 2017), https://www.guttmacher.org/news-release/2017/abortion-common-experience-us-women-despite-dramatic-declines-rates.

[5] Luu Doan Ireland et al., *Medical Compared With Surgical Abortion for Effective Pregnancy Termination in the First Trimester*, 126 Obstetrics & Gynecol. 22, 22 (2015).

[6] Nat'l Acads., *supra* note 1, at 51.

4

"surgery" nor a "procedure." In Alabama, medication abortion is available up to 70 days or 10.0 weeks, as measured from a woman's last menstrual period ("LMP").

11.     Surgical abortion, despite its name, is not what is commonly understood to be "surgery"—it involves no incision and no need for general anesthesia. In the first trimester, surgical abortions are generally performed using suction curettage technique, which involves using a curette connected to a suction apparatus to gently empty the contents of the uterus. This procedure typically takes five to ten minutes. Starting around 15 weeks LMP, abortions are generally performed using a method called the dilation and evacuation ("D&E"), in which clinicians dilate the cervix further and use instruments to empty the uterus. In Alabama, abortions may not be performed at and after 22.0 weeks LMP (the law uses post-fertilization dating, which is 20 weeks), except in extremely narrow circumstances.

12.     For some patients, medication abortion is contraindicated, and/or there are factors that counsel in favor of a surgical abortion, including patients with medical conditions that make surgical abortion a safer and/or more appropriate course.[7]

13.     At AWC, we provide medication abortions up to 10 weeks LMP and surgical abortions up to 21.6 weeks LMP. We are the only provider in the state that provides abortion after 14 weeks LMP.

14.     In 2019 AWC performed 1939 abortions. Of those, 732 were medication abortion and 1207 were surgical abortions.  Of those 1207 surgical abortions, 412 were performed on patients at and after 13 weeks LMP, meaning that none of those patients would have been eligible for medication abortion.

---

[7] Nat'l Acads., *supra* note 1, at 51–52.

15.     In January and February 2020, AWC performed 360 abortions, 147 of which were medication abortions and 213 of which were surgical abortions. Of those 213 surgical abortions, 77 were performed on patients at and after 13 weeks LMP, meaning that none of those patients would have been eligible for medication abortion.

16.     In my experience, individuals seek abortion for a multitude of complicated and personal reasons. Indeed, a majority of women having abortions in the United States already have at least one child.[8] Some patients have abortions because they conclude that it is not the right time to become a parent or have additional children, they desire to pursue their education or career, or they lack the necessary financial resources or a sufficient level of partner or familial support or stability. Other patients seek abortions because continuing with the pregnancy could pose a greater risk to their health, especially if their past pregnancies have been high-risk.[9]

17.     While our patients generally seek abortion as soon as they are able, many face logistical obstacles that can delay access to abortion care. Some patients may not discover they are pregnant until later in their pregnancies, others may experience difficulties navigating the medical system, including finding a provider and scheduling an appointment. Many of my patients are also struggling financially; indeed, approximately 60% are on Medicaid, which (except in very limited circumstances) does not cover the cost of abortion.[10] Patients need to gather the resources to pay for the abortion and related costs, figure out transportation to a clinic, arrange for time off of work (which is often unpaid, as many patients lack paid time off or sick

---

[8] Guttmacher Inst., *Induced Abortions in the United States* 1 (Sept. 2018), https://www.guttmacher.org/sites/default/files/factsheet/fb_induced_abortion.pdf; *see also* Jenna Jerman et al. , *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008*, Guttmacher Inst.  6, 7 (May 2016), https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf.

[9] M. Antonia Biggs et al., *Understanding Why Women Seek Abortions in the US*, 13:29 BMC Women's Health 1, 7 (2013).

[10] Alabama prohibits public insurance, including Medicaid, and insurance purchased on the state health exchange from covering abortion services except in the very limited circumstances where a patient's physical health or life is at risk, or where the pregnancy is a result of rape or incest.

6

leave), and, for the vast majority of women seeking abortions who are mothers already, possibly arrange childcare.[11]

18.     The COVID-19 pandemic has likely only exacerbated all of this. As a result of COVID-19, and associated social distancing measures, patients have been laid off work or faced other work disruptions, placing them in precarious financial situations that may make it even harder to afford an abortion and associated costs, on top of their cost of living. The crisis has also resulted in the closing down of schools in Alabama and has imposed restrictions on childcare facilities,[12] which may make it even harder to arrange child care, and may make it more difficult or risky to access public transportation in order to travel to the clinic.

19.     On top of all this are delays imposed by Alabama abortion restrictions. For example, Alabama law already forces patients to delay their abortions for at least 48-hours after receiving state-mandated counseling and materials, despite the fact that, in my experience, patients rarely take those materials. This means patients who struggle to navigate getting time off of work and coordinate transportation or childcare must do so on two separate occasions. Under Alabama law, our minor patients, unless emancipated, must also obtain either parental consent or a judicial order excusing them of that requirement before they can receive abortion care. For those that choose to involve a parent, negotiating a time when a parent (who may have work and other obligations) can accompany them to the clinic may delay them from accessing care. And for those who choose not to involve a parent, navigating the judicial system in order to obtain the

---

[11] Jerman et al., *supra* note 8 at 8–10; Sarah E. Baum et al., *Women's Experience Obtaining Abortion Care in Texas After Implementation of Restrictive Abortion Laws: A Qualitative Study*, 11 PLoS One 1, 7–8, 11 (2016); Lawrence B. Finer et al. , *Timing of Steps and Reasons for Delays in Obtaining Abortions in the United States*, 74 Contraception 334, 335 (2006).

[12] *See* Associated Press, *Alabama Infections Top 120*, U.S. News (Mar. 21, 2020 12:22 PM), https://www.usnews.com/news/best-states/alabama/articles/2020-03-21/alabama-infections-top-120-state-backs-off-daycare-closings.

required order waiving Alabama's consent requirement will likewise force them to delay their abortion.

20.    Although abortion is always a very safe medical procedure, the health risks associated with it increase with gestational age.[13] As ACOG and other well-respected medical professional organizations have observed, abortion "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[14]

21.    Moreover, although so much is unknown about COVID-19, including whether it can complicate pregnancy, ACOG has warned that pregnant women should be considered an "at-risk population for COVID-19" because pregnant people may be exposed to additional health risks from the virus.[15]

**AWC's Efforts to Prevent COVID-19 Spread and Conserve Needed Resources**

22.    In response to the COVID-19 pandemic, AWC is following Centers for Disease Control (CDC) and National Abortion Federation (NAF) safety guidelines, and has taken extensive steps to help reduce and prevent the transmission of the virus and ensure that our public health system has the resources needed to respond to the public health crisis, while continuing to provide time-sensitive reproductive health care like abortion.

23.    Approximately two weeks ago, we changed the way we are scheduling patients at AWC. While we used to do wave scheduling—scheduling several patients' appointments for

---

[13] Nat'l Acads., *supra* note 1, at 77–78, 162–63.

[14] ACOG et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

[15] ACOG, *Practice Advisory - Novel Coronavirus 2019 (COVID-19)* (last updated Mar. 13, 2020), https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/novel-coronavirus-2019; *see also* Ctrs. for Disease Control & Prevention, *Information for Healthcare Providers: COVID-19 and Pregnant Women* (last updated Mar. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq html.

each hour slot, and permitting them to arrive in waves—we have altered our scheduling practices to ensure that we are able to comply with social distancing guidance and ensure that patients are appropriately spaced at least 6 feet apart in our clinic. At this time, we are also no longer permitting patients to bring guests into the building, with only very limited exceptions for essential guests (i.e., a parent for a minor and a translator).

24.     We have also instituted protocols to screen for COVID-19 when patients arrive. We are taking the temperature of all clinic staff before they clock in in the morning, as well as everyone else who comes in our doors. We have a controlled access facility that requires patients to buzz in for entry. We have posted a sign on the front door that informs patients that their temperature will be checked upon presentation for care. The sign also informs patients of the common symptoms associated with COVID-19 (fever, cough, shortness of breath, sore throat, or flu-like symptoms) and requests that if they have been experiencing those symptoms, they not enter the building and instead call the clinic for instructions. Our sign also alerts patients that if they have recently traveled internationally or by air within the last 14 days, or have been in close proximity with anyone with a confirmed or presumed positive case of COVID-19, that they should call us. If, after reading the sign, a patient requests entry through buzzing in, our nurse has a stand set up at the front to take their temperature.

25.     Once the patient enters the clinic, they are given hand sanitizer and sent to our waiting area, where we are making sure to separate our patients so they are all at least 6 feet apart. We have removed all the magazines, books, and other objects from both the waiting rooms and exam rooms. We are asking all patients to make sure they wash their hands and sanitize often, cover any cough or sneeze, and immediately discard used tissues. As is our standard

practice, we also disinfecting the waiting room, exam rooms and recovery rooms, and all frequently touched surfaces, on a continuous basis throughout the day.

26.     While we are working extremely hard to ensure we comply with CDC, ACOG, NAF and Alabama safety guidelines surrounding COVID-19, we could do even more were our hands not tied by Alabama's restrictions on abortion care.

27.     For example, Alabama law mandates that we provide most patients with some of the state-mandated counseling, in-person, at least 48-hours prior to their abortion. This forces patients to leave their home to travel to the clinic for an additional visit, and interact with more people for longer periods of time, thereby increasing their risk of exposure to COVID-19. State law also requires that we perform an in-person physical exam, including an ultrasound and laboratory testing, before every medication abortion patient. This physical exam is not medically necessary in all cases.

28.     But for these medically unnecessary requirements I would be able to complete counseling visits and provide abortion care to some medication abortion patients via telemedicine without them having to visit the clinic.  In other words, these restrictions on my ability to exercise my medical judgment and provide care prevent me from being able to further limit the number of patients in the clinic at any given time, and reduce the amount of time any given patient has to spend outside their home during COVID-19.

29.     If Alabama really cared about reducing the spread and transmission of COVID-19, it would lift the ban on abortion providers' use of telemedicine to complete state-mandated counseling, and lift the in-person physical exam requirement, and permit us to use our best clinical judgment to ensure that patients are able to minimize time spent outside their homes during this public health crisis.

30.     Neither medication nor surgical abortion requires extensive amounts of PPE. For the laboratory exam and the state-mandated ultrasound that must be performed before every abortion, we use only non-sterile gloves. To hand the patient pills for a medication abortion requires no PPE at all. For procedural abortions, the physician uses only sterile gloves during the procedure, a gown, a surgical mask and reusable eyewear, and the assistant uses only a surgical mask, gloves, and reusable eyewear.

31.     We do not use N-95 masks to perform abortions, which I understand to be the PPE item is that most effective for preventing against transmission of COVID-19 and is currently in short supply. Likewise, all of our procedures are performed in our own outpatient facilities, so we are not using any hospital resources that may be needed for COVID-19 response; no hospital staff or supplies, no hospital beds, let alone intensive care unit (ICU) beds, and no ventilators.

32.     Caring for pregnant patients who are continuing their pregnancies requires significantly more patient interaction with the healthcare system and significantly more PPE. A typical pregnancy is generally forty weeks in duration. Even an uncomplicated pregnancy requires a minimum of one prenatal appointment per month, along with additional appointments to complete labs and ultrasounds. Each separate encounter with a health care provider requires the use of gloves, a face mask, and other forms of PPE. For a complicated or high risk pregnancy, the number of visits can double; indeed, starting at 26 weeks LMP, patients with high risk pregnancies are often coming in twice a week for routine monitoring visits, which may also involve an ultrasound and non-stress test (NST) evaluations. During each of these visits, the clinician will be wearing gloves *at a minimum*; with COVID-19, many may also be wearing masks for both their protection and the protection of the patient.

11

33.     An abortion, by contrast, requires only a maximum of 2-3 visits, and could require even less but for Alabama's restrictions on the use of telemedicine and mandatory in-person physical exam requirement.

34.     Furthermore, every time a pregnant person presents to the hospital for evaluation prior to labor, which could happen multiple times, they will be interacting with more people and increasing the hospital's use of PPE. An actual birth—attended by multiple medical care providers, including, but not limited to, nursery personnel, a labor and delivery nurse, an OB tech, a physician, and an anesthesiologist—could involve anywhere from seven to ten gowns, masks, and sterile gloves. For an uncomplicated pregnancy, the patient is going to remain in the hospital at least 24-48 hours in the state of Alabama, for a c-section up to 72-96 hours, and for a more complicated pregnancy, potentially even longer. Again, this means that the patient will require a use of a hospital bed or room, and will require the time and attention of hospital staff, who will have to use PPE during interactions with the patient.

35.     In sum, forcing a patient to carry an unwanted pregnancy to term will not only increase the risks to their health (associated with pregnancy and contracting COVID-19) and well-being, but will also increase the duration and frequency of their interactions with medical clinicians and the amount of PPE expended on their care, which may inhibit public health officials' ability to further reduce transmission of COVID-19 and the current strain on the medical system.

**The March 27, 2020 Order and Threatened Enforcement**

36.     On March 19, 2020, I became aware that the Alabama Department of Public Health (ADPH) issued an order that required the postponement of all "elective medical procedures" effective immediately.

12

37.     I considered the implications of the order on the care I offer both at my private OBGYN practice and at AWC. While I cancelled surgical cases at my OBGYN practice that I considered to be elective and could be postponed, I did not cancel my appointments with my pregnant patients, who, even early in their pregnancies, must be seen at a minimum of once every month. Likewise, I did not cancel any abortion procedures scheduled at AWC because, in my medical opinion, abortion is not an "elective" procedure and I was advised by my attorneys that the ADPH agreed that abortions were not covered by the March 19, 2020 order.

38.     We have a consistent and organized presence of protesters outside our clinic, even during the COVID-19 crisis, often more than 10 at a time. On March 23, we received a call from an anti-abortion protestor demanding to know why AWC was still open and providing care. Shortly thereafter, we received a call from the ADPH, requesting that AWC send them any policies put in place in response to the COVID-19 pandemic by the end of day. In response, we sent ADPH a copy of the patient notice sign posted outside our door, explained that, in response to the coronavirus pandemic, we are following CDC and NAF safety guidelines, and described the stringent precautions to keep our patients and staff safe and healthy. We received no response.

39.     I have also seen social media postings from March 23 and 24, attached hereto as Attachments 1 and 2, from an anti-abortion group known as "Abolitionists of Alabama," encouraging their followers to try reporting us for continued provision of care, and to call the Governor and Attorney General (AG) to issue a complaint and demand that they shut us down.

40.     On March 27, 2020, I discovered that State Health Officer Scott Harris had issued another order on behalf of the Alabama State Board of Health, mandating the postponement of "all dental, medical and surgical procedures . . . until further notice," except those procedures

13

"necessary to treat an emergency medical condition," defined by the Order, and those "necessary to avoid serious harm from an underlying condition or disease, or necessary as part of a patient's ongoing and active treatment."

41.     In my professional medical opinion, pregnancy is an "underlying condition" and performing an abortion on a pregnant patient who wishes to terminate the pregnancy is "necessary in order to avoid serious harm" to that patient that would arise if the patient were forced to remain pregnant against their will.

42.     I understand that the March 27 Order went into effect on March 28 at 5:00 pm, and is set to remain in full force and effect until at least 5:00 P.M. on April 17, 2020. However, I also understand that, by its own terms, the order contemplates that it may be extended past the April 17 date. As a healthcare provider, it is my opinion that it is extremely unlikely that the COVID-19 crisis will be resolved in three weeks from now. In fact, I don't believe we have even hit the peak of the crisis yet; the numbers of COVID-19 cases across the country are increasing day by day, and many states are just beginning to take the crisis seriously and institute responsive measures.

43.     Since the March 27 order was issued, my attorneys have informed me that they have reached out to ADPH and the AG to confirm whether they interpret the March 27 order to prohibit the continued provision of abortion care. It is my understanding that the only guidance we have received is that the Attorney General has indicated that at least some pre-viability abortions are prohibited under the March 27 Order. I also understand that the AG has issued enforcement guidance for the order, which makes clear that violators may be charged with a criminal misdemeanor and subject to stiff financial penalties.

**Harms Caused by the Order and the ADPH and AG's Refusal to Clarify its Application**

44.     Based on the refusal of ADPH and the AG to provide any clarification about their interpretation of the March 27 Order other than that they think it prohibits at least some pre-viability abortions, and because of the risks not only of criminal prosecution but to my medical license and AWC's license, I cannot take the risk of continuing to perform most abortions. The ADPH and the AG will not even confirm whether they interpret medication abortion to be permissible under the order, even though it is not considered by medical professionals, including abortion providers, to be a "medical or surgical procedure." And even if the ADPH and/or the AG consider some abortions to be permissible under the Order, I cannot know for certain what standards they will use to determine whether and when a particular abortion falls into a "permissible" category, and whether those standards will align with my best clinical judgment as a medical professional. As a result, I am deeply concerned about performing abortions even in what I consider to be emergent circumstances.

45.     Indeed, based on my experience providing abortion care for over a decade in an extremely hostile environment, I legitimately fear that the views of law enforcement or ADPH will not align with my clinical judgment. I and the rest of my staff at AWC are under intense scrutiny all the time. Since I have been practicing, the state legislature has waged an unrelenting campaign against abortion, enacting new laws aimed at restricting access to abortion that make it increasingly more difficult for Alabama abortion clinics to keep their doors open and for patients to access care. We have to spend significant amounts of time making sure that we are in compliance with every new law, rule, and regulation governing our practice, so as to avoid being shut down, and thus forced to stop providing compassionate reproductive health care to our patients. In light of my experience providing abortion care in Alabama, navigating laws and regulations governing my practice, and interfacing with the ADPH and AG, I am deeply

concerned that if I do not interpret the Order extremely narrowly, I will be putting myself and my staff at AWC in jeopardy. With criminal penalties and my livelihood on the line, I can't take that risk. Nor can I in good conscience impose that risk on the other physician who provides care at AWC and the rest of my staff at the clinic.

**The Impact of the March 27 Order on My Patients**

46.     Patients delayed in accessing abortion as a result of the Order will suffer increased risks to their physical health from remaining pregnant for longer against their will,[16] including possible increased risk of contracting COVID-19.[17] These pregnant patients may also suffer heightened emotional distress or anxiety as a result of this public health crisis, which has pushed hospitals and the medical professional to a breaking point; they may be concerned that if they face issues with their pregnancy, a medical facility or hospital may struggle to accommodate them and their partners or support people, or that (by virtue of seeking medical care) they may be exposed to COVID-19, which they may be more susceptible to because they are pregnant.

47.     Assuming some of these patients are still able to obtain abortions after the Order expires, or because they have managed to travel to another state, many will face increased financial and health costs related to abortion, as they will have been pushed later into pregnancy, when abortion is more expensive, and the procedure is more complicated, and thus carries with it greater risks. Pushing patients to obtain care later in their pregnancies will not only risk harm to their physical and mental health and financial well-being; it will also risk exacerbating the COVID-19 crisis by increasing duration and frequency of patient interactions with the outside world and the use of PPE.  For example, many of the medication abortion patients will no longer

---

[16] Nat'l Acads., *supra* note 1, at 77–78.

[17] Ctrs. for Disease Control & Prevention, *supra* note 15.

be eligible for medication abortion, and will instead require surgical abortions instead, necessitating correspondingly greater amounts of clinician-patient contact and PPE.

48.     On top of all that, forcing all of the patients still able to legally obtain an abortion in Alabama to attempt to obtain them at the same time—after the Order expires and before they reach the point in pregnancy at which abortion is no longer available in the state—will create a crush of demand that health centers are unlikely to be able to meet. As the only clinic in the state that provides care after 14 weeks LMP, AWC will be especially hard-hit if patients are forced to delay their abortion care later into the second-trimester of their pregnancies. I am concerned that we may not have the capacity to care for the number of patients who will need our services if, as a result of the delay imposed by the Order, AWC becomes the only clinic in the state where they can come for care.

49.     While we would of course do our utmost to try to meet patient demands on our services, we do not have the ability to drastically expand our provision of care. Besides myself, AWC employs only one other physician; because of zoning rules, we cannot provide care on weekends, so would have to find a way to see as many patients as we comfortably schedule (and as we could physically safely care for) between 8:00 am and 5:00 pm during the weekdays (which is the only time frame during which we are able to provide, also due to zoning rules). Alabama's mandatory two-trip and 48-hour waiting period requirements, as well as its ban on the use of telemedicine for abortion, will only increase our scheduling difficulties, and the risk that at least some people forced to delay as a result of the Order will be unable to obtain abortions in the Alabama at all.

50.     Other patients, rather than wait for the Order to expire—or because they simply cannot afford to wait, given where they are at in their pregnancies—may attempt to travel

hundreds of miles out of state to try to obtain an abortion. This requires them to overcome all of the logistical barriers associated with accessing abortion discussed above, including finding and paying for transportation and (if needed) childcare, and trying to obtain time off work (which may only be unpaid, forcing them to forgo wages, and/or putting them at risk of losing their job). And, as explained above, all of this may be more difficult and costly in the midst of the current COVID-crisis, given the limitations it has placed on public transit and childcare options.

51.     Moreover, given the logistical hurdles of traveling out-of-state, particularly during the COVID-19 pandemic, these patients are also likely to obtain abortions later than they would have had they accessed care from AWC or other provides, which—as noted above—entails greater risks and costs than an earlier procedure. And efforts to travel are also likely to expose both patients and other people to additional risk of contagion, at a time when states, including Alabama, have urged their citizens to reduce travel and stay at home as much as possible in order to reduce the rate of transmission of COVID-19.

52.     For other patients, travel to another state will simply not be possible, particularly during the pandemic. Most of my patients at AWC are poor or low-income and already struggle mightily to raise the money to afford an abortion, as well as related costs like travel, childcare, etc. And it has forced some of them into even more precarious financial situations as a result of layoffs or hour cuts associated with COVID-19 crisis. For example, the other day we treated a patient at AWC who works in the restaurant industry, and relayed that her employer had cut down her hours to just one day a week, since the restaurant was now only doing take-out as a result of the pandemic, and could not afford to pay all staff for full-time work. She expressed concern over how she would make ends meet working just one day a week. Patients like these,

who already struggle to afford the costs associated with accessing abortion, will be even less likely to be able to obtain timely care if we are forced to stop providing in Alabama.

53.     Finally, some patients, including those who are unable overcome the logistical and financial barriers associated with accessing care out of state, and those foreclosed from accessing abortion at all given gestational age limits, will be forced to carry to term against their will. As a result, these patients will have to seek out and obtain prenatal care and will eventually go into labor and give birth which, as discussed above, only increases their interactions with the health care system and requires *more* health care resources, not less. Moreover, studies have shown that patients who are denied a wanted abortion (in contrast to those able to obtain abortion care) face serious consequences, including greater likelihood of living in poverty, staying in abusive relationships, and experiencing mental health issues, as well as increased chances of suffering health consequences from continuing a pregnancy.[18]

54.     We know from experience that when patients cannot access the services they need to terminate a pregnancy within the healthcare system, some will find ways to do so outside the healthcare system, not all of which may be safe. I know personally of women who have attempted to self-induce abortion by ingesting drugs or herbs they purchased or read about on the internet. If attempts to self-induce give rise to additional health problems, some of these patients may be forced to seek emergent medical care, thereby increasing their interactions with the outside world and further taxing the medical system as it works to respond to the COVID-19 crisis. In other words, if women end up having to present to the hospital after resorting to potentially dangerous measures to self-induce at home, the medical system will be forced to

---

[18] Advancing New Standards in Reproductive Health, Turnaway Study *(2020)*, https://www.ansirh.org/research/turnaway-study.

expend a lot more resources (human and PPE) on their care than if we had allowed them to obtain a safe abortion within the healthcare system in the first place.

     55.     In sum, if the Order is permitted to be applied to ban pre-viability abortion procedures, forcing us to cancel the appointments we have scheduled through April 17, and to refrain from scheduling any new appointments until at least April 18 (or, if the Order is extended, for an indefinite period of time), it will not only inflict extreme and irreparable harm to our patients, it will also risk exacerbating the COVID-19 crisis, thereby undermining the stated purpose Order itself.

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 30, 2020

/s Yashica Robinson
Yashica Robinson, M.D.

ATTACHMENT 1

< **Replies**


**Kasia da Silva**
There are 10 or more there!!
5h   Like


**Mary Stern Baggett**
**Kasia da Silva** where?
5h   Like


**Kasia da Silva**
The President said no more than 10 people in any gathering.
5h   Like                                     1


**Mary Stern Baggett**
**Kasia da Silva** are they supposed to be closed, legally??
5h   Like


**Kasia da Silva**
I mean at the clinic
5h   Like


**Kasia da Silva**
I would think so Mary. Try reporting them. Most places have stopped all non elective surgery.
3h   Like

ATTACHMENT 2

← Abolitionists of Alabama 🔍

 **Abolitionists of Alabama** ⋯
Mar 24 at 3:16 PM • 🌐

They're still murdering pre-born children here in
Huntsville AL.
Please call the Governor's Office today here in
Alabama as well as the Alabama Attorney
General's Office and issue a complaint. Be
respectful.

The Abortion mill remains open while  churches
and other businesses are forced to close. The
Public Health Department stated the mill was in
violation of the order to that all elected
procedures be put on hold. Make some noise,
maybe a few children will be saved.

1-334-242-7100 Governors Kay Ivey' s Office
1-334-242-7335 the Alabama Attorney
General's office.

Thank you. Please share.

👍 Like          💬 Comment          ↗ Share

😢👍😡 4

📷   Write a comment…        GIF 🙂

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

**NORTHERN DIVISION**

|  |  |
|---|---|
| YASHICA ROBINSON, M.D., et al, | |
| Plaintiffs, | CIVIL ACTION |
| v. | Case No. 2:19-cv-365-MHT-JTA |
| STEVEN MARSHALL, in his official capacity as Alabama Attorney General, et al., | |
| Defendants. | |

**DECLARATION OF GLORIA GRAY IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Gloria Gray, hereby declare and state the following:

1. I am the owner and administrator of the West Alabama Women's Center, Inc. ("WAWC" or the Clinic"), located in Tuscaloosa, Alabama, which I co-founded with Dr. Louis Payne in 1993. WAWC is and always has been the only licensed abortion clinic in Tuscaloosa, and indeed today is one of only three health centers providing abortion care in all of Alabama.  I submit this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction.

*Provision of Abortion Care at WAWC*

2. WAWC generally provides abortion care up to 14 weeks of pregnancy as measured from the first day of a patient's last menstrual period ("lmp").  Prior to the COVID-19 crisis, on one or two days a month we had a doctor who was able to provide care up to 17 weeks of pregnancy, but

because of the crisis that physician was not able to come to the Clinic in March and I do not know when they may be able to do so again.

3. We provide two methods of abortion.  We provide surgical abortions (also known as aspiration or procedural abortion) up to 14 weeks lmp.

4. WAWC also provides medication abortion up to 10 weeks lmp.

5. In January of this year, we provided 240 abortions.  In February, we provided 227 abortions.

6. Alabama law requires patients seeking an abortion to make two trips to the clinic at least 48 hours apart.  At the first visit, the patient must obtain state-mandated information.  She must then make a separate trip to the clinic, no sooner than 48 hours later, in order to obtain the abortion.  I understand that in some states this pre-abortion counseling is provided over the phone or via video which would eliminate the need for the first trip, but Alabama law does not permit this.

7. Our patients seek abortion care for a variety of reasons. Some are not ready to become parents.  Many already have a child and do not have the financial or emotional resources to add an additional child to their family. Some are students who want to complete their education before having children. Some do not want to be tied financially or emotionally to the putative father.  In some instances, they fear abuse if their pregnancy is discovered or fear that having a child with an abusive partner will make it more difficult for them to leave.  Some have health conditions that are exacerbated by their pregnancy.  Some are pregnant as a result of rape.

*WAWCs Response to the COVID-19 Outbreak*

8. WAWC is committed to doing everything it can to protect the health of its patients and staff while still providing essential health care services.  In response to the COVID-19 outbreak,

even before the State Health Officer issued his orders, we started taking measures to minimize the risk of transmission of the virus and have continued to add additional measures.

9. For example, staff members screen all patients by telephone before they come to the clinic to determine if they have symptoms of COVID-19 or have been exposed to someone with COVID-19. We will not schedule an appointment who reports such symptoms or exposure.

10. When a patient arrives at the Clinic, we review these questions; patients with symptoms or who have had contact with a person with a positive test must return home.  In addition, we take the temperature of every patient.  Patients with fevers of 100 or greater must return home.  Patients who are not screened out are provided with hand sanitizer upon entry.

11. We follow the same protocol of screening and taking the temperature for staff.

12. We are also limiting the number of people who enter the clinic and ensuring that patients maintain a safe distance from one another in the waiting room and recovery area. We have removed furniture from the waiting room so that patients sit further apart.  If there are too many patients at the Clinic at any one time, we require some patients to wait outside until it is their turn to be seen.

13. To reduce the risk of transmission, unfortunately, we are no longer able to allow support people to wait with patients in the Clinic. We make an exception for one family member in the case of a patient under 18.

14.  We use personal protective equipment as appropriate, but we do not have any of the N-95 respirator masks that I understand are in critically short supply.


*Impact on Patients of the State Public Health Officer's Order*

15.  On March 27, the State Public Health Officer issued an order (the "Order") stating that "all medical or surgical procedures shall be postponed until further notice" with exceptions only for "procedures necessary to treat an emergency medical condition" and those "necessary to avoid

serious harm from an underlying condition or disease, or necessary as part of a patient's ongoing and active treatment."

16. As I understand it, the State has been entirely unwilling to provide any guidance as to whether we can continue to provide surgical abortion, or even medication abortion, under this Order.  But the State has made clear that criminal penalties will nonetheless apply for violations.

17. Because the State has been unwilling to provide any clarification about its interpretation of the Order and because violation carries criminal penalties, absent relief from this Court, WAWC is no longer providing abortion care.

18. This has tremendous repercussions for our patients who rely on us.  In a typical week, we provide approximately 50-60 abortions.  This week, we have already had to cancel 17 patients who were scheduled to be seen on Monday or Tuesday.  Absent an order from this Court, we will need to proceed with further cancellations.

19. These first cancellations were just devastating to our patients.  Some had had to travel several hours to get to us for the first state-mandated visit.  The majority of our patients have very low-incomes.  Many are parents of dependent children.  It took everything some of them had to find a way to get to us the first time.  Learning that after all that they wouldn't be able to get the care they needed nearly broke them.  Many calls ended in tears.

20.  At least one of the patients we had to cancel will now be past our limit to provide abortion care and her only option to get an abortion in Alabama will be to travel to Huntsville (if she can do so) if and when the Court issues an order allowing the clinics to resume providing care. Other patients scheduled for later this week are in the same situation.

21.  Similarly, some patients who are scheduled to receive a medication abortion will be delayed such that medication is no longer an option for them.  These patients must then instead have a surgical abortion, if they are able to have one at all.  This is a perverse outcome.  Medication

abortion allows the patient to be in the clinic for a shorter amount of time, thus reducing the risk for COVID-19 exposure for patients and staff, and requires the use of less personal protective equipment than a surgical abortion.  In addition, increased travel can mean increased exposure.

22.  I worry that many of our patients who cannot be seen at our facility will not be able to seen at all.  Obtaining transportation is extremely challenging for many of our patients during the best of times.  Many do not have cars and must depend on friends or relatives to drive them to the Clinic, both for the state-mandated counseling and for the abortion. Securing the money for gas is also problematic for many patients with limited resources.  The COVID-19 crisis has only exacerbated these problems.

23.  In addition, the cost of the abortion increases as the pregnancy advances, particularly if one is no longer eligible for an aspiration abortion. Paying for an abortion (and the associated costs of childcare and transportation) has always been very difficult for our patients.  That is even more true now with so many people losing their jobs due to crisis.

24. Forcing us to stop providing abortion care harms our patients in multiple ways. Depending on how long this crisis continues, some may still be able to get abortions, but even they will be delayed which increases both the risks of an abortion and its cost.  But many others will be denied an abortion entirely, for a number of reasons.  In some instances, by the time the Order is lifted they will be at a gestational age that requires them to travel several hours to Huntsville which for the reasons I explained above many will not be able to do.  For others, the advance in the gestational age of the pregnancy will mean that the price will have increased such that they are no longer be able to afford the abortion.  And in still other cases, they will be past the legal limit in Alabama.  Every one of these patients will suffer the tremendous anxiety that comes with not knowing whether they will face the life-altering consequences of having to continue a pregnancy against their will.

I declare under penalty of perjury that the foregoing is true and correct.

/s Gloria Gray
Gloria Gray

Executed March 29, 2020

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

**NORTHERN DIVISION**

| | |
|---|---|
| YASHICA ROBINSON, M.D. et al., | |
| Plaintiffs, | |
| | CIVIL ACTION |
| v. | Case No. 2:19-cv-365-MHT-JTA |
| STEVEN MARSHALL, in his official capacity as Alabama Attorney General, et al., | |
| Defendants. | |

**DECLARATION OF JANE DOE[1] IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Jane Doe, declare and state the following:

1. I am in my mid-20s and I have a young daughter. I adore her. She is my everything.

2. I am separated from my husband, but we are working hard to try to figure things out so that we can get back together for us and for our daughter.

3. I knew now was not the time for us to add another child to our family so I am on birth control. But unfortunately, my birth control failed.

4. Now I am pregnant. Never in a million years did I think I would need an abortion, but I know I can't have a baby now for a lot of reasons.

5. I am struggling to put my marriage back together. Having a baby now would put way too much stress on us and I worry it would ruin any chance we have of being a family again.

---

[1] Jane Doe is a pseudonym. A motion to file a pseudonymous declaration and a brief in support is forthcoming.

6. And, to be honest, I just don't have the financial or emotional resources to have another child right now. I worry that if I had another child right now I wouldn't be able to care for that baby and my daughter in the way that I want to and that they deserve.

7. I know adoption is an option. But I have been through a pregnancy and given birth to a child and I know myself. I don't think that, at the end of nine months of pregnancy and childbirth, I could place my child for adoption.

8. In addition, I had very serious complications at the end of my pregnancy and during childbirth. I also had post-partum depression following the birth of my daughter. I worry that if forced to continue my pregnancy and deliver, I could have suffer these complications again and that this time I might not survive.

9. Given all of these considerations, it is clear to me that I cannot continue this pregnancy.

10. Given that decision, I scheduled an appointment for abortion in my home state. However, before the date of my appointment, the clinic called and said that it had to cancel because of the COVID-19 crisis.

11. Determined to not have another child, I next scheduled an appointment in a neighboring state. There too, before the date of my appointment, the clinic called to cancel explaining that the state was forcing them to stop providing abortions.

12. Then my husband found a clinic in Tuscaloosa, Alabama that was able to see me. However, they told us that Alabama state law requires patients to come in for an initial visit at least 48 hours before they can have the abortion. They were willing to see me on Saturday to start the process and that meant on Monday I would finally be able to have the abortion I need.

13. Tuscaloosa is over a four hour drive from where I live. Going there would mean staying overnight in a motel for two nights. Although money is tight, I felt like I had no choice.

14. On Saturday, I came in for my initial visit. Part way though my session, the clinic informed me that the state had taken some new action that meant that I probably wasn't going to be able to have the abortion on Monday.

15. I was devastated. I know this is not the right time in my life to have another child. I am a very responsible person and I need to be able to take care of my children on my own and to be the kind of mother I want to be and that I am to my daughter. I can't do that with a new baby right now.

16. Plus, based on my experience with my prior pregnancy, I am terrified that if I continue this pregnancy I will not live through it. And then what will happen to my daughter and this new baby?

17. For the sake of me, my daughter, and other people like us, I ask that the Court allow the clinics to continue to provide abortion care.

I declare under penalty of perjury that the foregoing is true and correct.


/s/ Jane Doe_____

Jane Doe


Executed: March 29, 2020

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

YASHICA ROBINSON, M.D, et al.,

        Plaintiffs,

v.

STEVEN MARSHALL, et al.,

        Defendants.

CIVIL ACTION
Case No. 2:19-cv-365-MHT-SMD

---

**DECLARATION OF RANDALL C. MARSHALL IN SUPPORT OF
PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

Randall C. Marshall declares and states the following:

1.      I am the Executive Director of the American Civil Liberties Union of Alabama and one of the counsel of record in this case.

2.      On Friday, March 20, 2020, plaintiffs' counsel became aware of a March 19 Order of the State Health Officer Suspending Certain Public Gatherings Due to the Risk of Infection by COVID-19 (Applicable Statewide) (copy attached as Attachment 1). Paragraph 6 of the order stated: "Effective immediately, all elective dental and medical procedures shall be delayed." Paragraph 9 made the order effective until April 6, 2020, with the possibility that it could be extended beyond that date.

3.      I called the Department of Public Health's general counsel's office to speak with general counsel about the applicability of paragraph 6 of that order to

Alabama clinics that provided abortion services. As no one was then currently available, I left a message about why I was calling.

4.     Within an hour, Assistant General Counsel Dana Billingsley returned my call. After a brief discussion about the order, I directly asked Ms. Billingsley whether the Department intended to apply the order to the clinics. She responded that the Department "has no plans to apply the order to the clinics." She then sent me a copy of CMS elective surgery guidelines and a copy of a slightly amended order that did not alter paragraph 9 of the original order.

5.     During that conversation, Ms. Billingsley mentioned that ADHP had spoken to Reproductive Health Services in Montgomery and the Department was satisfied that the clinic was taking appropriate measures, including instituting a system to allow social distancing.

6.     After reviewing the amended order, I sent Ms. Billingsley a confirming email that the Department would not apply the elective surgery language to Alabama providers of abortion services. A copy of the email is attached as Attachment 2. There was no further correspondence between us regarding the March 19 Order or the amended Order issued March 20.

7.     We relayed the Department's assurances to our clients so that they could continue to provide services as scheduled.

8.     On Friday, March 27, plaintiffs' counsel became aware of a new amended order stating that:

Effective March 28, 2020 at 5:00 P.M., all dental, medical, or surgical procedures shall be postponed until further notice, subject to the following exceptions:

a. Dental, medical, or surgical procedures necessary to treat an emergency medical condition. For purposes of this order, "emergency medical condition" is defined as a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain, psychiatric disturbances, and/or symptoms of substance abuse) such that the absence of immediate medical attention could reasonably be expected by a person's licensed medical provider to result in placing the health of the person in serious jeopardy or causing serious impairment to bodily functions or serious dysfunction of bodily organs.

b. Dental, medical, or surgical procedures necessary to avoid serious harm from an underlying condition or disease, or necessary as part of a patient's ongoing and active treatment.

9.     I called the number on Ms. Billingsley's signature block from her emails to me and left a message that we wanted to get clarity from the Department that the amended order still would not be applied to the clinics.

10.     When I didn't receive a call back, I sent an email to Ms. Billingsley and Brian Hale, General Counsel, explaining why we believed that the March 27 Order could not be applied to the clinics: "We believe that medication abortion is not a procedure within the terms of the order and that surgical abortion procedures fall within the exceptions.  If the department disagrees and intends to enforce the order against the clinics, please let us know before the effective date and time of the order so that we may seek the appropriate legal relief." A copy of the email is attached as Attachment 3.

11.     Later that evening, I received an e-mail from Katherine Green Robertson, Chief Counsel to the Attorney General, stating that the "Alabama

Department of Public Health referred your inquiry to our office." She went on to say: "As the order indicates, procedures are exempt from mandatory postponement only if they meet the criteria set out in 7a. or b." She also sent a link to a March 21, 2020, memorandum from the Attorney General which made clear that violation of the State Health Officer's Order was subject to criminal enforcement. A copy of the email is attached as Attachment 4.

12.     The next morning, March 28, I responded to Ms. Robertson's email, and sent a copy to Ms. Billingsley and Mr. Hale, again seeking the Attorney General's, and the Department's, intention of applying the March 27 Order to the clinics. A copy of the email is attached as Attachment 5.

13.     We did not receive a response to that email and thus no indication whether the State, or the Department, will seek to enforce the Order against the clinics. Because of the imminent threat of criminal prosecution of the clinics and their doctors, we sent a final email to counsel of record at the Attorney General's office and to general counsel for the Department asking for a direct response in order to avoid litigation. A copy of the email is attached as Attachment 6.

14.     We received a response stating: "Per the order, we are unable to provide you with a blanket affirmation that abortions will, in every case, fall within one of the exemptions." A copy of the email is attached as Attachment 7.

15.     Given the State's position, plaintiffs are in the crosshairs of being second guessed and prosecuted for their medical judgment. Hence, they seek emergency relief from the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 30, 2020.

/s/ *Randall C. Marshall*
Randall C. Marshall

ATTACHMENT 1

# ORDER OF THE STATE HEALTH OFFICER
# SUSPENDING CERTAIN PUBLIC GATHERINGS
# DUE TO RISK OF INFECTION BY COVID-19

## (APPLICABLE STATEWIDE)

**WHEREAS**, Coronavirus Disease 2019 (COVID-19) has been detected in Alabama; and

**WHEREAS,** the appearance of COVID-19 in the State poses the potential of widespread exposure to an infectious agent that poses significant risk of substantial harm to a large number of people; and

**WHEREAS**, the State Board of Health has designated COVID-19 to be a disease of epidemic potential, a threat to the health and welfare of the public, or otherwise of public health importance; and

**WHEREAS,** on March 13, 2020, on recommendation of the State Health Officer, Kay Ivey, Governor of the State of Alabama, declared a state public health emergency exists in the State of Alabama; and

**WHEREAS,** on March 16, 2020, the Jefferson County Health Officer, in response to a rapidly growing number of cases of COVID-19 being detected in Jefferson County, issued an order suspending certain public gatherings in that county; and

**WHEREAS**, on March 17, 2020, the State Health Officer issued a similar order for counties surrounding Jefferson, including Blount, Saint Clair, Shelby, Tuscaloosa, and Walker Counties, and

**WHEREAS,** further social distancing measures are necessary to be implemented on a statewide basis to prevent the spread of COVID-19; and

**WHEREAS,** *Code of Ala. 1975*, § 22-2-2(4), authorizes the State Health Officer, on behalf of the State Board of Health, to direct that conditions prejudicial to health in public places within the State be abated;

**NOW THEREFORE, THESE PREMISES CONSIDERED**, it is ordered that the following be implemented statewide:

1. Effective today, March 19, 2020, at 5:00 P.M., all gatherings of 25 persons or more, or gatherings of any size that cannot maintain a consistent six-foot distance between persons, are prohibited. This Order shall apply to all gatherings, events or activities that bring 25 or more persons in a single room or single space at the same time.

2. Effective today, March 19, 2020, at 5:00 P.M., all beaches shall be closed. For purposes of this section, the term "beach" means the sandy shoreline area abutting the Gulf of Mexico, whether privately or publicly owned, including beach access points.

3. Effective Friday, March 20, 2020, all Senior Citizen Center gatherings shall be closed. Senior Citizen Centers and their partners are urged to assure that their clients continue to receive needed meals via curbside pick-up or delivery.

4. Effective at the close of school or business today, March 19, 2020, the following shall be closed:

a.      All schools, public and private, including but not limited to: elementary, secondary, postsecondary, technical, or specialty schools, and colleges and universities. This school closure order is not intended to prevent any employers from making continued necessary staffing decisions. Employers are authorized to advise employees to work from home or maintain flexible work schedules. If working from home is not feasible, the employee should practice social distancing, maintaining consistent six-foot distance between persons, for the duration of this order and follow public health guidelines.

b.      Preschools and childcare centers.

(1) This shall not apply to childcare centers operated for the exclusive benefit of essential employees of the following categories of employers: State and Local Governments, First Responders (including EMS and Fire Services), Law Enforcement, Hospitals, Nursing Home/Long Term Care Facilities (including Assisted Living and Specialty Care Assisted Living Facilities), End Stage Renal Disease Treatment Centers, Pharmacies and Grocery Stores. For this exception to apply, the childcare center must be employer-operated and located on the premises of, or in the immediate vicinity of, one of these enumerated categories of employers, and a parent or guardian of each child shall be readily available. The childcare center must meet local and state fire and health requirements.

(2) This shall also not apply to licensed childcare centers that contract to provide services exclusively to the above-named employers, or that provide services exclusively to children of essential employees of the above-named employers.

(3) This shall also not apply to daytime special activities programs provided by local boards of education for children of essential employees of the above-named employers if those children were between the ages of 6 and 12 as of March 13, 2020.

(4) In the childcare centers and special activities programs addressed in (1), (2), and (3) above, no more than 11 children shall be allowed in any one room at the same time, and operators of these centers and programs are encouraged to use enhanced sanitation practices consistent with guidance from the CDC and the Alabama Public Department of Public Health.

5. Effective immediately, all Hospitals and Nursing Home/Long Term Care Facilities (including Assisted Living and Specialty Care Assisted Living Facilities) shall prohibit visitation of all visitors and non-essential health care personnel, except for certain compassionate care situations such as maternity and end-of-life.

2

6. Effective immediately, all elective dental and medical procedures shall be delayed.

7. Effective today, March 19, 2020, at 5:00 P.M., all restaurants, bars, breweries, or similar establishments shall not permit on-premises consumption of food or drink.

    a.      Such establishments may continue to offer food for take-out or delivery provided the social distancing protocols including maintaining a consistent six-foot distance between persons are followed.

    b.      Such establishments are strongly encouraged to offer online ordering and curbside pick-up of food.

    c.      Hospital food service areas are excluded from this order provided they have their own social distancing plan.

8. If organizers or sponsors of otherwise suspended events desire, they may submit a request for an exemption from this order, at the discretion of the State Health Officer.  While the State Health Officer is under no obligation to grant such an exemption, it shall be fairly considered based on the following criteria:

    a.      Effective measures have been taken to identify those attending the event who may potentially be affected with COVID-19, including but not limited to personal testing for the disease or submission of current medical clearances to the organizer.

    b.      Effective measures have been taken to prevent the spread of infection even by those that are infected while not symptomatic, including the provision of anti-infection measures such as proper facemasks, personal sanitation measures, and other measures that may be considered proper.

Requests for an exemption must be submitted AT LEAST two weeks in advance of any scheduled event.

9. Prior to April 6, 2020, a determination shall be made whether to extend this Order.

Upon the effective dates and times set forth above, this Order supersedes all orders previously issued by the State Health Officer and Jefferson and Mobile County Health Officers, and shall remain in full force and effect until rescinded by order of the State Health Officer.  The Jefferson and Mobile County Health Officers are authorized, after consultation with the State Health Officer, to implement more stringent measures as local circumstances require.

Done on this _19_ day of March, 2020.

_____
Scott Harris, M.D., M.P.H.
State Health Officer

3

ATTACHMENT 2



Randall Marshall <rmarshall@aclualabama.org>

## CMS Guidance re Elective Medical and Surgical Procedures

**Randall Marshall** <rmarshall@aclualabama.org>                                   Fri, Mar 20, 2020 at 2:19 PM
To: Dana.Billingsley@adph.state.al.us
Bcc: Alexa Kolbi-Molinas <akolbi-molinas@aclu.org>

Dana --

Thank you for promptly returning my call this afternoon and for forwarding the CMS guidance and the amended order.

We also thank you for clarifying that the Department has no plans to apply the March 19 order requiring the indefinite delay of "all elective ... medical procedures" to Alabama providers of abortion services. My reading of the amended order is that it does not alter the Department's plans in this regard.

Thanks again and have a good week-end.


Randall C. Marshall
Executive Director
American Civil Liberties Union of Alabama, Inc.
P.O. Box 6179
Montgomery, AL 36106-0179




On Fri, Mar 20, 2020 at 2:10 PM <Dana.Billingsley@adph.state.al.us> wrote:
An Amended Order form the SHO is attached - it was just released.

Thank you.


Dana H. Billingsley
Assistant General Counsel
Alabama Department of Public Health
201 Monroe Street, Suite 1540
Montgomery, Alabama 36104
334-206-7952 (T)
dana.billingsley@adph.state.al.us

Confidentiality Notice: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or privileged information. If this message concerns a lawsuit, it may be considered a privileged communication. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.


| From: | Dana Billingsley/LEGAL/ADPH |
| To: | rmarshall@aclualabama.org |
| Date: | 03/20/2020 02:04 PM |
| Subject: | CMS Guidance re Elective Medical and Surgical Procedures |

Randall,

Thank you for speaking with me today and for contacting the Department. The CMS guidance concerning elective medical and surgical procedures is attached for your information, as we discussed.

Let us know if you need anything further.

[attachment "~8046168.pdf" deleted by Dana Billingsley/LEGAL/ADPH]

Dana H. Billingsley
Assistant General Counsel
Alabama Department of Public Health
201 Monroe Street, Suite 1540
Montgomery, Alabama 36104
334-206-7952 (T)
dana.billingsley@adph.state.al.us

Confidentiality Notice: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or privileged information. If this message concerns a lawsuit, it may be considered a privileged communication. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**Confidentiality Notice -** *This e-Mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or privileged information. If this message concerns a lawsuit, it may be considered a privileged communication. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

ATTACHMENT 3



Randall Marshall <rmarshall@aclualabama.org>

---

## new order effective March 28 at 5 p.m.

**Randall Marshall** <rmarshall@aclualabama.org>          Fri, Mar 27, 2020 at 4:00 PM
To: Dana.Billingsley@adph.state.al.us, Brian.Hale@adph.state.al.us
Bcc: Alexa Kolbi-Molinas <akolbi-molinas@aclu.org>, Meagan Burrows <mburrows@aclu.org>, "Flaxman, Carrie"
<Carrie.Flaxman@ppfa.org>, RCM <rmarshall@aclualabama.org>

Dana and Brian:

As you know we represent Alabama abortion providers. They have already taken all
necessary and feasible steps to protect the health and safety of their patients and staff while
continuing to provide only that care which is essential to patient health and cannot be delayed
without risk to patient health.

We have now become aware of a new order effective March 28, 2020, at 5 p.m. regarding
postponement of dental, medical or surgical procedures with exceptions.

As you may know, the Joint Statement by the American College of Obstetricians and
Gynecologists, the American Board of Obstetrics & Gynecology, *et al.*, on Abortion Access
During the COVID-19 Outbreak, issued March 18, 2020, states that to "the extent that
hospital systems or ambulatory surgical facilities are categorizing procedures that can be
delayed during the COVID-19 pandemic, abortion should not be categorized as such a
procedure" because it "is an essential component of comprehensive health care" and "a time-
sensitive service for which a delay of several weeks, or in some cases days, may increase the
risks [to patients] or potentially make it completely inaccessible." *See* https://
www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-
19-outbreak.

We believe that medication abortion is not a procedure within the terms of the order and that
surgical abortion procedures fall within the exceptions. If the department disagrees and
intends to enforce the order against the clinics, please let us know before the effective date
and time of the order so that we may seek the appropriate legal relief.

Thank you for your cooperation in this matter.

Randall C. Marshall
Executive Director
American Civil Liberties Union of Alabama, Inc.
P.O. Box 6179
Montgomery, AL 36106-0179

ATTACHMENT 4



**Randall Marshall <rmarshall@aclualabama.org>**

---

## RE: FW: new order effective March 28 at 5 p.m.

**Robertson, Katherine** <Katherine.Robertson@alabamaag.gov>          Fri, Mar 27, 2020 at 8:23 PM
To: "rmarshall@aclualabama.org" <rmarshall@aclualabama.org>

Mr. Marshall,

The Alabama Department of Public Health referred your inquiry to our office. As the order indicates, procedures are exempt from mandatory postponement only if they meet the criteria set out in 7a. or b.

The Attorney General has issued enforcement guidance that is available for your review at the following link: https://www.alabamaag.gov/Documents/files/03-27-2020-GuidanceEnforcementStateHealth Order.pdf.

Best,

Katherine Green Robertson

Chief Counsel to the Attorney General

Office of the Attorney General

State of Alabama

501 Washington Avenue

Post Office Box 300152

Montgomery, AL 36130

334.300.6919 Cell

334.353.1941 Office



Confidentiality Notice:  The information contained in this email and the documents attached hereto contain confidential information intended only for the use of the intended recipients.  If the reader of the message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained herein is strictly prohibited.  If you have received this communication in error, please immediately notify me by reply email.

3/28/2020 ACLU of Alabama Mail - Fw: new order effective 03/30/2028 at 5 p.m.

Case 2:19-cv-00365-MHT-JTA Document 79 Filed 03/30/20 Page 62 of 71

Begin forwarded message:

**From:** Randall Marshall <rmarshall@aclualabama.org>
**Date:** March 27, 2020 at 4:00:45 PM CDT
**To:** dana.billingsley@adph.state.al.us, Brian.Hale@adph.state.al.us
**Subject: new order effective March 28 at 5 p.m.**

Dana and Brian:

As you know we represent Alabama abortion providers. They have already taken all necessary and feasible steps to protect the health and safety of their patients and staff while continuing to provide only that care which is essential to patient health and cannot be delayed without risk to patient health.

We have now become aware of a new order effective March 28, 2020, at 5 p.m. regarding postponement of dental, medical or surgical procedures with exceptions.

As you may know, the Joint Statement by the American College of Obstetricians and Gynecologists, the American Board of Obstetrics & Gynecology, *et al.*, on Abortion Access During the COVID-19 Outbreak, issued March 18, 2020, states that to "the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure" because it "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible." *See* https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

We believe that medication abortion is not a procedure within the terms of the order and that surgical abortion procedures fall within the exceptions. If the department disagrees and intends to enforce the order against the clinics, please let us know before the effective date and time of the order so that we may seek the appropriate legal relief.

Thank you for your cooperation in this matter.

Randall C. Marshall

Executive Director

American Civil Liberties Union of Alabama, Inc.

P.O. Box 6179

Montgomery, AL 36106-0179

**Confidentiality Notice -** *This e-Mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or privileged information. If this message concerns a lawsuit, it may be considered a privileged communication. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*


Confidentiality Notice: The information contained in this email and the documents attached hereto contain confidential information intended only for the use of the intended recipients. If the reader of the message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained herein is strictly prohibited. If you have received this communication in error, please immediately notify me by reply email.

ATTACHMENT 5

3/29/2020 — ACLU of Alabama Mail - RE: FW: new order effective March 28 at 5 p.m.

Case 2:19-cv-00365-MHT-JTA Document 79 Filed 03/30/20 Page 65 of 71



Randall Marshall <rmarshall@aclualabama.org>

## RE: FW: new order effective March 28 at 5 p.m.

**Randall Marshall** <rmarshall@aclualabama.org>                              Sat, Mar 28, 2020 at 9:27 AM
To: "Robertson, Katherine" <Katherine.Robertson@alabamaag.gov>
Cc: Alexa Kolbi-Molinas <akolbi-molinas@aclu.org>

Ms. Robinson:

Thank you for your email.  However, it does not provide answers to the key questions.

As noted in our original email, we interpret the order not to apply to medication abortion because it is neither a surgery nor a procedure, or to apply to surgical abortions because they fall within the exceptions. If the Attorney General or the Department disagrees and intends to enforce the order against the clinics and physicians that provide medication and/or surgical abortions, please let us know before the effective date and time of the order so that we may seek the appropriate legal relief.

Thank you for your attention to this matter.


Randall C. Marshall
Executive Director
American Civil Liberties Union of Alabama, Inc.
P.O. Box 6179
Montgomery, AL 36106-0179



On Fri, Mar 27, 2020 at 8:23 PM Robertson, Katherine <Katherine.Robertson@alabamaag.gov> wrote:

Mr. Marshall,

The Alabama Department of Public Health referred your inquiry to our office. As the order indicates, procedures are exempt from mandatory postponement only if they meet the criteria set out in 7a. or b.

The Attorney General has issued enforcement guidance that is available for your review at the following link: https://www.alabamaag.gov/Documents/files/03-27-2020-GuidanceEnforcementStateHealthOrder.pdf.

Best,

Katherine Green Robertson

Chief Counsel to the Attorney General


Office of the Attorney General

State of Alabama

501 Washington Avenue

Post Office Box 300152

Montgomery, AL 36130

334.300.6919 Cell

334.353.1941 Office



Confidentiality Notice:  The information contained in this email and the documents attached hereto contain confidential information intended only for the use of the intended recipients.  If the reader of the message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained herein is strictly prohibited.  If you have received this communication in error, please immediately notify me by reply email.

Begin forwarded message:

**From:** Randall Marshall <rmarshall@aclualabama.org>
**Date:** March 27, 2020 at 4:00:45 PM CDT
**To:** dana.billingsley@adph.state.al.us,  Brian.Hale@adph.state.al.us
**Subject: new order effective March 28 at 5 p.m.**

Dana and Brian:

As you know we represent Alabama abortion providers.  They have already taken all necessary and feasible steps to protect the health and safety of their patients and staff while continuing to provide only that care which is essential to patient health and cannot be delayed without risk to patient health.

We have now become aware of a new order effective March 28, 2020, at 5 p.m. regarding postponement of dental, medical or surgical procedures with exceptions.

As you may know, the Joint Statement by the American College of Obstetricians and Gynecologists, the American Board of Obstetrics & Gynecology, *et al.,* on Abortion Access During the COVID-19 Outbreak, issued March 18, 2020, states that to "the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure" because it "is an essential

component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible." *See* https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

We believe that medication abortion is not a procedure within the terms of the order and that surgical abortion procedures fall within the exceptions. If the department disagrees and intends to enforce the order against the clinics, please let us know before the effective date and time of the order so that we may seek the appropriate legal relief.

Thank you for your cooperation in this matter.

Randall C. Marshall

Executive Director

American Civil Liberties Union of Alabama, Inc.

P.O. Box 6179

Montgomery, AL 36106-0179

**Confidentiality Notice -** *This e-Mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or privileged information. If this message concerns a lawsuit, it may be considered a privileged communication. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

Confidentiality Notice: The information contained in this email and the documents attached hereto contain confidential information intended only for the use of the intended recipients. If the reader of the message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained herein is strictly prohibited. If you have received this communication in error, please immediately notify me by reply email.

ATTACHMENT 6



Randall Marshall <rmarshall@aclualabama.org>

---

## March 27 Order

**Randall Marshall** <rmarshall@aclualabama.org>      Sun, Mar 29, 2020 at 9:11 AM
To: "Robertson, Katherine" <Katherine.Robertson@alabamaag.gov>, "LaCour, Eddie" <elacour@ago.state.al.us>, Jim Davis <jimdavis@ago.state.al.us>, Brad Chynoweth <bchynoweth@ago.state.al.us>, Dana.Billingsley@adph.state.al.us, Brian.Hale@adph.state.al.us
Cc: Alexa Kolbi-Molinas <akolbi-molinas@aclu.org>
Bcc: RCM <rmarshall@aclualabama.org>, Jennifer Dalven <JDALVEN@aclu.org>, Meagan Burrows <mburrows@aclu.org>, Ryan Mendias <rmendias@aclu.org>

We have not heard from the Attorney General's office or the Department about the application of the March 27 order to abortions. Because the Attorney General has made clear that criminal penalties apply, we are preparing to seek emergency relief.

You can avoid that action by affirmatively stating that the March 27 order does not prohibit the clinics and their physicians from providing abortions.

In order to avoid litigation, please respond by 5 p.m. today.


Randall C. Marshall
Executive Director
American Civil Liberties Union of Alabama, Inc.
P.O. Box 6179
Montgomery, AL 36106-0179

ATTACHMENT 7



Randall Marshall <rmarshall@aclualabama.org>

## March 27 Order

**Robertson, Katherine** <Katherine.Robertson@alabamaag.gov>      Sun, Mar 29, 2020 at 2:23 PM
To: Randall Marshall <rmarshall@aclualabama.org>, "Davis, Jim" <Jim.Davis@alabamaag.gov>,
"Dana.Billingsley@adph.state.al.us" <Dana.Billingsley@adph.state.al.us>, "Brian.Hale@adph.state.al.us"
<Brian.Hale@adph.state.al.us>
Cc: Alexa Kolbi-Molinas <akolbi-molinas@aclu.org>

Mr. Marshall,

Per the order, we are unable to provide you with a blanket affirmation that abortions will, in every case, fall within one of
the exemptions.

Thank you,
Katherine Robertson

Get Outlook for iOS

**From:** Randall Marshall <rmarshall@aclualabama.org>
**Sent:** Sunday, March 29, 2020 9:11 AM
**To:** Robertson, Katherine; LaCour, Edmund; Davis, Jim; Chynoweth, Brad; Dana.Billingsley@adph.state.al.us;
Brian.Hale@adph.state.al.us
**Cc:** Alexa Kolbi-Molinas
**Subject:** March 27 Order

> This message has originated from an **External Source.** Please use proper judgment and caution when opening
> attachments, clicking links, or responding to this email.

[Quoted text hidden]

Confidentiality Notice: The information contained in this email and the documents attached hereto contain confidential
information intended only for the use of the intended recipients. If the reader of the message is not the intended recipient,
you are hereby notified that any dissemination, distribution or copying of the information contained herein is strictly
prohibited. If you have received this communication in error, please immediately notify me by reply email.