**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| YASHICA ROBINSON, M.D., et al., | |
| Plaintiffs, | CIVIL ACTION |
| v. | Case No. 2:19-cv-365-MHT-JTA |
| STEVEN MARSHALL, et al., | |
| Defendants. | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE
RELIEF**</u>

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Yashica Robinson, M.D., Alabama Women's Center, Reproductive Health Services, and West Alabama Women's Center, on behalf of themselves and their patients, their clinic administrators, physicians, and staff, move for a temporary restraining order, followed by a preliminary injunction, to enjoin the application of the State Public Health Officer's March 27, 2020 emergency order insofar as it prohibits pre-viability abortions in Alabama. *See* Scott Harris, M.D., M.P.H., State Health Officer, "Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19," Mar. 27, 2020 ("March 27 Order"), attached to Pls.' Supplemental and Partially Verified Compl. for Declaratory and Injunctive Relief as Ex. B.

Because of Defendants' interpretation of the March 27 Order, Plaintiffs have already been forced to start cancelling abortions scheduled for today (March 30, 2020). **If this Court does not enter an injunction by 8:00 p.m. today (March 30, 2020), Plaintiffs will be forced to start**

**canceling the more than twenty abortions scheduled for tomorrow alone (March 31, 2020),** **including at least one patient who will be pushed past the legal limit for abortion in Alabama** **if she does not obtain an abortion *this week*.**   Plaintiffs have additional patients scheduled for the remainder of this week.  Absent relief from this Court, they will be forced to cancel those patients, and deny care to hundreds of additional new patients who call needing care, as well.

As the American College of Obstetricians and Gynecologists ("ACOG") has recognized, abortion care is essential care because it cannot be delayed without risking the health and safety of the patient.[1] Indeed, as set forth further below, the Alabama Department of Public Health ("ADPH" or "the Department") previously agreed, having advised counsel for Plaintiffs that the Department had no intention to enforce earlier emergency orders to prohibit abortions. Decl. of Randall Marshall in Support of Pls.' Mot. for TRO and Prelim. Inj. ("Marshall Decl."), attached to Pls.' Mot. for TRO and Prelim. Inj. as Ex. 4. On March 27, 2020, however, the Department issued a new order mandating the postponement of *all* surgical and medical procedures not necessary to treat an "emergency medical condition" or "avoid serious harm from an underlying condition," after 5:00 p.m. on March 28th. March 27 Order at 4.  As explained below, Plaintiffs believe that, as with the earlier emergency order, the plain language of the March 27 Order permits pre-viability abortions. However, as of yesterday afternoon, the Attorney General refused to provide any further guidance as to how it is interpreting the scope of the Order other than to make plain that in its view some—and perhaps most—abortions are not permitted. The Attorney General did make clear, however, that violation of the March 27 Order carries criminal penalties. Given the Defendants'

---

[1] ACOG et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

clear intention to apply the March 27 Order to at least some pre-viability abortions, the refusal to provide any clarity on how the Order will be interpreted, and the Order's criminal and licensure penalities, Plaintiffs cannot continue to provide abortion services absent relief from this Court.

During the COVID-19 outbreak, Plaintiffs—like all healthcare providers—have an important role to play in serving their communities, including by taking steps to reduce the transmission and spread of COVID-19, while continuing to provide essential healthcare services. However, as explained below, forcing a pregnant person to stay pregnant against their will does not reduce the risk of transmission of the virus nor does it preserve health care resources. To the contrary, because a pregnant person needs medical care whether they decide to have an abortion or continue their pregnancy, forcing a person to stay pregnant against their will not only taxes an already overburdened health care system, but also increases the risks of transmission of the virus and harm from the virus itself, because pregnant people face increased risks from respiratory viruses.

Absent an immediate order from this Court, Defendants' actions will deny Plaintiffs' patients their right to access safe and legal pre-viability abortion in Alabama. The use of the State Health Officer's emergency powers in this manner violates nearly five decades of Supreme Court precedent that prohibits states from banning abortion before viability, and is, therefore, unconstitutional. There is no health and safety justification for forcing Alabamians to remain pregnant against their will in the midst of a pandemic. Accordingly, Plaintiffs seek to restrain and preliminarily enjoin Defendants, their officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them from enforcing the March 27 Order to prohibit pre-viability abortions.

## STATEMENT OF FACTS

**A.    The Emergency Orders**

In March 2020, the United States declared a state of emergency, and Governor Ivey proclaimed a state of emergency in Alabama.[2] The virus has reached every state in the country, with 644 confirmed cases in Alabama and 3 deaths as of midday on March 28, 2020.[3] Federal and state officials and medical professionals expect a surge of infections that will test the limits of an increasingly burdened health care system.[4]

In light of this new reality, on March 19, 2020, the State Health Officer, pursuant to his authority to direct that conditions prejudicial to health in public places be abated, Ala. Code. § 22-2-2(4), issued an order stating, *inter alia*, that "effective immediately all elective dental and medical procedures shall be delayed." *See* Scott Harris, M.D., M.P.H., State Health Officer, Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19, Mar. 19, 2020 ("March 19 Order").[5] The March 19 Order did not define or otherwise explain what constitutes an "elective" medical procedure. However, at a press conference held the same day, the State Health Officer stated:

> This is not a closure of offices for physicians or dentists or optometrists.
> Those offices remain open and those professionals continue to care for their

---

[2] *See* Proclamation No. 9994, 85 Fed. Reg. 15,337, 2020 WL 1272563 (Mar. 13, 2020); Governor Kay Ivey, Proclamation of the Governor, "State of Emergency: Coronavirus (COVID-19)," Mar. 13, 2020, https://governor.alabama.gov/assets/2020/03/2020-03-13-Initial-COVID-19-SOE.pdf.

[3] ADPH, *Alabama's COVID-19 Data and Surveillance Dashboard*, https://alpublichealth.maps.arcgis.com/apps/opsdashboard/index.html#/6d2771faa9da4a2786a509d82c8cf0f7; Ctrs. for Disease Control & Prevention, *Cases in U.S.* (last updated Mar. 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[4] Ctrs. for Disease Control & Prevention, *Interim Guidance for Healthcare Facilities: Preparing for Community Transmission of COVID-19 in the United States* (last updated Feb. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/guidance-hcf html.

[5] *Available at* https://www.alabamapublichealth.gov/legal/assets/order-adph-cov-gatherings-031920.pdf.

> patients. They are still available to care for urgent and emergent situations, but all elective procedures shall be delayed. I would remind people that 'elective' can be somewhat subjective. CMS [the federal Centers for Medicare & Medicaid Services] issued guidance last night that's available on their website about what could be considered an elective procedure.

Ala. Pub. Health Training Network ("ALPHTN"), *COVID-19 Alabama Update*, YouTube (Mar. 19, 2020) at 5:00–5:27, https://youtu.be/vAj6vz2bd28. The CMS guidance referenced by the State Health Officer emphasizes suggests "the following factors to be considered as to whether planned *surgery* should proceed." Centers for Medicare & Medicaid Services, CMS Adult Elective Surgery and Procedures Recommendations ("CMS Recommendations") (emphasis added).[6]

- Current and projected COVID-19 cases in the facility and region;
- Supply of PPE ["Personal Protective Equipment"] to the facilities in the system;
- Staffing availability;
- Bed availability, especially intensive care unit (ICU) beds
- Ventilator availability
- Health and age of the patient, especially given the risks of concurrent COVID-19 infection during recovery;
- Urgency of the procedure.

*Id.* On March 20, 2020, the State Health Officer issued an amended order that did not alter the language concerning elective medical and surgical procedures. *See* Scott Harris, M.D., M.P.H., State Health Officer, Amendment to Emergency Order Suspending Public Gatherings Due to Risk of Infection by COVID-19 (Applicable Statewide), Mar. 20, 2020 ("March 20 Order").[7]

On March 20, 2020, counsel for Plaintiffs spoke to counsel for ADPH who confirmed that ADPH did not intend the Orders to apply to abortions. Marshall Decl. ¶ 4. Counsel for ADPH also stated that the Department had spoken to Plaintiff RHS and the Department was satisfied that the clinic was taking appropriate measures, including instituting a system to allow social distancing.

---

[6] *Available at* https://www.cms.gov/files/document/31820-cms-adult-elective-surgery-and-procedures-recommendations.pdf.

[7] *Available at* http://alabamapublichealth.gov/legal/assets/order-publicgathering-032020.pdf.

*Id.* ¶ 5. Between March 20-27, Plaintiffs continued to perform pre-viability abortions, while taking all necessary steps to protect patients and staff from exposure to and transmission of COVID-19. *Id.* ¶ 7; Decl. of Gloria Gray in Support of Pls.' Mot. for TRO and Prelim. Inj. ("Gray Decl.") ¶¶ 8–14 ; Decl. of Yashica Robinson, M.D., in Support of Pls.' Mot. for TRO and Prelim. Inj. ("Robinson Decl.") ¶¶ 22–25, 31, 36–37.

On March 27, the State Public Health Officer issued a second amended order stating, in relevant part, that effective March 28, 2020 at 5:00 P.M. "*all* medical or surgical procedures shall be postponed *until further notice*, subject to the following exceptions:":

(a) Medical or surgical procedures necessary to treat an emergency medical condition, which is defined as a "medical condition manifesting itself by acute symptoms of sufficient severity … such that the absence of immediate medical attention could reasonably be expected . . . to result in placing the health of the person in serious jeopardy or causing serious impairment to bodily functions or serious dysfunction of bodily organs."

(b) Medical or surgical procedures "necessary to avoid serious harm from an underlying condition or disease, or necessary as part of a patient's ongoing and active treatment."

March 27 Order at 4 (emphasis added). The March 27 Order stated that "[t]his Order shall remain in full force and effect until 5:00 P.M. on April 17, 2020[,]" and that prior to that date "a determination shall be made whether to extend this Order—or, if circumstances permit, to relax this Order." The March 27 Order was also promulgated as an emergency rule, which is not set to expire for 120 days. *See* Ala. Admin. Code 420-4-1-.13 ER, attached to Pls.' Supplemental and Partially Verified Compl. for Declaratory and Injunctive Relief as Ex. C . There is good reason to believe the Order will be extended, as the State Public Officer, like many others, has indicated that crisis conditions will continue for a significant period of time. *See* ALPHTN, *COVID-19 Alabama Update Press Conference*, YouTube (Mar. 17, 2020) at 17:14–17:30, https://youtu.be/jjM8vdNbmM0 ("So I think with the respiratory infections, a three or four month

course is a reasonable place to start guessing how long it's going to last, but you know we certainly hope that with these mitigation strategies it won't last that long but it's just unknown because it's a new virus."). Indeed, just four days before the March 27 Order was issued, extending the original March 19 and 20 Orders by almost two weeks, he warned, "I would say Alabamians ought to be prepared that that might happen that they [the emergency orders] might be extended." ALPHTN, *COVID-19 Alabama Update*, YouTube (Mar. 23, 2020) at 27:09–27:14, https://youtu.be/-tFPiYNlQl0. And yesterday, President Trump announced the extension of social distancing recommendations through the end of April.[8]

**B.      Abortion in Alabama**

Abortion is one of the safest medical procedures in the United States and is substantially safer than continuing a pregnancy through to childbirth. Robinson Decl. ¶ 9. While pregnancy can be a blessing for many families, even an uncomplicated pregnancy poses challenges to a woman's entire physiology and stresses most major organs. For example, during pregnancy the heart rate increases in order to pump 30-50 percent more blood. By the second trimester, the heart is already doing 50 percent more work than usual, and that heightened rate continues throughout the rest of the pregnancy. Because of the increased blood flow, a woman's kidneys become enlarged and the liver must produce more clotting factors to prevent the woman from bleeding to death. However, this latter change increases the risks of blood clots or thrombosis. During pregnancy, a woman's lungs must also work harder to clear both the carbon dioxide produced by her own body and the carbon dioxide produced by the fetus. Yet her very ability to breathe in the first place is hampered by the fetus growing in the woman's abdomen, leaving most pregnant women feeling chronically

---

[8] Bobby Allyn, To Fight Virus, Trump Extends Social Distancing Guidelines for 30 More Days, NPR, Mar. 29, 2020, https://www.npr.org/2020/03/29/821976925/coronavirus-cases-soar-across-the-u-s-and-officials-say-worse-is-yet-to-come

short of breath. Every organ in the abdomen—e.g., intestines, liver, spleen—is increasingly compressed throughout pregnancy by her expanding uterus. A pregnant woman's response to infections is also altered by her physiology. She is at greater risk for certain infections. Indeed, while much is unknown about COVID-19, ACOG has warned that "pregnant women are known to be at greater risk of severe morbidity and mortality from other respiratory infections such as influenza and SARS-CoV. As such, pregnant women should be considered an at-risk population for COVID-19."[9] Moreover, there is a 15 to 20 percent risk of miscarriage present in every pregnancy. Complications from miscarriage can lead to infection, hemorrhage, surgery, and even death.

Even an uncomplicated pregnancy can suddenly become life-threatening during labor and delivery. Furthermore, one-third of pregnancies result in a caesarean section (C-section) delivery. Even though C-section deliveries are relatively common, it is still a significant abdominal surgery that carries risks of hemorrhage, infection and injury to internal organs. And even a vaginal delivery can lead to injury, such as injury to the pelvic floor. A recent longitudinal study shows that when pregnant people are denied access to desired abortions, their overall health, and the health of their family is consistently worse as compared to those who were able to obtain an abortion.

By contrast, complications from abortion are rare, and when they occur they can usually be managed in an outpatient clinic setting, either at the time of the abortion or in a follow-up visit.

---

[9] ACOG, *Practice Advisory - Novel Coronavirus 2019 (COVID-19)* (last updated Mar. 13, 2020), https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/ novel-coronavirus-2019; *see also* Ctrs. for Disease Control & Prevention, *Information for Healthcare Providers: COVID-19 and Pregnant Women* (last updated Mar. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq html.

Robinson Decl. ¶ 9. Although abortion is a very safe medical procedure, the health risks associated with it increase with gestational age. *Id.* at ¶ 20. As ACOG and other well-respected medical professional organizations have observed, specifically in relation to the COVID-19 pandemic, abortion is "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[10]

Abortion is also extremely common; approximately one in four women in this country will have an abortion by age forty-five. Robinson Decl. ¶ 9. The decision to terminate a pregnancy is informed by a combination of diverse, complex, and interrelated factors that are intimately related to the individual's values and beliefs, culture and religion, health status and reproductive history, familial situation, and resources and economic stability. *Id.* at ¶ 16; Gray Decl. ¶ 7. Some people have abortions because they conclude that it is not the right time to become a parent given their age, desire to pursue their education and/or career, or because they feel they lack the necessary financial resources or level of partner or familial support or stability. Robinson Decl. ¶ 16; Decl. of Jane Doe ¶¶ 2–6, 15 ("Doe Decl."); Gray Decl. ¶ 7. Many are already mothers; indeed, a majority of women having abortions (59%) already have at least one child. Robinson Decl. ¶ 16. Some people seek abortions to preserve their life or health; some because they have become pregnant as a result of rape; and others because they decide not to have children at all. *Id.*; Doe Decl. ¶ 8, 16; Gray Decl. ¶ 7. Some people who have suffered trauma, such as sexual assault or domestic violence, may be concerned that pregnancy, childbirth, and/or an additional child may exacerbate already extremely difficult and dangerous situations for them and put them at risk of greater sexual or physical violence or worse. Gray Decl. ¶ 7. Some people decide to have an

---

[10] ACOG et al., *supra.*

abortion because of an indication or diagnosis of a fetal medical condition or anomaly.  Robinson Decl. ¶ 16; Suppl. Compl. ¶ 71.  Some families do not feel they have the resources—financial, medical, educational, or emotional—to care for a child with disabilities or complex medical conditions or to simultaneously provide for the children they already have.  Robinson Decl. ¶ 16.

There are two main methods of abortion: medication abortion and procedural abortion. *Id.* at ¶ 10. Medication abortion involves the patient ingesting a combination of two pills: mifepristone and misoprostol. *Id.*  The patient takes the mifepristone in the health center and then, typically twenty-four to forty-eight hours later, takes the misoprostol at a location of their choosing, most often at their home, after which they expel the contents of the pregnancy in a manner similar to a miscarriage. *Id.*  Medication abortion is available in Alabama up to 10 weeks, as measured from the last menstrual period ("LMP").  *Id.*

Despite sometimes being referred to as "surgical abortion," procedural abortion is not what is commonly understood to be "surgery"; it involves no incision, no need for general anesthesia, and no requirement of a sterile field.  *Id*. at ¶ 11. For some patients, medication abortion is contraindicated or there are other factors that would necessitate a procedural abortion, such as when the patient has an allergy to the medications or other medical conditions that make procedural abortion relatively safer.  *Id*. at ¶ 12. In the procedural abortion known as aspiration, the clinician uses gentle suction from a narrow, flexible tube to empty the contents of the patient's uterus. *Id*. at ¶ 11. Before inserting the tube through the patient's cervix and into the uterus, the clinician may dilate the cervix using medication and/or small, expandable rods. *Id*. Beginning around fifteen weeks LMP, clinicians generally must use instruments to complete the procedure, a technique called dilation and evacuation ("D&E"). *Id*. at ¶ 11; *see also generally W. Ala. Women's Ctr. v. Miller*, 217 F. Supp.3d 1313, 1320, 1336–37 (M.D. Ala. 2016) (describing abortion procedures).

10

Neither method of abortion requires extensive PPE, particularly as compared to the PPE required for multiple pre-natal visits and labor and delivery. *Id*. at ¶ 30. Indeed, pregnant patients have a minimum of one prenatal care visit per month, which increases as pregnancy progresses; that number is higher for high-risk pregnancies or where there are other pregnancy complications. *Id*. at ¶ 32. PPE is used at every visit. *Id*. Moreover, a pregnant patient may make multiple visits to the hospital before she is in active labor. *Id*. at ¶ 34 An actual birth is attended by multiple medical care providers, involves extensive PPE, and can require a hospital stay ranging from 24-96 hours, or even longer. *Id*.

Currently, there are only three licensed abortion clinics in Alabama: Plaintiff Reproductive Health Services ("RHS") in Montgomery; Plaintiff West Alabama Women's Center ("WAWC") in Tuscaloosa; and Plaintiff Alabama Women's Center ("AWC") in Huntsville. Gray Decl. ¶ 1; Suppl. Compl. ¶ 16. AWC is the only clinic in the state that provides abortion care after 14 weeks LMP. Robinson Decl. ¶ 13. These outpatient clinics provide over 99% of abortions performed in the state.[11]

The window during which a patient can obtain an abortion in Alabama is limited. Pregnancy is generally forty weeks in duration, and Alabama prohibits abortion except in narrow circumstances after twenty weeks.  *Id.* at ¶¶ 11, 32,; *see also* Ala. Code § 26-23B-5. Patients generally seek abortion as soon as they are able, but many face logistical obstacles that can delay access to abortion care. Robinson Decl. ¶ 17. Patients will need to schedule an appointment, gather the resources to pay for the abortion and related costs, and arrange transportation to a clinic, and

---

[11] Ala. Dep't of Health, Ala. Center for Health Statistics, Vital Statistics, *Induced Terminations of Pregnancy, Residents of Alabama, 2018*,
http://www.alabamapublichealth.gov/healthstats/assets/itop2018al%20.pdf

possibly time off of work (without paid sick leave) or childcare during appointments. Gray Decl. ¶¶ 6, 19, 22-23; Robinson Decl. ¶ 17. Delays result in higher financial and emotional costs to the patient. Gray Decl. ¶ 19. These obstacles and delays are only exacerbated when a patient can no longer obtain an abortion in the city where or close to where she lives, and must instead travel extended distances to obtain abortion services.  Gray Decl. ¶ 20. These burdens fall most heavily on the low-income women who make up the vast majority of Plaintiffs' patients, many of whom do not have access to reliable transportation or the financial resources to travel to a distant city or state to obtain medical care, and also on those who are victims of domestic violence, who must overcome exceptional hurdles to obtain an abortion without their abusers' knowledge. Suppl. Compl. ¶ 113; Gray Decl. ¶ 22-23; Robinson Decl. ¶ 17. *See generally Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1355–60 (M.D. Ala. 2014). The COVID-19 pandemic has only exacerbated existing burdens on patients seeking abortion care. Robinson Decl. ¶ 18. It has limited public transit availability, caused layoffs and other work disruptions, shuttered schools and childcare facilities, and otherwise limited patients' options for transportation and childcare support during a time of recommended social-distancing and shelter-in-place orders. Gray Decl. ¶ 23; Robinson Decl. ¶ 18.

Meanwhile, Alabama law contains a web of medically unnecessary abortion restrictions that impose burdens that weigh even more heavily during the current pandemic and that further undermine any conceivable state interest in this case. Robinson Decl. ¶ 19. For example, Alabama law imposes an entirely unnecessary and unjustified "two-visit" requirement on most patients seeking abortions, *see* Ala. Code § 26-23A-4(a) (requiring most patients to be provided certain state-mandated abortion counseling "in-person" at least 48 hours prior to the abortion); Robinson Decl. ¶ 19. In addition, Alabama law requires an "in person" physical exam for every medication

abortion patient, *see* Ala. Code § 26-23E-7, and also imposes medically unnecessary ultrasound and laboratory testing requirements, *see, e.g.*, Ala. Code § 26-23A-4(b)(4); Ala. Admin. Code 420-5-1-.03(4)(d); Robinson Decl. ¶ 19, that effectively prohibit the use of telemedicine—even though "[m]edical abortion can be provided safely and effectively via telemedicine with a high level of patient satisfaction . . . [and] the model appears to improve access to early abortion in areas that lack a physician health care provider."[12]   In fact, the Alabama Board of Medical Examiners ("ALBME") has issued an order "encourage[ing] [health care providers] to communicate with patients, and provide telehealth services, through remote technologies," including the "the prescribing of controlled substances using telemedicine . . . to patients **for whom they have not conducted an in-person medical evaluation**."[13]   The State Public Health Officer could further minimize risks to patients and health care providers, while preserving access to essential health care and PPE, by similarly using his broad emergency powers to waive these medically unnecessary in-person requirements, but has not done so. Robinson Decl. ¶ 29.

## C.   Plaintiffs' Response to the COVID-19 Crisis and Emergency Orders

Plaintiffs are committed to doing their part to "flatten the curve," protect patients and staff, and minimize the use of PPE. Indeed, even before the State Health Officer issued any emergency orders, Plaintiffs had taken numerous proactive steps in this direction, including by imposing stringent social distancing measures at their clinics. Gray Decl. ¶¶ 8-14; Robinson Decl. ¶¶ 22-26. Plaintiffs' continued provision of abortions, under circumstances modified to respond to the

---

[12] ACOG, *Medical Management of First-Trimester Abortion*, Practice Bulletin No. 143, at 12 (2014).

[13] ALBME, Joint Not. of Enforcement Discretion by the [ALBME] and the Alabama State Board of Pharmacy (emphasis in original), Mar. 23, 2020, https://www.alabamapublichealth.gov/legal/assets/notice-examiner-pharmacy-enforcement-032320.pdf

COVID-19 crisis, was consistent with guidance issued by leading national medical associations,

including:

- The Ambulatory Surgery Center Association's *COVID-19: Guidance for ASCs for Necessary Surgery*, issued March 18, 2020, which states that consideration of whether delay of a surgery is appropriate must account for risk to the patient of delay, "'including the expectation that a delay of 6–8 weeks or more may be required to emerge from an environment in which COVID-19 is less prevalent.'"[14]

- The Joint Statement by ACOG, the American Association of Gynecologic Laparoscopists, *et al.*, on Elective Surgeries,[15] issued March 16, 2020, which states that "Obstetric and gynecologic procedures for which a delay will negatively affect patient health and safety should not be delayed. This includes gynecologic procedures and procedures related to pregnancy for which delay would harm patient health. Obstetrician–gynecologists and other health care practitioners should be aware of the unintended impact that policies responding to COVID-19 may have, including limiting access to time-sensitive obstetric and gynecological procedures."

- The Joint Statement by the ACOG, the American Board of Obstetrics & Gynecology, *et al.,* on Abortion Access During the COVID-19 Outbreak,[16] issued March 18, 2020, which states that to "the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure' because it 'is an essential component of comprehensive health care' and 'a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."

The continued provision of abortion care was likewise consistent with the CMS guidance initially

relied upon by the Department.  *See* CMS Recommendations. As demonstrated above, abortion is

time-sensitive medical care.  *Id.* (factors to be considered in deciding whether surgeries should

proceed include "[u]rgency of the procedure"). Moreover, because medication abortion occurs at

---

[14] *See also* Am. Surgical Ctr. Ass'n, *COVID-19: Guidance for ASCs on Necessary Surgeries* (last updated Mar. 19, 2020), https://www.ascassociation.org/asca/resourcecenter/
latestnewsresourcecenter/covid-19/covid-19-guidance (quoting Am. Coll. of Surgeons, *COVID-19: Recommendations for Management of Elective Surgical Procedures* (Mar. 13, 2020), https://www.facs.org/about-acs/covid-19/information-for-surgeons/elective-surgery).

[15] Am. Ass'n of Gynecologic Laparoscopists et al., *Joint Statement on Elective Surgery During COVID-19 Pandemic* (Mar. 16, 2020), https://www.aagl.org/news/joint-society-message-on-covid-19/.

[16] ACOG et al., *supra*.

home, because over 99% of procedural abortions in Alabama are performed in the outpatient setting, and because complications from abortion requiring hospital treatment are vanishingly rare, neither method of abortion burdens hospital staff and facilities, let alone requires the use of ICU beds and ventilators. Robinson Decl. ¶ 31. Similarly, because neither method requires an inpatient hospital stay, neither method leaves a patient at risk for contracting COVID-19 during recovery. *See* CMS Recommendations (factors to be considered in deciding whether surgeries should proceed include surgeries' impact on "the supply of [PPE], hospital and intensive care unit beds, and ventilators").

**D.     The March 27 Order and the Resulting Impact**

In the week between the March 20 and March 27 Orders, news articles reported that abortion was considered an "essential" health procedure under the emergency orders.[17] Plaintiffs received calls from anti-abortion protesters demanding to know why they were still open, and anti-abortion activists are believed to have contacted the Governor and the Attorney General to complain that abortion clinics were still open, *see* Robinson Decl. ¶¶ 38-39; "Abolitionists of Alabama" Messages, attached to Robinson Decl. as Attachments 1 & 2.

On March 27, 2020, the Department issued a new order mandating the postponement of *all* surgical and medical procedures not necessary to treat an "emergency medical condition"[18] or

---

[17] *See, e.g.*, Abbey Crain, *Alabama abortion clinics deemed essential amid COVID-19 business closures*, AL.com, Mar. 25, 2020, https://www.al.com/news/2020/03/alabama-abortion-clinics-deemed-essential-amid-covid-19-business-closures.htm

[18] The Order defines an "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain, psychiatric disturbances, and/or symptoms of substance abuse) such that the absence of immediate medical attention could reasonably be expected by a person's licensed medical provider to result in placing the health of the person in serious jeopardy or causing serious impairment to bodily functions or serious dysfunction of bodily organs." March 27 Order at 4.

"avoid serious harm from an underlying condition." March 27 Order at 4. That afternoon, counsel

for Plaintiffs reached out to counsel for ADPH, stating:

> As you know we represent Alabama abortion providers.  They have already taken all necessary and feasible steps to protect the health and safety of their patients and staff while continuing to provide only that care which is essential to patient health and cannot be delayed without risk to patient health.

> We have now become aware of a new order effective March 28, 2020, at 5 p.m. regarding postponement of dental, medical or surgical procedures with exceptions.

> As you may know, the Joint Statement by the American College of Obstetricians and Gynecologists, the American Board of Obstetrics & Gynecology, *et al.,* on Abortion Access During the COVID-19 Outbreak, issued March 18, 2020, states that to "the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure" because it "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely                inaccessible." *See* https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

> We believe that medication abortion is not a procedure within the terms of the order and that surgical abortion procedures fall within the exceptions.  If the department disagrees and intends to enforce the order against the clinics, please let us know before the effective date and time of the order so that we may seek the appropriate legal relief.

Email from Randall Marshall to Dana Billingsley (Mar. 27, 2020, 4:00 p.m.), attached to Marshall

Decl. as Attachment 3. Counsel for ADPH did not respond, and instead referred the request for

clarification to the Office of the Attorney General who responded that evening, as follows:

> The Alabama Department of Public Health referred your inquiry to our office. As the order indicates, procedures are exempt from mandatory postponement only if they meet the criteria set out in 7a. or b.

> The Attorney General has issued enforcement guidance that is available for your review at the following link:
> https://www.alabamaag.gov/Documents/files/03-27-2020-GuidanceEnforcementStateHealthOrder.pdf.

Email from Katherine Robertson to Randall Marshall (Mar. 27, 2020, 8:23 p.m.), attached to Marshall Decl. as Attachment 4. The Attorney General's "Guidance for Law Enforcement" explains that each violation of the March 27 Order constitutes a misdemeanor under Ala. Code § 22-2-14. *See* Steve Marshall, Attorney General, Guidance for Law Enforcement, Mar. 27, 2020, attached to Pls.' Supplemental and Partially Verified Compl. for Declaratory and Injunctive Relief as Ex. D. The guidance goes on to state (emphasis in the original): "While the unprecedented nature of this pandemic and the government's evolving response seem to demand some restraint related to criminal enforcement of this order, **if a violator has been made aware of the state health order and the refusal to comply presents a threat to public health and safety, [criminal penalties] are available as an enforcement tool.**" *Id.*

On March 28, 2020, Plaintiffs' counsel again wrote to counsel for the ADPH and the Attorney General requesting clarification:

> As noted in our original email, we interpret the order not to apply to medication abortion because it is neither a surgery nor a procedure, or to apply to surgical abortions because they fall within the exceptions. If the Attorney General or the Department disagrees and intends to enforce the order against the clinics and physicians that provide medication and/or surgical abortions, please let us know before the effective date and time of the order so that we may seek the appropriate legal relief.

Email from Randall Marshall to Katherine Robertson (Mar. 28, 2020, 9:27 a.m.), attached to Marshall Decl. as Attachment 5.

Receiving no response, on the morning of March 29, Plaintiffs' counsel once again wrote to Defendants' counsel, informing them of Plaintiffs' intention to sue if assurances that they could

continue to provide abortion care were not forthcoming.   Email from Randall Marshall to Katherine Robertson et al. (Mar. 29, 2020, 9:11 a.m.), attached to Marshall Decl. as Attachment 6..   Later that afternoon, Plaintiffs received an email from the Office of the Attorney General, stating: "Per the order, we are unable to provide you with a blanket affirmation that abortions will, in every case, fall within one of the exemptions." Email from Katherine Robertson to Randall Marshall (Mar. 29, 2020, 2:23 p.m.), attached to Marshall Decl. as Attachment 7. Plaintiffs filed the instant request for injunctive relief the next day.

Plaintiffs have already had to cancel appointments for 17 patients who were scheduled for this week.  Gray Decl ¶ 18.  If an injunction does not issue, they will be forced to cancel or turn away hundreds more.  Gray Decl. ¶ 18; Robinson Decl. ¶¶ 7-8.  Patients that have already had their appointments cancelled have been devastated; in many instances the calls cancelling the appointments have ended in tears.  Gray Decl. ¶19; Doe Decl. ¶¶ 15-16.  In the best case scenario, absent an injunction, patients will have their abortions delayed, increasing the risk to their health and the cost of the procedure. Gray Decl. ¶ 24; Robinson Decl. ¶¶ 7-8, 46-47, 50-51.  In many other instances, however, they will be unable to have an abortion at all and will be forced to bear a child against their will.  Gray Decl. ¶ 24; Robinson Decl. ¶¶ 7-8, 52-54.  All will face the enormous anxiety and distress of not knowing whether they will be able to get the care they need. *See generally* Doe Decl.; Gray Decl. ¶ 24; Robinson Decl. ¶¶ 46-54.

## ARGUMENT

Plaintiffs seek an *ex parte* TRO, and thereafter, a preliminary injunction, to prevent the March 27 Order from inflicting imminent and irreparable injury on Plaintiffs' patients who will be deprived health care necessary to protect themselves from serious harm, along with ability to exercise their constitutional rights. As set forth in Plaintiffs' motion the requirements for an *ex*

18

*parte* TRO have been met. *See* Fed. R. Civ. P. 65(b)(1). Moreover, as is discussed further below, Plaintiffs are entitled to injunctive relief because the following four factors weigh heavily in Plaintiffs' favor: (1) whether the movant has a substantial likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether threatened injury to the movant outweighs any damage the proposed injunction would cause the opposing party; and (4) whether entry of relief in Plaintiffs' favor is in the public interest. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

Here, Defendants interpretation of the March 27 Order to prohibit pre-viability abortions directly contravenes decades of binding Supreme Court precedent, and is wholly unjustified by the current crisis.  Moreover, injunctive relief will prevent severe and irreparable harm to Plaintiffs' patients; is consistent with the balance of hardships; and serves the public interest. Accordingly, this Court should grant Plaintiffs' request for injunctive relief.

## I.    PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR SUBSTANTIVE DUE PROCESS CLAIM.

Plaintiffs are certain to succeed on the merits of their claim that applying the March 27 Order to prohibit pre-viability abortions violates Plaintiffs' patients' constitutional rights. As this Court recently recognized, "banning abortion before viability violates Supreme Court precedent" and "contravenes established law." *Robinson v. Marshall*, 415 F. Supp. 3d 1053, 1057–58 (M.D. Ala. 2019).  Specifically, as this Court recognized, the Supreme Court held in *Roe v. Wade*, 410 U.S. 113 (1973), that the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution protects a woman's right to choose abortion, 410 U.S. at 153–54, and that prior to viability, a state may not ban abortion, *id.* at 163–65. Rather, a state may proscribe abortion only *after* viability, and even then, it must allow abortion where necessary to preserve the life or health

of the patient. *Id.* at 163–64. The Supreme Court has repeatedly reaffirmed this core holding, including as recently as 2016. *See, e.g.*, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016); *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 846, 871 (1992)..

Unsurprisingly, attempts to ban abortion prior to viability have been uniformly rejected by appellate courts across the country. *See*, *e.g.*, *Jackson Women's Health Org. v. Dobbs*, 951 F.3d 246, 248 (5th Cir. 2020) (per curiam) ("*Jackson III*") (ban on abortions starting at six weeks); *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 268–69 (5th Cir. 2019) ("*Jackson II*") (ban on abortions starting at fifteen weeks); *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 772–73 (8th Cir. 2015) (ban on abortions after six weeks), *cert. denied*, 136 S. Ct. 981 (2016); *Edwards v. Beck*, 786 F.3d 1113, 1117–19 (8th Cir. 2015) (ban on abortions after twelve weeks), *cert. denied*, 136 S. Ct. 895 (2016); *Isaacson v. Horne*, 716 F.3d 1213, 1217, 1231 (9th Cir. 2013) (ban on abortions starting at twenty weeks), *cert. denied*, 571 U.S. 1127  (2014); *Jane L. v. Bangerter*, 102 F.3d 1112, 1117–18 (10th Cir. 1996) (ban on abortions starting at twenty weeks), *cert. denied*, 520 U.S. 1274 (1997); *Sojourner T. v. Edwards*, 974 F.2d 27, 29, 31 (5th Cir. 1992) (ban on all abortions), *cert. denied*, 507 U.S. 972 (1993); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1368–69, 1371–72 (9th Cir. 1992) (ban on all abortions), *cert. denied*, 506 U.S. 1011 (1992).

Defendants may argue that the March 27 Order is not a ban because it permits some— albeit an unknown quantity—pre-viability abortions that Defendants believe fit the Order's exceptions. Defendants may also argue that because of the current crisis, this Court should apply the undue burden balancing test that applies to abortion regulations, rather than the "bright-line rule" set forth above that governs abortion bans. *Robinson*, 415 F. Supp. 3d at 1056.  Under that balancing test, a regulation that, "while furthering [a] valid state interest, has the effect of placing

20

a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Whole Woman's Health*, 136 S. Ct. at 2309 (alteration in the original) (quoting *Casey*, 505 U.S. at 877).   This test "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at 2309. [19]

Neither argument withstands scrutiny. "Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 879. Thus, the availability of abortions for *some* women "does not [] alter the nature of the burden" the March 27 Order imposes on those whom ADPH or the Attorney General deem do not meet its exceptions. *Horne*, 716 F.3d at 1227. Indeed, as this Court and others have specifically recognized, "[a] medical exception cannot save an otherwise unconstitutional ban," *Robinson*, 415 F. Supp. 3d at 1058 (internal quotation marks and citation omitted); *see also Horne*, 716 F.3d. at 1227 (holding a "law's emergency exception does not transform it from a ban into a limitation as to the mode or manner of conducting abortions . . . even with a medical emergency exception, a proscription on a woman's *choice* to undergo an abortion remains invalid.); *West Ala. Women's Center v. Miller*, 299 F. Supp. 3d 1244, 1283 (M.D. Ala. 2017) ("*WAWC III*") (holding that a "health-exception . . . does not nullify the burden the fetal-demise requirement creates on women's access to second-trimester abortion"). What is more, the Department's and Attorney General's refusals to provide any guidance as to what the exceptions mean, and the Attorney General's written guidance

---

[19] Defendants may additionally argue that the March 27 Order is not a ban because it is limited in duration, even though no one—particularly not Defendants—can say with any certainty how limited it actually is. This is irrelevant. First, there is no authority holding that a state may ban abortion for weeks at a time, so long as it intends to lift the ban at some unknown point in the future. Second, it is extremely unlikely that the crisis will be over in a matter of weeks. *See supra.*. Third, even a three-week delay unnecessarily jeopardizes patient health, and will prevent some patients from obtaining an abortion altogether. Robinson Decl. ¶¶ 7-8, 46-55.  As set forth below, no state interests justify these harms.

concerning prosecution of violations of the March 27 Order, make it extremely unlikely that except in extraordinary circumstances any provider would risk the "tender mercies of a prosecutor's discretion and the vagaries of a jury's decision" and continue to provide abortions under the Order. *West Ala. Women's Center v. Williamson*, 900 F.3d 1310, 1329 (11th Cir. 2018); Robinson Decl. ¶¶ 44-45.

Perhaps more importantly, even if there were emergency circumstances that could justify governmental action forcing pregnant people to remain pregnant against their will – and even if it were appropriate to balance the burdens of banning abortions against the benefits it confers – the application of the March 27 Order to pre-viability abortions would be unconstitutional. As detailed below, nothing about the COVID-19 crisis justifies banning abortion and the burdens imposed by doing so are significant.

**First,** the State cannot demonstrate that prohibiting abortion, a "time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible," ACOG et al., *supra*, advances any COVID-19 related interests. The stated purpose of the March 27 Order is to implement "further social distancing measures . . . to prevent the spread of COVID-19." March 27 Order at 1.[20]  However, patients who are prohibited from obtaining abortions must seek prenatal care and will likely have to make at least one (if not multiple) trips to health care facilities—meeting with multiple health care providers—for the duration of the March 27 Order, as well as any likely extension of that (or a subsequent) order. Robinson Decl. ¶¶ 32-33, 35.  Those with complicated pregnancies will require even more interventions. *Id.* at ¶ 32. Some of these patients will ultimately give birth, requiring

---

[20] Although the March 27 Order does not state that the preservation of PPE is one of its purposes, as explained above, *see supra*, the provision on abortion care uses little PPE and far less than what is needed for prenatal care and delivery.

the patient to be admitted to one of the State's already over-burdened hospitals for multiple days. *Id.* at ¶ 34.[21] By contrast, over 99% of abortions in Alabama are performed *outside* the hospital in Plaintiffs' outpatient facilities. *See id.* at ¶ 31. Moreover, prohibiting abortion will force some patients to attempt to travel to other states to try to access abortion care, and potentially using public transportation, even though public health experts have advised the public to minimize activities outside the home. *Id.* at ¶¶ 50-51. Finally, because "pregnant women are known to be at greater risk of severe morbidity and mortality from other respiratory infections such as influenza and SARS-CoV," and should be considered an "at-risk population for COVID-19,"[22] forcing people to remain pregnant against their will actually increases the risk to the public health.

**Second**, circumstances strongly suggest that what began as a reasonable public health approach to the COVID-19 crisis, has now devolved into a politically-motivated attempt to use the State Public Health officer's emergency powers to prohibit abortions. *See* Marshall Decl. ¶¶ 2-14; Robinson Decl. ¶¶ 38-40; *see also* n.17, *supra*. To begin with, the plain language of the March 27 Order should not apply to pre-viability abortions. The March 27 Order contains two exceptions: one for *immediate* emergency medical care and one for care that is necessary to avoid serious harm to the patient—*regardless* of whether the patient's condition has deteriorated to the point that the need for medical care is urgent *and regardless* of whether a given procedure could be delayed for some set period of time without unduly jeopardizing patient health. All abortions protect the health

---

[21] *See, e.g.*, Jayme Fraser & Matt Wynn, *US hospitals will run out of beds if coronavirus cases spike*, USA TODAY, Mar. 13, 2020 (estimating that there will be 12-14 seriously ill patients per available hospital bed in Alabama), https://www.usatoday.com/in-depth/news/investigations/2020/03/13/us-hospitals-overwhlemed-coronavirus-cases-result-in-too-few-beds/5002942002/.

[22] ACOG, *Practice Advisory - Novel Coronavirus 2019 (COVID-19)* (last updated Mar. 13, 2020), https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/novel-coronavirus-2019; *see also* Ctrs. for Disease Control & Prevention, *Information for Healthcare Providers: COVID-19 and Pregnant Women* (last updated Mar. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq.html.

of the person who does not want to continue their pregnancy to term. *See* Robinson Decl. ¶ 41. By taking the position that the March 27 Order nonetheless bans some pre-viability abortions, the Attorney General belies an intention to prohibit abortion for its own sake. This is not a legitimate state interest. *See Casey*, 505 U.S. at 877 ("A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it.").

Nor is there any rational justification for the Department's and Attorney General's refusal to clarify that medication abortion, which only involves taking medications by mouth, is not "surgery" or a "procedure" under the terms of the March 27 Order. Indeed, it is difficult to imagine any context *other* than abortion where the ADPH would refuse to clarify for its licensees the terms of its own orders—particularly where violations of that order carry criminal penalties. Moreover, as discussed above, as between medication or procedural abortions—let alone as between any abortion at all and continuing a pregnancy to term—medication abortion requires the least health care resources and uses the least PPE.  Robinson Decl. ¶ 30.  Once again, the refusal to provide any clarity as to what abortions ADPH or the Attorney General believe constitute criminal acts under the March 27 Order belies a desire to prohibit abortion, not to preserve even some access to essential health care.

Moreover, prohibiting patients from exercising their constitutional right to abortion becomes even more difficult to justify when viewed against the other activities that are still permissible in Alabama. As just one example, the need for social distancing clearly is not so great as to prevent the Alabama Alcoholic Beverage Control Board from issuing an "emergency rule"

permitting the sale of alcoholic beverages for off-site consumption using "curbside pick-up or take-out services." Ala. Admin. Code r. 20-X-6-.19 (Mar. 24, 2020).[23] Indeed, the State Public Health Officer has effectively deemed such businesses "essential," and refrained from ordering their closure or from prohibiting their employees traveling to and from work every day and interacting with customers. *See* March 27 Order. However, Plaintiffs and their staff cannot continue to interact with their patients to provide time-sensitive, constitutionally protected medical services – even to hand them medications – except in extremely narrow circumstances.

What is more, Paragraph 9 of the March 27 Order expressly permits "organizers and sponsors of otherwise suspended events" to seek an exemption from the Order's terms, and states "[w]hile the State Health Officer is under no obligation to grant such an exemption, it shall be fairly considered based on the following criteria":

> a. Effective measures have been taken to identify those attending the event who may potentially be affected with COVID-19, including but not limited to personal testing for the disease or submission of current medical clearances to the organizer.

> b. Effective measures have been taken to prevent the spread of infection even by those that are infected while not symptomatic, including the provision of anti-infection measures such as proper face masks [PPE], personal sanitation measures, and other measures that may be considered proper.

As the Department is aware, Plaintiffs have taken substantial steps to be able to continue to provide essential health care—care that is "central to personal dignity and autonomy," *Robinson*, 415 F. Supp. 3d at 1059—while protecting their patients and staff. Marshall Decl. ¶¶ 6-7; Robinson Decl. ¶¶ 22-26; *see also* Gray Decl. ¶¶ 8-14. Yet, while the Department is apparently willing to at least consider whether these measures may be sufficient to allow sponsored gatherings to take place in

---

[23] Available at, https://www.alabamapublichealth.gov/legal/assets/order-abc-curbside-sales032420.pdf.

25

Alabama in the midst of the COVID-19 crisis, neither the Department or the Attorney General is willing to consider these measures sufficient to permit individuals to exercise their constitutional right to decide whether and when to bear a child.  In effect, the State has effectively achieved through emergency measures in 2020 what the legislature could not in 2019: a near-total ban on abortions.

While the benefits of prohibiting pre-viability abortion during the COVID-19 crisis are virtually non-existent (if not wholly pretextual), the burdens are significant.  Indeed, this Court has addressed the effects of preventing patients from accessing abortion—even temporarily—imposes on women in Alabama no less than four times over the past six years. *See Robinson*, 415 F. Supp. 3d at 1058-59; *Miller*, 217 F. Supp. 3d at 1327–1332; *W. Ala. Women's Ctr. v. Williamson*, 120 F. Supp. 3d 1296,  1309–12 (M.D. Ala. 2015); *Strange*, 33 F. Supp. 3d at 1355–63.  As applied, the March 27 Order will prevent women who would have obtained abortions from obtaining them to the detriment of their health and wellbeing; delay others' access to abortion, also to the detriment of their health and wellbeing; and impose other physical, emotional, and dignitary harms on patients and their families. Doe Decl. ¶¶ 5-6, 15-16; Gray Decl. ¶¶ 7, 18-24; Robinson Decl. ¶¶ 46-55.  And "[e]very one of them will suffer the anxiety that comes with not knowing whether they will face the life-altering consequences of having to continue a pregnancy against their will." Gray Decl. ¶ 24.  Moreover, as discussed above, while abortion is always safer than continuing a pregnancy to term, the risks of carrying a pregnancy to term are heightened in light of the COVID-19 crisis. These burdens will fall particularly harshly on racial minorities, people with low-incomes, and people experiencing domestic violence and abuse—communities already hard-hit by the physical, economic, and social implications of the COVID-19 crisis. Suppl. Compl. ¶¶ 111-115. Further, prohibiting abortion increases the risk that some people "who desperately seek to

exercise their ability to decide whether to have a child [will] take unsafe measures to end their pregnancies." *Strange*, 33 F. Supp. 3d at 1363; *see also W. Ala. Women's Ctr.*, 120 F. Supp. 3d at 1309-12.  Finally, when the March 27 Order is finally lifted, it is likely to strain the capacity of existing remaining providers to care for women in need of abortion services. Robinson Decl. ¶¶ 48-49. As such, the burdens of the March 27 Order, as applied by Defendants, far outweigh its putative benefits and is therefore unconstitutional.  *See Casey*, 505 U.S. at 878 ("Unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right."); *see also Hellerstedt*, 136 S. Ct. at 2309.

## II.   PLAINTIFFS' PATIENTS WILL SUFFER IRREPARABLE HARM IF THE MARCH 27 ORDER IS ENFORCED AGAINST PRE-VIABILITY ABORTIONS.

Plaintiffs' patients will suffer serious and irreparable harm in the absence of a temporary restraining order and preliminary injunction. First, the application of the March 27 Order to pre-viability abortions violates the constitutional right to privacy, which inflicts *per se* irreparable harm.  *See Robinson*, 415 F. Supp. 3d at 1058 ("[A]ny ongoing violation of the constitutional right to privacy constitutes 'irreparable injury.'") (internal citations omitted); *see also Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (citing *Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981)); *Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013). And, as demonstrated above, forcing patients to forgo abortion care and remain pregnant against their will inflicts serious physical, emotional, and psychological consequences that alone constitute irreparable harm. *See also Roe*, 410 U.S. at 153 ("The detriment that the State would impose upon the pregnant woman by denying this choice altogether is apparent."); *Bentley*, 951 F. Supp. 2d at

1289.   This "disruption or denial of . . . patients' health care cannot be undone after a trial on the merits." *Planned Parenthood of Kan. & Mid-Mo. v. Andersen*, 882 F.3d 1205, 1236 (10th Cir. 2018) (internal quotation marks omitted), *cert. denied sub nom. Andersen v. Planned Parenthood of Kan. & Mid-Mo.*, 139 S. Ct. 638 (2018). That the State would inflict these irreparable harms on Alabamians in the midst of an unprecedented global pandemic, putting them at greater risk of complications from COVID-19, only underscores the need for injunctive relief.

## III.    THE BALANCE OF HARMS AND PUBLIC INTEREST SUPPORT INJUNCTIVE RELIEF.

Plaintiffs' requested relief will "essentially continue[] the status quo," tipping the balance of equities toward Plaintiffs and serving the public interest. *Jackson Women's Health Org. v. Currier*, 940 F. Supp. 2d 416, 424 (S.D. Miss. 2013), *aff'd*, 760 F.3d 448 (5th Cir. 2014). In addition, given the likelihood that the March 27 Order will be extended, it is likely that many of Plaintiffs' patients will be forced to forgo an abortion entirely and carry an unwanted pregnancy to term. Where civil rights are at stake, an injunction *serves* the public interest because the injunction "would protect the public interest by protecting those rights to which it too is entitled." *Nat'l Abortion Fed'n v. Metro. Atlanta Rapid Transit Auth.*, 112 F. Supp. 2d 1320, 1328 (N.D. Ga. 2000); *see also Jackson Women's Health Org.*, 940 F. Supp. 2d at 424 ("[T]he grant of an injunction will not disserve the public interest . . . when an injunction is designed to avoid constitutional deprivations."). Moreover, as set forth more fully above, the non-existent benefits of forcing patients to remain pregnant against their will is outweighed by the harm of eliminating abortion access in the midst of a pandemic that increases the risks of continuing an unwanted pregnancy, as well as the risks of traveling to other states in search of time-sensitive medical care.

Particularly where Plaintiffs are already taking steps to protect the safety of their patients and staff, injunctive relief here is supported by the balance of harms and the public interest.

## IV.      A BOND IS NOT NECESSARY IN THIS CASE.

This Court should waive the Federal Rule of Civil Procedure 65(c) bond requirement. As the Eleventh Circuit held in *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, LLC*, "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.'"  425 F.3d 964, 971 (11th Cir. 2005) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)).  The Court should use its discretion to waive the requirement in this case, as the preliminary injunction will not result in a monetary loss for Defendant.  Moreover, Plaintiffs are healthcare providers dedicated to serving low-income and underserved communities, and a bond would strain their already-limited resources.

## CONCLUSION

For these reasons, this Court should grant Plaintiffs' motion for a temporary restraining order and, following that, a preliminary injunction to enjoin enforcement of the March 27 Order to prohibit pre-viability abortions.

Dated: March 30, 2020

Respectfully submitted,

/s/Alexa Kolbi-Molinas
Alexa Kolbi-Molinas *
New York State Bar No. 4477519
Meagan Burrows *
New York State Bar No. 5341904

29

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
akolbi-molinas@aclu.org
mburrows@aclu.org
(212) 519-7845

Randall C. Marshall
ASB-3023-A56M
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-1747
rmarshall@aclualabama.org

*Attorneys for Plaintiffs Yashica Robinson, M.D., Alabama Women's Center, Reproductive Health Services, and West Alabama Women's Center*

*\*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 30, 2020, I electronically filed the foregoing with the Clerk of Court for the United States District Court for the Middle District of Alabama using the CM/ECF system, thereby serving all counsel of record, and served the State Public Health Officer, Proposed Defendant Scott Harris, by and through his attorneys through the email addresses below:

- Brian Hale, brian.hale@adph.state.al.us

- Dana Billingsly, dana.billingsley@adph.state.al.us

/s/ Randall Marshall
Randall Marshall

*Attorney for Plaintiffs Yashica Robinson,
M.D., Alabama Women's Center,
Reproductive Health Services, and West
Alabama Women's Center*
