## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

|  |  |
|---|---|
| YASHICA ROBINSON, M.D., ALABAMA WOMEN'S CENTER, PLANNED PARENTHOOD SOUTHEAST INC., REPRODUCTIVE HEALTH SERVICES, and WEST ALABAMA WOMEN'S CENTER, on behalf of themselves, their patients, physicians, clinic administrators, and staff, | |
| | CIVIL ACTION NO.2:19-cv-365-MHT-JTA |
| Plaintiffs, | |
| v. | |
| STEVEN MARSHALL, in his official capacity as Alabama Attorney General, | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiffs, by and through their attorneys, bring this Supplemental and Partially Verified Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof state the following:

## INTRODUCTION

1.     This is a constitutional challenge, under 42 U.S.C. § 1983, to House Bill 314 (hereinafter "H.B. 314" or "the 2019 Ban"), attached hereto as Exhibit A,

which bans nearly all abortions in Alabama.

2.     This is also a constitutional challenge to the Alabama State Public Health Officer's March 27, 2020 emergency order (the "March 27 Order" or "Order") attached hereto as Exhibit B, as applied to prohibit pre-viability abortions in Alabama.

3.     People seek abortions for a multitude of diverse, complex, and interrelated factors that are intimately linked to their values and beliefs, culture and religion, health status and reproductive history, familial situation, educational and/or career goals, and resources and economic stability.

4.     For over forty-six years—since the Supreme Court decided *Roe v. Wade*, 410 U.S. 113 (1973)—U.S. law has recognized the fundamental federal constitutional right to make the profoundly important and personal decision whether or not to terminate a pregnancy. The U.S. Supreme Court has repeatedly recognized that this right is central to obtaining equality and respecting the dignity, autonomy, and bodily integrity of all individuals.

5.     By criminalizing the performance of an abortion (or attempted performance of an abortion) at all points in pregnancy, H.B. 314 directly conflicts with *Roe* and more than four decades of Supreme Court precedent affirming its central holding.

6.     Indeed, H.B. 314 was drafted by Eric Johnston of the Alabama Pro-

Life Coalition, who said that he fully "expect[s] . . . holdings of unconstitutionality in the trial court and in the appellate court."[1] The 2019 Ban's sponsor in the Alabama House of Representatives, Republican State Representative Terri Collins, has likewise admitted that H.B. 314 is "unconstitutional" and that "all our pro-life bills are unconstitutional right now."[2]

7.    Even Governor Kay Ivey acknowledged, upon signing H.B. 314 into law, that Alabama's pre-1973 criminal abortion ban "has been rendered unenforceable as a result of the U.S. Supreme Court decision in *Roe v. Wade*" and that H.B. 314 "may similarly be unenforceable."[3]

8.    Likewise, by using the State Public Health Officer's emergency powers to criminalize pre-viability abortions, the March 27 Order directly conflicts with *Roe* and more than four decades of Supreme Court precedent affirming its central holding and is unconstitutionally vague.

9.    Absent an order from this Court, H.B. 314 is scheduled to take effect

---

[1] *All Things Considered: Author of Alabama Restrictive Abortion Bill Wants to Revisit Roe v. Wade Decision* (National Public Radio broadcast May 16, 2019) (transcript available at https://www.npr.org/2019/05/16/724089804/author-of-alabama-restrictive-abortion-bill-wants-to-revisit-roe-v-wade-decision).

[2] Jenny Jarvie, *Conservative states enact abortion bans in hope of overturning Roe vs. Wade*, LOS ANGELES TIMES, May 11, 2019, https://www.latimes.com/nation/la-na-abortion-bans-states-roe-wade-supreme-court-20190511-story.html.

[3] *Governor Ivey Issues Statement After Signing the Alabama Human Life Protection Act*, Office of the Governor, May 15, 2019, https://governor.alabama.gov/statements/governor-ivey-issues-statement-after-signing-the-alabama-human-life-protection-act/.

on November 15, 2019, at which point Plaintiffs will be forced to stop providing and/or referring for abortions. Enforcement of the 2019 Ban will thereby inflict immediate and irreparable harm on Plaintiffs' patients by violating their constitutional rights, threatening their health and well-being, and forcing them to continue their pregnancies to term against their will.

10.     Further, absent an order from this Court, the March 27 Order will force Plaintiffs to stop providing pre-viability abortions for the duration that the March 27 Order, or any amended or subsequent version thereof, remains in effect. Enforcement of the March 27 Order will thereby inflict immediate and irreparable harm on Plaintiffs' patients by violating their constitutional rights, threatening their health and well-being, and forcing them to continue their pregnancies to term against their will.

11.     Accordingly, Plaintiffs request (1) this Court declare H.B. 314 unconstitutional under more than four decades of binding Supreme Court precedent and enjoin its enforcement; and (2) this Court declare the March 27 Order unconstitutional, as applied to ban pre-viability abortion, under more than four decades of binding Supreme Court precedent and to enjoin its enforcement.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

4

13.     Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occur in this judicial district and because Defendants Marshall, Bailey, Harris, Lequire, and Walburn, who are sued in their official capacities, carry out their official duties at offices located in this district.

## **PLAINTIFFS**

15.     Plaintiff Yashica Robinson, M.D., is a highly experienced, board-certified OB-GYN and abortion provider, and is the Medical Director of the Alabama Women's Center ("AWC") in Huntsville, Alabama. Dr. Robinson provides pre-viability abortions, which are banned under H.B. 314 and the March 27 Order, as applied by Defendants Marshall and Harris. Dr. Robinson sues on her own behalf and on behalf of her patients.

16.     Plaintiff AWC has provided safe and legal abortions in Huntsville, Alabama, for nearly twenty years. In addition to providing abortions, which are banned under H.B. 314 and the March 27 Order, as applied by Defendants Marshall and Harris, AWC also provides a range of high-quality reproductive health services, including contraceptive counseling and care, testing and treatment

5

for sexually transmitted infections, pregnancy testing and options counseling, and referrals for prenatal care and adoption services. Plaintiff AWC is the sole abortion clinic in Huntsville. AWC sues on its own behalf and on behalf of its patients, clinic administrator, physicians, and staff.

17.    Plaintiff Planned Parenthood Southeast, Inc. ("PPSE") is a not-for profit corporation, organized under the laws of Georgia. PPSE, which operates seven health centers in Alabama, Georgia, and Mississippi, provides comprehensive reproductive health care, including family planning services, testing and treatment for sexually transmitted infections, cancer screening and treatment, pregnancy testing and all options counseling, and, at four health centers in Georgia, medication abortion. Through a corporate predecessor, PPSE has provided care in Alabama since 1930. PPSE operates two health centers in Alabama, in Birmingham and Mobile. It is currently building a new facility in Birmingham where it will relocate, and renovating its Mobile health center. PPSE has provided abortions in Alabama in the past, and intends to provide abortions again in the near future, before the end of the year. In the meantime, PPSE refers its Alabama patients seeking abortions to other providers, including the other Plaintiffs. PPSE sues on its own behalf and on behalf of its patients, clinic administrators, physicians, and staff.

18.    Plaintiff Reproductive Health Services ("RHS") has provided safe and

legal abortion services in Montgomery, Alabama, for nearly four decades. In addition to providing abortions, which are banned by H.B. 314 and the March 27 Order, as applied by Defendants Marshall and Harris, RHS provides a range of high-quality reproductive health care services, including routine pap smears and well-woman exams; testing for sexually transmitted infections; contraceptive counseling and care, including Depo Provera shots; pregnancy testing and all options counseling; and referrals for pre-natal care and/or adoption services. RHS is the sole abortion clinic in Montgomery. RHS sues on its own behalf and on behalf of its patients, clinic administrator, physicians, and staff.

19.     Plaintiff West Alabama Women's Center ("WAWC") has provided safe and legal abortions in Tuscaloosa, Alabama, for more than two decades. In addition to providing abortions, which would be banned by H.B. 314 and the March 27 Order, as applied by Defendants Marshall and Harris, WAWC also provides a range of high-quality reproductive health services, including contraceptive counseling and care, testing and treatment for sexually transmitted infections, pregnancy testing and options counseling, and referrals for prenatal care and adoption services. WAWC is the sole abortion clinic in Tuscaloosa. WAWC sues on its own behalf and on behalf of its patients, clinic administrator, physicians, and staff.

**DEFENDANTS**

7

20.     Defendant Steve Marshall is the Attorney General of the State of Alabama, located at 501 Washington Avenue, Montgomery, Alabama. The Attorney General may, at "any time he [] deems proper,  . . . superintend and direct the prosecution of any criminal case in any of the courts of this state," Ala. Code § 36-15-14, and may also "direct any district attorney to aid and assist in the investigation or prosecution of any case in which the state is interested," *id.* at § 36-15-15. As such, Defendant Marshall is responsible for criminal enforcement of H.B. 314, Ala. Code § 26-23E-12(c), and the March 27 Order. Defendant Marshall is sued in his official capacity.

21.     Defendant Robert L. Broussard is District Attorney for Madison County, located at 100 North Side Square, Huntsville, Alabama. District attorneys have the power to "draw up all indictments and to prosecute all indictable offenses" within their jurisdiction. Ala. Code § 12-17-184(2). As such, Defendant Broussard is responsible for criminal enforcement of, *inter alia*, H.B. 314, Ala. Code § 26-23E-12(c), and the March 27 Order in Huntsville. Defendant Broussard is sued in his official capacity.

22.      Defendant Danny Carr is District Attorney for Jefferson County, located at 801 Richard Arrington Jr. Blvd. N., Birmingham, Alabama. District attorneys have the power to "draw up all indictments and to prosecute all indictable offenses" within their jurisdiction. Ala. Code § 12-17-184(2). As such, Defendant

Carr is responsible for criminal enforcement of, *inter alia*, H.B. 314, Ala. Code § 26-23E-12(c), and the March 27 Order in Birmingham. Defendant Carr is sued in his official capacity.

23.     Defendant Ashley Rich is District Attorney for Mobile County, located at 205 Government Street, Mobile, Alabama. District attorneys have the power to "draw up all indictments and to prosecute all indictable offenses" within their jurisdiction. Ala. Code § 12-17-184(2). As such, Defendant Rich is responsible for criminal enforcement of, *inter alia*, H.B. 314, Ala. Code § 26-23E-12(c), and the March 27 Order in Mobile. Defendant Rich is sued in her official capacity.

24.     Defendant Daryl D. Bailey is District Attorney for Montgomery County, located at 251 South Lawrence Street, Montgomery, Alabama. District attorneys have the power to "draw up all indictments and to prosecute all indictable offenses" within their jurisdiction. Ala. Code § 12-17-184(2). As such, Defendant Bailey is responsible for criminal enforcement of, *inter alia*, H.B. 314, Ala. Code § 26-23E-12(c), and March 27 Order in Montgomery. Defendant Bailey is sued in his official capacity.

25.     Defendant Hays Webb is District Attorney for Tuscaloosa County, located at 714 Greensboro Avenue, Suite 410, Tuscaloosa, Alabama. District attorneys have the power to "draw up all indictments and to prosecute all indictable

offenses" within their jurisdiction. Ala. Code § 12-17-184(2). As such, Defendant

Webb is responsible for criminal enforcement of, *inter alia*, H.B. 314, Ala. Code §

26-23E-12(c), and March 27 Order in Tuscaloosa. Defendant Webb is sued in his

official capacity.

26.     Defendant Scott Harris, M.D., is the State Health Officer at the

Alabama State Department of Public Health ("ADPH"), located at 201 Monroe

Street, Montgomery, Alabama. Defendant Harris promulgated the March 27 Order

pursuant to Ala. Code § 22-2-2(4), which authorizes the State Health Officer, on

behalf of the State Board of Health, to direct that conditions prejudicial to health in

public places within the State be abated. Among other things, he is responsible for

supervising and directing all activities of ADPH, pursuant to Ala. Code § 22-2-2 *et*

*seq.*, including the licensing, inspecting, and disciplining of abortion or

reproductive health care centers, *see id.* at § 22-21-20 *et seq.*; Ala. Admin. Code r.

420-5-1-.01 *et seq.*  As such, Defendant Harris is responsible for ensuring that

patient care at abortion clinics is "rendered in accordance with all applicable . . .

state . . . laws," Ala. Admin. Code r. 420-5-1-.03(1), including H.B. 314 and the

March 27 Order. Defendant Harris is sued in his official capacity.

27.     Defendant Mark H. Lequire, M.D., is the Chairman of the Alabama

Board of Medical Examiners ("ALBME"), located at 848 Washington Avenue,

Montgomery, Alabama. The Board of Medical Examiners may, on its own motion,

investigate any evidence which appears to show that a physician is or may be guilty of any of the acts, offenses, or conditions set forth in Ala. Code § 34-24-360, which includes, *inter alia*, conviction of a felony and "unprofessional conduct," as defined in the Alabama Administrative Code, and recommend or request that the Medical Licensure Commission of Alabama suspend or revoke the license of a physician. *See id.* at § 34-24-361; Ala. Admin. Code r. 540-X-1-.07. As such, Defendant Lequire is responsible for initiating actions that could result in penalties or other adverse actions taken against physicians' licenses relating to violations of H.B. 314 and the March 27 Order.. Defendant Lequire is sued in his official capacity.

28. Defendant James H. Walburn, M.D., is the Chairman of the Medical Licensure Commission of Alabama ("MLCA"), located at 848 Washington Avenue, Montgomery, Alabama. The MLCA shall have the power and duty to suspend, revoke, or restrict any license to practice medicine or osteopathy in the State of Alabama or place on probation or fine any licensee whenever the licensee shall be found guilty on the basis of substantial evidence of, *inter alia*, conviction of a felony or "unprofessional conduct," as defined in the Alabama Administrative Code. *See* Ala. Code § 34-24-360; Ala. Admin. Code r. 545-X-1-.06; Ala. Admin. Code r. 545-X-4-.06. In addition, the MLCA is authorized to "call upon the attorney general, district attorney, or other prosecuting attorneys of this state to

11

assist in any request." Ala. Admin. Code r. 545-X-1-.06(5). As such, Defendant

Walburn is responsible for imposing penalties or taking other adverse actions

against physicians' licenses relating to violations of H.B. 314 and the March 27

Order. Defendant Walburn is sued in his official capacity.

## STATUTORY & LEGAL FRAMEWORK

### H.B. 314

29.     The 2019 Ban makes it a crime "for any person to intentionally

perform or attempt to perform an abortion" at any stage in pregnancy, except to

avert death or "serious health risk." H.B. 314 § 4.

30.     The 2019 Ban's exception for "serious health risk[s]" is extremely

limited and would be difficult, if not impossible, to comply with. For example, the

exception requires sign-off from a second, and in some cases third, physician, *see*

*id.* at §§ 3(6), 4(b); it requires certain abortions be performed in a hospital, *see id.*

at § 3(6); and because the definitions are nearly identical, it provides no guidance

for physicians to distinguish between a "serious health risk," *see id.* at § 3(6), and a

"medical emergency," *see id.* at § 3(4).

31.     In addition to the foregoing exceedingly narrow exception, the 2019

Ban excludes from the definition of abortion a procedure to terminate the

pregnancy in cases where the fetus "would die after birth or shortly thereafter or be

stillborn." H.B. 314 § 3(1), (3).

32.     Performance of an abortion in violation of the 2019 Ban constitutes a Class A felony, which is punishable by imprisonment for 10-99 years. H.B. 314 § 6(a); Ala. Code § 13A-5-6(a)(1).

33.     Attempted performance of an abortion in violation of the 2019 Ban constitutes a Class C felony, which is punishable by imprisonment for 1-10 years. H.B. 314 § 6(b); Ala. Code § 13A-5-6(a)(3).

34.     Anyone who refers a person for an abortion performed in violation of H.B. 314 may be subject to liability for criminal solicitation or conspiracy, which are Class B felonies punishable by imprisonment for 2-20 years, Ala. Code § 13A-4-1, *id.* at § 13A-4-3, *id.* at § 13A-5-6, or as an accomplice or for aiding and abetting the performance of an abortion, which carries the same penalties as performing the abortion directly in violation of H.B. 314—a class A felony punishable by imprisonment for 10-99 years, Ala. Code § 13A-2-23, *id.* at § 13A-5-6.

35.     Any physician who performs or attempts to perform, or refers for, an abortion in violation of the 2019 Ban may also be subject to medical license probation, suspension, revocation, or restriction and/or fines or other disciplinary action. *See* Ala. Code § 34-24-360; Ala. Admin. Code r. 545-X-1-.06; Ala. Admin. Code r. 545-X-4-.06; Ala. Code § 34-24-53; Ala. Code § 34-24-361; Ala. Admin. Code r. 540-X-1-.07.

36.     Any administrator of a licensed abortion clinic who "knowingly and willfully permits" a physician to perform or attempt to perform, or refer for, abortions in violation of H.B. 314 shall be guilty of a Class C felony, which is punishable by imprisonment for 1-10 years. *See* Ala. Code § 26-23E-12; Ala. Code § 26-23E-6; Ala. Code § 13A-5-6(a)(3).

37.     H.B. 314 is set to take effect on November 15, 2019, which is six months from the date of the Governor's signature. H.B. 314 § 10. Upon that date, the Plaintiffs will face, *inter alia*, severe criminal penalties and the risk of adverse licensure and/or disciplinary action, if they continue to perform and/or refer for abortions.

### The March 27 Order

38.     In March 2020, the United States declared a state of emergency and Governor Ivey proclaimed a state of emergency in Alabama in response to the COVID-19 virus.

39.     The COVID-19 virus has reached every state in the country, with 644 confirmed cases in Alabama and 3 deaths as of midday on March 28, 2020.

40.     On March 19, 2020, the State Health Officer, pursuant to his authority to direct that conditions prejudicial to health in public places be abated, Ala. Code. § 22-2-2(4), issued an order stating, *inter alia*, that "effective immediately all

14

elective dental and medical procedures shall be delayed."[4] The March 19 Order did
not define or otherwise explain what constitutes an "elective" medical procedure.

41.    At a press conference held the same day, the State Health Officer
stated, in reference to the March 19 Order: "This is not a closure of offices for
physicians or dentists or optometrists. Those offices remain open and those
professionals continue to care for their patients. They are still available to care for
urgent and emergent situations, but all elective procedures shall be delayed. I
would remind people that 'elective' can be somewhat subjective. CMS [Centers for
Medicare & Medicaid Services] issued guidance last night that's available on their
website about what could be considered an elective procedure." Ala. Pub. Health
Training Network ("ALPHTN"), *COVID-19 Alabama Update*, YouTube (Mar. 19,
2020) at 5:00–5:27, https://youtu.be/vAj6vz2bd28.

42.    The CMS guidance referenced by the State Health Officer emphasizes
suggests "the following factors to be considered as to whether planned *surgery*
should proceed": Current and projected COVID-19 cases in the facility and region;
Supply of [Personal Protective Equipment ("PPE")] to the facilities in the system;
Staffing availability; Bed availability, especially intensive care unit (ICU) beds

---

[4] *Available at* https://www.alabamapublichealth.gov/legal/assets/order-adph-cov-gatherings-031920.pdf.

Ventilator availability; Health and age of the patient, especially given the risks of concurrent COVID-19 infection during recovery; Urgency of the procedure.[5]

43.    On March 20, 2020, the State Health Officer issued an amended order that did not alter the language concerning elective medical and surgical procedures.[6]

44.    On March 20, 2020, counsel for Plaintiffs spoke to counsel for ADPH who confirmed that ADPH did not intend the Orders to apply to abortions. Counsel for ADPH also stated that they had spoken to RHS and approved of the measures they were taking to protect patient and staff health in light of the COVID-19 crisis, while continuing to provide essential medical services.

45.    Even prior to the issuance of the emergency orders, Plaintiffs had taken numerous proactive steps to "flatten the curve," including by imposing stringent social distancing measures at their clinics.

46.    Between March 20-27, Plaintiffs continued to perform pre-viability abortions, while taking all necessary steps to protect patients and staff from exposure to and transmission of COVID-19.

---

[5] *See* CMS, Adult Elective Surgery and Procedures Recommendations ("CMS Recommendations") (emphasis added), https://www.cms.gov/files/document/31820-cms-adult-elective-surgery-and-procedures-recommendations.pdf.
[6] March 20, 2020 Amended Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by Covid-19, http://alabamapublichealth.gov/legal/assets/order-publicgathering-032020.pdf.

47.     Plaintiffs' continued provision of abortions, under circumstances modified to respond to the COVID-19 crisis, was consistent with guidance issued by leading national medical associations, including the Ambulatory Surgery Center Association, American College of Surgeons, American College of Obstetricians and Gynecologists ("ACOG"), the American Association of Gynecologic Laparoscopists, and others, as well as the federal Centers for Medicare and Medicaid Services.[7]

48.     During this time Plaintiffs Robinson and AWC received phone calls from anti-abortion protesters demanding to know why they were still open and providing services. Plaintiff Robinson also saw numerous social media posts from anti-abortion activists urging their supporters to call the Governor and Attorney General and demand the closure of AWC pursuant to the emergency orders.

49.     Also during this time, newspaper articles were published in Alabama stating that ADPH had deemed abortion clinics "essential" businesses.

---

[7] *See, e.g.*, Am. Surgical Ctr. Ass'n, *COVID-19: Guidance for ASCs on Necessary Surgeries* (last updated Mar. 19, 2020), https://www.ascassociation.org/asca/resourcecenter/ latestnewsresourcecenter/covid-19/covid-19-guidance; Am. Coll. of Surgeons, *COVID-19: Recommendations for Management of Elective Surgical Procedures* (Mar. 13, 2020), https://www.facs.org/about-acs/covid-19/information-for-surgeons/elective-surgery; Am. Ass'n of Gynecologic Laparoscopists et al., *Joint Statement on Elective Surgery During COVID-19 Pandemic* (Mar. 16, 2020), *https://www.aagl.org/news/joint-society-message-on-covid-19*; ACOG et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

50.     On March 27, the State Public Health Officer issued a second amended order stating, in relevant part, that effective March 28, 2020 at 5:00 P.M. "*all* medical or surgical procedures shall be postponed *until further notice*, subject to the following exceptions:"

(a) Medical or surgical procedures necessary to treat an emergency medical condition, which is defined as a "medical condition manifesting itself by acute symptoms of sufficient severity … such that the absence of immediate medical attention could reasonably be expected . . . to result in placing the health of the person in serious jeopardy or causing serious impairment to bodily functions or serious dysfunction of bodily organs."

(b) Medical or surgical procedures "necessary to avoid serious harm from an underlying condition or disease, or necessary as part of a patient's ongoing and active treatment."

March 27 Order.

51.     The March 27 Order stated that "[t]his Order shall remain in full force and effect until 5:00 P.M. on April 17, 2020[,]" and that prior to that date "a determination shall be made whether to extend this Order—or, if circumstances permit, to relax this Order."

52.     The March 27 Order was also promulgated as an emergency rule, which is not set to expire for 120 days. *See* Ala. Admin. Code 420-4-1-.13 ER, attached hereto as Exhibit C.

53.     The State Public Officer has repeatedly indicated that crisis conditions will continue for a significant period of time. This is consistent with the statements of federal and state officials and other medical professionals who expect a surge of

18

infections that will test the limits of an increasingly burdened health care system, as well as the most recent statement by the President (as of March 30, 2020) that federal guidelines would recommend that social distancing measures be in place until at least April 30, 2020.

54.     On the afternoon of March 27, Plaintiffs' counsel reached out to ADPH, explaining that Plaintiffs had "already taken all necessary and feasible steps to protect the health and safety of their patients and staff while continuing to provide only that care which is essential to patient health and cannot be delayed without risk to patient health" and setting forth Plaintiffs' understanding that "medication abortion is not a procedure within the terms of the order and that surgical abortion procedures fall within the exceptions." Plaintiffs' counsel requested that ADPH inform counsel if it "disagrees and intends to enforce the order against the clinics" before the March 28 5:00 PM effective date of the order so that Plaintiffs could seek the appropriate legal relief.

55.     Counsel for ADPH did not respond, and instead referred the request for clarification to the Office of the Attorney General who responded that evening stating only that "[a]s the order indicates, procedures are exempt from mandatory postponement only if they meet the criteria set out in 7a. or b," and referring Plaintiff's counsel to the Attorney General's Guidance for Law Enforcement concerning the March 27 Order, attached hereto as Exhibit D.

56.     This guidance explains that each violation of the March 27 Order constitutes a misdemeanor under Ala. Code § 22-2-14. The guidance goes on to state (emphasis in the original): "While the unprecedented nature of this pandemic and the government's evolving response seem to demand some restraint related to criminal enforcement of this order, **if a violator has been made aware of the state health order and the refusal to comply presents a threat to public health and safety, [criminal penalties] are available as an enforcement tool.**" *Id.*

57.     On March 28, 2020, Plaintiffs' counsel again wrote to counsel for the ADPH and the Attorney General requesting clarification, reasserting that Plaintiffs' "interpret the order not to apply to medication abortion because it is neither a surgery nor a procedure, or to apply to surgical abortions because they fall within the exceptions" and requesting that the AG or the ADPH inform Plaintiffs' counsel if they disagree with this interpretation before the effective time of the Order, so that Plaintiffs may seek the appropriate legal relief.

58.     Receiving no response, on the morning of March 29, Plaintiffs' counsel once again wrote to Defendants' counsel, informing them of Plaintiffs' intention to sue if assurances that Plaintiffs could continue to provide abortion care were not forthcoming.

59.     Later that afternoon, the Office of the Attorney General responded stating: "Per the order, we are unable to provide you with a blanket affirmation that abortions will, in every case, fall within one of the exemptions."

60.     Given the risk of criminal and licensure penalties, and the refusal of the Department or Attorney General to provide any guidance other than that it is their position that at least some pre-viability abortions constitute criminal acts, Plaintiffs, their physicians, and staff have been forced to cancel scheduled appointments and to stop providing abortion care.

## FACTUAL ALLEGATIONS

## Abortion in Alabama

61.     There are only three outpatient clinics currently providing abortions in the state of Alabama—Plaintiff AWC in Huntsville; Plaintiff RHS in Montgomery; and Plaintiff WAWC in Tuscaloosa. While Plaintiff PPSE is not currently providing abortions in Alabama, it has done so in the past, and intends to provide them again in the near future.

62.     AWC is the only clinic in the state providing abortions after 14 weeks LMP.

63.     The window during which a patient can obtain an abortion in Alabama is limited. Pregnancy is generally forty weeks in duration, and Alabama prohibits abortion except in narrow circumstances after twenty weeks.  Ala. Code §

26-23B-5.

64.     According to 2017 data made available by the State, less than 0.001%
of abortions performed in the entire state were provided in Alabama hospitals in
2017.[8] The data for 2018 is the same.[9]

65.     Abortion is one of the safest medical procedures in the United States
and is substantially safer than continuing a pregnancy through to childbirth.

66.     Complications from abortion are rare, and when they occur they can
usually be managed in an outpatient clinic setting, either at the time of the abortion
or in a follow-up visit.

67.     Abortion is also extremely common; approximately one in four
women in this country will have an abortion by age forty-five.[10]

68.     Some people have abortions because they conclude that it is not the
right time to become a parent given their age, desire to pursue their education

---

[8] Ala. Dep't of Health, Ala. Center for Health Statistics, Vital Statistics, *Induced Terminations of
Pregnancy, Residents of Alabama, 2017*,
http://www.alabamapublichealth.gov/healthstats/assets/ITOP_2017AL%20.pdf.

[9] Ala. Dep't of Health, Ala. Center for Health Statistics, Vital Statistics, *Induced Terminations of
Pregnancy, Residents of Alabama, 2018*,
http://www.alabamapublichealth.gov/healthstats/assets/itop2018al%20.pdf.

[10] *See* Guttmacher Institute, *Abortion Is a Common Experience for U.S. Women, Despite
Dramatic Declines in Rates*, (Oct. 19, 2017), https://www.guttmacher.org/news-
release/2017/abortion-common-experience-us-women-despite-dramatic-declines-rates.
Although abortion bans, like H.B. 314, have a disparate impact on women—in particular, women
of color, low-income women, and young women—these bans also inflict irreparable
constitutional and dignitary harm on members of transgender and gender non-binary
communities who likewise need access to abortion services.

and/or career, or because they feel they lack the necessary financial resources or level of partner or familial support or stability. Many are already mothers; indeed, a majority of women having abortions (59%) already have at least one child.[11]

69.     Some people seek abortions to preserve their life or health; some because they have become pregnant as a result of rape; and others because they decide not to have children at all.

70.     Some people who have suffered trauma, such as sexual assault or domestic violence, may be concerned that pregnancy, childbirth, and/or an additional child may exacerbate already extremely difficult and dangerous situations for them and put them at risk of greater sexual or physical violence or worse.

71.     Some people decide to have an abortion because of an indication or diagnosis of a fetal medical condition or anomaly. Some families do not feel they have the resources—financial, medical, educational, or emotional—to care for a child with special needs or to simultaneously provide for the children they already have.

72.     Ultimately, the decision to terminate a pregnancy for any reason is motivated by a combination of diverse, complex, and interrelated factors that are

---

[11] *See* Guttmacher Institute, *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008*, (May 2016), https://www.guttmacher.org/report/characteristics-us-abortion-patients-2014.

intimately related to the individual's values and beliefs, culture and religion, health status and reproductive history, familial situation, and resources and economic stability.

73.    There are two main methods of abortion: medication abortion and procedural abortion.

74.    Medication abortion involves the patient ingesting a combination of two pills: mifepristone and misoprostol. The patient takes the mifepristone in the health center and then, typically twenty-four to forty-eight hours later, takes the misoprostol at a location of their choosing, most often at their home, after which they expel the contents of the pregnancy in a manner similar to a miscarriage.

75.    ACOG has stated that "[m]edical abortion can be provided safely and effectively via telemedicine with a high level of patient satisfaction . . . [and] the model appears to improve access to early abortion in areas that lack a physician health care provider."[12]

76.    Using telemedicine for medication abortion would be particularly beneficial during the COVID-19 crisis; however Alabama law requires a medically unnecessary "in-person" physical exam for every medication abortion patient, *see* Ala. Code 26-23E-7, and imposes medically unnecessary ultrasound and laboratory

---

[12] ACOG, *Medical Management of First-Trimester Abortion*, Practice Bulletin No. 143, at 12 (2014).

24

testing requirements, *see, e.g.* Ala. Code § 26-23A-4(a), Ala. Admin. Code 420-5-1-.03, that effectively prohibit the use of telemedicine.

77.     This medically unnecessary restriction is inconsistent with the recent statements of the Alabama Board of Medical Examiners ("ALBME") "encourage[ing] [health care providers] to communicate with patients, and provide telehealth services, through remote technologies," including the "the prescribing of controlled substances using telemedicine . . . to patients **for whom they have not conducted an in-person medical evaluation**."[13]

78.     Medication abortion is available in Alabama up to 10 weeks, as measured from the last menstrual period ("LMP").

79.     For some patients, medication abortion is contraindicated or there are other factors that would necessitate a procedural abortion, such as when the patient has an allergy to the medications or other medical conditions that make procedural abortion relatively safer.

80.     Despite sometimes being referred to as "surgical abortion," procedural abortion is not what is commonly understood to be "surgery"; it involves no incision, no need for general anesthesia, and no requirement of a sterile field.

---

[13] ALMBE, Joint Notice of Enforcement Discretion by the [ALBME] and the Alabama State Board of Pharmacy (emphasis in original), https://www.alabamapublichealth.gov/legal/assets/notice-examiner-pharmacy-enforcement-032320.pdf

81.     In the procedural abortion known as aspiration, the clinician uses gentle suction from a narrow, flexible tube to empty the contents of the patient's uterus. Before inserting the tube through the patient's cervix and into the uterus, the clinician may dilate the cervix using medication and/or small, expandable rods.

82.     Beginning around fifteen weeks LMP, clinicians generally must use instruments to complete the procedure, a technique called dilation and evacuation ("D&E").

83.     Neither method of abortion requires extensive PPE, particularly as compared to the PPE required for multiple pre-natal visits and labor and delivery.

84.     Patients generally seek abortion as soon as they are able, but many face logistical obstacles that can delay access to abortion care. Patients will need to schedule an appointment, gather the resources to pay for the abortion and related costs, and arrange transportation to a clinic, and possibly time off of work (without paid sick leave) or childcare during appointments.

85.     Delays result in higher financial and emotional costs to the patient. Although abortion is a very safe medical procedure, the health risks associated with it increase with gestational age.

86.     These obstacles and delays are only exacerbated when a patient can no longer obtain an abortion in the city where or close to where she lives, and must instead travel extended distances to obtain abortion services.

87.    The COVID-19 pandemic has only exacerbated existing burdens on patients seeking abortion care. It has people's ability to use public transit, caused layoffs and other work disruptions, shuttered schools and childcare facilities, and otherwise limited patients' options for transportation and childcare support during a time of recommended social-distancing and shelter-in-place orders. Indeed, jobless claims are soaring due to the virus.

### Pregnancy and the COVID-19 Crisis

88.    While pregnancy can be a blessing for many families, even an uncomplicated pregnancy poses challenges to a woman's entire physiology and stresses most major organs.

89.    A pregnant woman's response to infections is also altered by her physiology, which puts her at greater risk for certain infections.

90.    While much is unknown about COVID-19, ACOG has warned that "pregnant women are known to be at greater risk of severe morbidity and mortality

27

from other respiratory infections such as influenza and SARS-CoV. As such, pregnant women should be considered an at-risk population for COVID-19."[14]

91.     Moreover, there is a 15 to 20 percent risk of miscarriage present in every pregnancy. Complications from miscarriage can lead to infection, hemorrhage, surgery, and even death.

92.     Even an uncomplicated pregnancy can suddenly become life-threatening during labor and delivery. Furthermore, one-third of pregnancies result in a caesarean section (C-section) delivery. Even though C-section deliveries are relatively common, it is still a significant abdominal surgery that carries risks of hemorrhage, infection and injury to internal organs. And even a vaginal delivery can lead to injury, such as injury to the pelvic floor.

93.     Published research shows patients who are denied a wanted abortion face serious consequences, including greater likelihood of living in poverty, staying in abusive relationships, and experiencing mental health issues, as well as increased chances of suffering health consequences from continuing a pregnancy, than patients able to obtain abortion care.

---

[14] ACOG, *Practice Advisory - Novel Coronavirus 2019 (COVID-19)* (last updated Mar. 13, 2020), https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/novel-coronavirus-2019; *see also* Ctrs. for Disease Control & Prevention, *Information for Healthcare Providers: COVID-19 and Pregnant Women* (last updated Mar. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq.html.

94.     Pregnant patients have a minimum of one prenatal care visit per month, which increases as pregnancy progresses; that number is higher for high-risk pregnancies or where there are other pregnancy complications. PPE is used at every visit. Moreover, a pregnant patient may make multiple visits to the hospital before she is in active labor.

95.     An actual birth is attended by multiple medical care providers at the hospital, including, but not limited to, nursery personnel, a labor and delivery nurse, an OB tech, a physician, and an anesthesiologist and involves extensive PPE. For an uncomplicated pregnancy, the patient is going to remain in the hospital at least 24-48 hours; for a C-section up to 72-96 hours; and for a more complicated or risky pregnancy, potentially even longer.

## Alabama's Targeted Campaign Against Abortion

96.     H.B. 314 is the culmination of a near-decade long campaign by the Alabama legislature to eliminate legal abortion in Alabama.

97.     Since 2011, the Alabama legislature has enacted a multitude of laws aimed at restricting and ultimately outlawing abortion in the state. This campaign has contributed to, as this Court has recognized, "a climate of extreme hostility" for "abortion providers and women seeking abortions in Alabama today." *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1334 (M.D. Ala. 2014) (Thompson, J).

98.    In 2011, the Legislature banned abortions starting at 20 weeks, with exceptions only for abortions necessary to avert death or "serious risk of substantial and irreversible physical impairment of a major bodily function." Ala. Code § 26-23B-5.

99.    In 2013, the Legislature imposed burdensome building requirements on abortion clinics, *see* Ala. Code § 26-23E-9, that forced multiple Alabama abortion clinics to undergo extensive and expensive renovations, and even purchase and relocate to entirely new properties.

100.   Also in 2013, the Legislature required all physicians performing abortions in Alabama to hold staff privileges at a hospital within the same statistical metropolitan area as the clinic. *See* Ala. Code § 26-23E-4(c). That requirement was found unconstitutional by this Court, *see, e.g.*, *Strange*, 33 F. Supp. 3d 1330; *Planned Parenthood Se., Inc. v. Strange*, 172 F. Supp. 3d 1275 (M.D. Ala. 2016) (Thompson, J.) (determining appropriate relief), and, after the Supreme Court in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), struck a virtually identical law, the Attorney General dismissed his appeal stating "there is now no good faith argument that the law is constitutional under controlling precedent." Mot. to Dismiss Appeal, *Planned Parenthood Se., Inc. v. Strange*, No. 16-11867 (11th Cir. July 15, 2016). *Cf. W. Ala. Women's Ctr. v. Williamson*, 120 F. Supp. 3d 1296, 1317 (M.D. Ala. 2015) (enjoining as

unconstitutional regulation requiring clinics to contract with physician with admitting privileges).

101.    In 2014, the Legislature increased the mandatory wait period between when physicians must provide state-mandated information to patients and when patients can lawfully obtain an abortion from 24 hours to 48 hours. *See* Ala. Code § 26-23A-4 . By requiring some of the state-mandated counseling to occur in-person, this law effectively imposes a two-trip requirement on most patients seeking an abortion. *Id.*

102.    Also in 2014, the Legislature altered the judicial bypass process through which a minor may seek a court order waiving the State's requirement she obtain parental consent prior to an abortion. *See* Ala. Code §§ 26-21-1, *et seq*. "Appl[ying] 38 years of Supreme Court authority on the subject, as all lower federal courts are bound to do," this Court declared the revisions violated "a pregnant minor's long-established constitutional right[s]." *Reprod. Health Servs. v. Marshall*, 268 F. Supp. 3d 1261, 1295 (M.D. Ala. 2017) (Walker, M.J.), *appeal pending*, No. 17-13561 (11th Cir.).

103.    In 2016, the Legislature prohibited the ADPH from issuing or renewing licenses for abortion clinics located within 2,000 feet of a K-8 public school, which would have had the effect of closing two of the state's then-five clinics and the only clinics in the state providing abortions in the second trimester.

31

Ala. Code § 22-21-35(b). This Court held that law unconstitutional and enjoined its enforcement. *W. Ala. Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244, 1280–81 (M.D. Ala. 2017), *aff'd sub nom. W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310 (11th Cir. 2018)*, pet. for cert. pending Harris v. W. Ala. Women's Ctr.*, No. 18-837 (2019).

104.   Also in 2016, Alabama banned the most common method of second-trimester abortion and the only method available in the outpatient setting, effectively banning abortion throughout the state starting at 15 weeks. Once again, this Court issued a permanent injunction against the ban, finding that, were the law to stand, "Alabama women w[ould] be altogether unable to access a safe abortion at or after 15 weeks of pregnancy." *Id.* at 1244.

### The 2019 Ban and March 27 Order's Impact on Plaintiffs' Patients

105.   If allowed to take effect, the 2019 Ban and March 27 Order will essentially eliminate legal abortion in Alabama.

106.   Pre-viability abortions are "necessary to avoid serious harm from an underlying condition" because forcing anyone to continue a pregnancy against their will threatens serious harm to their health, and therefore previability abortions fit within the exceptions to the March 27 Order.

107.   Medication abortions, which involve the patient taking one medication by mouth in the clinic and additional medications later when she is at

home, are not medical or surgical "procedures" within the meaning of the March 27 Order.

108.   Because the plain language of the March 27 Order should exempt pre-viability abortions, Plaintiffs have no way of knowing which pre-viability abortions are considered criminal acts under the March 27 Order.

109.   Accordingly, Plaintiffs have already started cancelling and turning away patients, and will continue to have to do so while the March 27 Order remains in effect.

110.   By targeting pre-viability abortion, the March 27 Order is likely to *increase* the need for other pregnancy-related healthcare and attendant need for medical facilities, personnel, and PPE during the COVID-19 crisis.

111.   The impact of the 2019 Ban and the March 27 Order will fall disproportionately on Black women and people who are low-income.

112.   Statistics show that in 2017, Black people made up less than 30% of Alabama's population,[15] but over 60% of people who obtained abortions in Alabama.[16]

---

[15] *See* U.S. Census Bureau, American FactFinder, ACS Demographic and Housing Estimates, 2013-2017 American Community Survey 5-Year Estimates, Alabama, 2017, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/17_5YR/DP05/0400000US0.

[16] Ala. Dep't of Health, Ala. Center for Health Statistics, Vital Statistics, *Induced Terminations of Pregnancy, Residents of Alabama, 2017*, http://www.alabamapublichealth.gov/healthstats/assets/ITOP_2017AL%20.pdf.

113.   The majority of Plaintiffs' patients are low-income.

114.   Many of Plaintiffs' patients do not have access to reliable transportation or the financial resources to travel to a distant city or state to obtain medical care, nor do those who are victims of domestic violence, who must overcome exceptional hurdles to obtain an abortion without their abusers' knowledge.

115.   The COVID-19 pandemic and its fallout do not reduce patients' needs for abortion; if anything, they make timely access to abortion even more urgent, while raising additional obstacles for patients seeking that care.  Now, during the COVID-19 pandemic, patients must navigate pre-existing barriers against the backdrop of job insecurity, more limited ability to access public transit, and limited childcare assistance due to mandatory social distancing and shelter in place orders.

116.   Without access to legal abortion in Alabama, patient care will be delayed, if not outright denied, subjecting patients to increased risks to their health and lives.

117.   Being forced to continue a pregnancy against one's will can pose a risk to a person's physical, mental, and emotional health, and even their life, as well as to the stability and well-being of their family, including existing children.

118.   When Plaintiffs had to cancel patients's appointments because of the March 27 Order, their patients were devastated.  Many of the calls ended in tears.

Because of the cancellations, one will no longer be able to get an abortion at the Tuscaloosa clinic where they had already been seen for the state-mandated counseling and would only be able to get an abortion at all if she can manage to get to Huntsville.

119.   All of Plaintiffs' patients are in a terrible state of limbo.  They do not know if they will be able to get the care they seek.  They must live day to day with the tremendous anxiety that comes with not knowing whether they will face the life-altering consequences of being forced to have a child against their will.

120.   Even if the March 27 Order is lifted on April 17, Plaintiff AWC, the only clinic in the state that provides abortions after 14 weeks, may not have the capacity to meet the increased patient load.

121.   Even for someone who is otherwise healthy and has an uncomplicated pregnancy, carrying that pregnancy to term and giving birth poses serious medical risk and can have long-term medical and physical consequences.  For someone with a medical condition caused or exacerbated by pregnancy, these risks are increased.

122.   Forced pregnancy poses a heightened risk in Alabama, and to Black women, in particular.

123.   According to ADPH, nearly two-thirds of Alabama counties lack

hospitals that offer obstetrical care.[17]

124.   Moreover, while the number of reported pregnancy-related deaths across the country has steadily increased from 7.2 deaths per 100,000 live births in 1987, to 18.0 deaths per 100,000 live births in 2014,[18] in Alabama, Black women are nearly five times more likely to die from pregnancy-related causes than White women.[19]

125.   In addition, Alabama is among the five states with the highest infant mortality rate in the country.[20]

### Injunctive Relief

126.   The 2019 Ban and March 27 Order will subject Plaintiffs' patients to significant and irreparable harm to their constitutional rights for which no adequate remedy at law exists. By preventing Plaintiffs' patients from obtaining an abortion in Alabama, the 2019 Ban and March 27 Order will also inflict significant and

---

[17] Jessica Ravitz, *Alabama says it wants to protect life. How does that claim stack up outside the womb?*, CNN, May 16, 2019, https://www.cnn.com/2019/05/16/health/alabama-treatment-of-living/index.html.

[18] National Center for Chronic Disease Prevention and Health Promotion, Division of Reproductive Health, *Pregnancy Mortality Surveillance System*, Aug. 7, 2018, https://www.cdc.gov/reproductivehealth/maternalinfanthealth/pregnancy-mortality-surveillance-system.htm?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Freproductivehealth%2Fmaternalinfanthealth%2Fpmss.html.

[19] Society for Maternal-Fetal Medicine, *Maternal Mortality Facts & Figures: Alabama*, Dec. 4, 2018, https://s3.amazonaws.com/cdn.smfm.org/mortality_records/2-:state_slug.pdf (accessed via https://www.smfm.org/data/mortality-map).

[20] Centers for Disease Control and Prevention, National Center for Health Statistics, *Infant Mortality Rates by State: 2017*, last updated Jan. 15, 2019, https://www.cdc.gov/nchs/pressroom/sosmap/infant_mortality_rates/infant_mortality.htm.

irreparable medical, emotional, dignitary, and other harms for which no adequate remedy at law exists.

127.   Enforcement of the 2019 Ban and March 27 Order will cause irreparable harm by threatening Plaintiffs and their physicians, clinic administrators, and other staff with substantial criminal and/or licensure penalties for providing abortion services and referring for abortion services.

## CLAIMS FOR RELIEF

### Count I

(Substantive Due Process – Plaintiffs' Patients' Right to Privacy)

128.   Plaintiffs repeat the factual allegations set forth above as fully set forth herein.

129.   By prohibiting an individual from making the ultimate decision whether to terminate a pregnancy prior to viability, H.B. 314 and the March 27 Order violate the rights to liberty and privacy secured to Plaintiffs' patients by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

### Count II

(Due Process -- Void for Vagueness)

130.   Plaintiffs repeat the factual allegations set forth above as fully set forth herein.

131.   By stating that that the March 27 Order makes at least some pre-viability abortions criminal, notwithstanding that the plain language of the March 27 Order should permit all pre-viability abortions, but refusing to provide guidance necessary for Plaintiffs to determine which abortions are considered criminal under Defendants' interpretation of the Order, Defendants have prevented Plaintiffs from understanding what conduct is prohibited and put them at risk of arbitrary and discriminatory enforcement in violation of their due process rights.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request this Court:

A.   Enter a judgment declaring H.B. 314 violates the Fourteenth Amendment to the United States Constitution and a preliminary and permanent injunction, restraining Defendants, their employees, agents, and successors in office from enforcing H.B. 314;

B.   Enter a judgment declaration that the March 27 Order, as applied to pre-viability abortions, violates the Fourteenth Amendment to the United States Constitution, and issue a temporary restraining order, preliminary injunction, and permanent injunction, restraining Defendants, their employees, agents, and successors in office from enforcing the March 27 Order to ban pre-viability abortions.

38

D.     To award Plaintiffs their costs and expenses, including reasonable

attorneys' fees pursuant to 42 U.S.C. § 1988; and

E.     To grant any additional relief as may be just and proper.

Respectfully submitted this 30th day of March, 2020.

/s/ Randall C. Marshall
Randall C. Marshall
ASB-3023-A56M
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
rmarshall@aclualabama.org

*Attorneys for Plaintiffs*

Alexa Kolbi-Molinas*
New York State Bar No. 4477519
Meagan Burrows*
New York State Bar No. 5341904
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
akolbi-molinas@aclu.org
mburrows@aclu.org
(212) 549-2633

*Attorneys for Plaintiffs Robinson, AWC,
RHS, and WAWC.*

39

Carrie Y. Flaxman*
District of Columbia Bar #458681
Planned Parenthood Federation of America
1110 Vermont Avenue, NW, Suite 300
Washington, D.C. 20005
carrie.flaxman@ppfa.org
(202) 973-4830

*Attorney for Plaintiff Planned Parenthood Southeast, Inc.*

*\*Admitted pro hac vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 30, 2020, I electronically filed the foregoing with

the Clerk of Court for the United States District Court for the Middle District of

Alabama using the CM/ECF system, thereby serving all counsel of record.

<div style="margin-left: 40%;">

/s/ Randall Marshall
Randall Marshall

*Attorney for Plaintiffs Yashica
Robinson, M.D., Alabama Women's
Center, Reproductive Health Services,
and West Alabama Women's Center*

</div>