# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| YASHICA ROBINSON, *et al.* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 2:19-cv-00365-MHT-JTA** |
| | ) | |
| STEVEN MARSHALL, in his | ) | |
| official capacity as Attorney General of | ) | |
| the State of Alabama, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

### BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

STEVE MARSHALL
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*
A. Barrett Bowdre (ASB-2087-K29V)
  *Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
Brad A. Chynoweth (ASB-0030-S63K)
Brenton M. Smith (ASB-1656-X27Q)
  *Assistant Attorneys General*

OFFICE OF ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Brad.Chynoweth@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov

***Counsel for Defendants Steve Marshall and State Health Officer Scott Harris***

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTS ............................................................................................................... 5

    A.    **COVID-19 Background** ........................................................................ 5

    B.    **Alabama Takes Extraordinary Measures in Response to COVID-19** ............ 6

    C.    **COVID-19's Effects on the Healthcare System** ................................... 9

    D.    **The Postponement of Medical Procedures in the March 27, 2020 Order Helps the State Fight COVID-19 by Maintaining Social Distancing, Conserving Healthcare Equipment (Particularly PPE), and Conserving Hospital Capacity.** ........................................................................... 11

    E.    **Most of the Abortions Performed at Plaintiffs' Clinics Are Surgical Abortions That Require the Use of PPE.** .............................................. 13

LEGAL STANDARD ....................................................................................... 14

ARGUMENT .................................................................................................... 15

    I.    **Plaintiffs Fail to Show That They Are Substantially Likely to Succeed on the Merits of Their Challenge to the Order.** ................................... 15

        A.    **The Order is constitutional under the deferential standard of review that applies to emergency measures.** ..................................... 15

        B.    **The Order does not place an undue burden on a woman's right to a previability abortion.** ...................................................... 21

        C.    **The Order is not void for vagueness.** ............................................ 25

    II.    **Plaintiffs Fail to Carry Their Burden of Establishing the Remaining Elements Required for a Preliminary Injunction.** ............................... 29

    III.    **The Court's Temporary Restraining Order Should Be Dissolved to Protect the Public Health and Put Alabama in the Best Position in the Fight Against COVID-19.** .............................................................. 31

CONCLUSION ................................................................................................. 33

CERTIFICATE OF SERVICE ......................................................................... 35

**Cases**

*ACLU of W. Tenn., Inc. v. Chandler*,
458 F. Supp. 456 (W.D. Tenn. 1978) .................................................... 18

*Compagnie Francaise de Navigation a Vapeur v. State Bd. of Health*,
186 U.S. 380 (1902) ................................................................................ 17

*Doe v. Bolton*,
410 U.S. 179 (1973) ................................................................................ 27

*Gonzales v. Raich*,
545 U.S. 1 (2005) .................................................................................... 16

*Hickox v. Christie*,
205 F. Supp. 3d 579 (D.N.J. 2016) ........................................................ 17

*In re Juan C.*,
28 Cal. App. 4th 1093 (Cal. Ct. App. 1994) .......................................... 18

*Indigo Room, Inc. v. City of Fort Myers*,
710 F.3d 1294 (11th Cir. 2013) ............................................................. 25

*Jacobson v. Commonwealth of Massachusetts*,
197 U.S. 11 (1905) ................................................ 4, 16, 18, 20, 28, 30

*Johnson v. United States*,
135 S. Ct. 2551 (2015) ................................................................ 26, 27, 28

*Lewis v. Casey*,
518 U.S. 343 (1996) ................................................................................ 33

*Moorhead v. Farrelly*,
727 F. Supp. 193 (D.V.I. 1989) ............................................................. 17

*Newman v. Alabama*,
683 F.2d 1312 (11th Cir. 1982) ............................................................. 29

*Palmer v. Braun*,
287 F.3d 1325 (11th Cir. 2002) ............................................................. 14

*Planned Parenthood of Southeastern Pennsylvania v. Casey*,
505 U.S. 833 (1992) ...................................................... 16, 21, 22, 23

*Roe v. Wade*,
410 U.S. 113 (1973) .............................................................. 16, 25, 27

*Sentelle v. New Orleans & C.R. Co.*,
166 U.S. 698 (1897) ................................................................................ 17

*Session v. Dimaya*,
    138 S. Ct. 1204 (2018) ............................................................................... 26

*Siegel v. LePore*,
    234 F.3d 1163 (11th Cir. 2000) ................................................................. 14

*Smith v. Avino*, 91 F.3d 105 (11th Cir. 1996), *abr. on other grounds*, *Steel Co.*
    *v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ............................................................................ passim

*State v. Forehand*,
    542 S.E.2d 110 (Ga. Ct. App. 2000) ......................................................... 18

*United States v. Chalk*,
    441 F.2d 1277 (4th Cir. 1971) ............................................................. 4,15,18

*United States v. Collier*,
    478 F.2d 268 (5th Cir. 1973) ..................................................................... 28

*United States v. Ferguson*,
    No. 1:07-CR-70, 2007 WL 4146319, (E.D. Tex. Nov. 16, 2007) ............. 18

*United States v. Vuitch,*
    402 U.S. 62, (1971) .............................................................................. 27, 18

*United States v. Williams*,
    553 U.S. 285 (2008) ............................................................................ 26, 28

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ................................................................................... 14

*Whole Woman's Health v. Hellerstedt*,
    136 S. Ct. 2292 (2016) ............................................................................... 22

## Statutes

Ala. Code § 22-2-14 ........................................................................................ 8,9

Ala. Code §§ 31-9-1 *et seq* ............................................................................... 7

Defendant Steve Marshall, sued in his official capacity as Alabama Attorney General, and Dr. Scott Harris, sued in his official capacity as State Health Officer, file this brief in support of their Motion to Dissolve the Court's Temporary Restraining Order (doc. 87) and in opposition to Plaintiffs' Emergency Motion for a Temporary Restraining Order and Preliminary Injunction (doc. 73).

## INTRODUCTION[1]

This case is about the State's attempt to save lives in the face of a once-in-a-century public health emergency. The novel coronavirus ("COVID-19") was first identified in Wuhan, China, in late 2019, and since then, it has spread across the globe with startling rapidity, reaching nearly every country in the world and all 50 states in our nation. The virus is easily transmissible, due in part to its long incubation period and the ability of asymptomatic carriers to infect others. And the devastation it has wreaked has been astounding. In Italy, hundreds of people have died each day for the last two weeks, as the virus's many victims have overwhelmed parts of the country's healthcare system. Similarly tragic scenarios are playing out in other countries, and now on our shores, as New York has reported over 1,500 deaths and tent hospitals have been constructed in Central Park to handle the surge of patients. Nationwide, there are now over 175,000 confirmed cases of COVID-19 and nearly 3,000 deaths attributed to the disease. In Alabama, what started as 6 confirmed cases on March 13 will likely become over 1,000 confirmed cases today. As the

---

[1] Defendants request that the Court take judicial notice of a number of official publications as well as a limited number of media reports of generally known facts regarding COVID-19. *See* Fed. R. Evid. 201. Where Defendants request judicial notice, their citations are provided in footnotes. By contrast, exhibits submitted by Defendants in support of their motion and brief are cited in the body of the text.

President's coronavirus response coordinator warned this week, "No state, no metro area, will be spared."[2]

Alabama, like every state, has responded to this extraordinary threat with extraordinary measures. Governor Kay Ivey and the State's Health Officer, Dr. Scott Harris, have worked with experts to formulate measures that protect the public against the virus. No matter what the State does, many people will be infected. Fortunately, most of them have a great chance of surviving, but only if the State has enough healthcare capacity to treat each patient with severe symptoms. If the system is overwhelmed, many people who could have been saved will lose their lives.

Thus, the State Health Officer has entered emergency orders that have altered the lives of every Alabamian. Among other things, the orders limit the number of people who can gather together, close non-essential businesses, and ban nearly all visits to hospitals and nursing homes.

Alabama, like many other States, has also ordered that elective medical and dental procedures be postponed. This is commonsense but critical action for at least three reasons. First, medical procedures require the use of personal protective equipment (PPE) like masks, gloves, and other materials that protect both healthcare workers and patients. For weeks now, physicians and nurses on the frontlines battling the pandemic in the United States and abroad have warned that PPE is running low or has run out at their facilities. Without PPE, healthcare workers face greater risk of contracting COVID-19, which risks their lives and the lives of patients who may acquire the virus from them or who may not have healthcare workers available to treat them. Second, the order promotes greater social distancing by removing reasons for people to congregate. And, third,

---

[2] Jason Lemon, *Trump's Coronavirus Response Coordinator Warns 'No Metro Area Will Be Spared' From Pandemic*, NEWSWEEK (Mar. 29, 2020, 12:52 PM), https://www.newsweek.com/trumps-coronavirus-response-coordinator-warns-no-metro-area-will-spared-pandemic-1494888.

even routine medical procedures carry some level of risk. A complication could require that a patient be rushed to an emergency room for additional care, taxing an already overburdened healthcare system. Thus, across the country, even many heart surgeries,[3] transplants,[4] and cancer treatments[5] are being postponed as healthcare providers face the current COVID-19 threat and brace for what is to come.

This postponement of procedures is currently set to run through April 17, 2020. It contains two categories of procedures that are excepted from the order: (1) procedures needed to treat an "emergency medical condition," and (2) procedures needed "to avoid serious harm from an underlying condition or disease, or necessary as part of a patient's ongoing and active treatment." 03-27-2020 ADPH Order, at 4.

Plaintiffs ask this Court to write a third exception into the State Health Officer's emergency order. In their view, pre-viability abortions must be set apart, immune from the regulation that applies to all other medical procedures. Plaintiffs are mistaken. "In an emergency situation, fundamental rights . . . may be temporarily limited or suspended." *Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998). And we unquestionably find ourselves in the middle of an emergency. In response, the State Health Officer's emergency order has shuttered businesses, curtailed the right to assemble, and emptied houses of worship. And it is possible that for some of Plaintiffs' patients,

---

[3] *See, e.g.*, Leah Shields, *Local Boy's 3rd Open Heart Surgery Postponed Due to COVID-19 Concerns*, WPSD (Mar. 25, 2020), https://www.wpsdlocal6.com/news/local-boy-s-rd-open-heart-surgery-postponed-due-to/article_6e27a498-6ed7-11ea-b6e3-538458d158db.html.

[4] *See, e.g.*, Cory Smith & Iris Vukmanovic, *7-Year-Old Boy's Surgery Delayed Because of Coronavirus Pandemic*, NBC Wash. (Mar. 25, 2020, 7:54 PM), https://www.nbcwashington.com/news/local/7-year-old-boys-surgery-delayed-because-of-coronavirus-pandemic/2253720/.

[5] *See, e.g.*, Marilynn Marchione, *Cancer, Heart Surgeries Delayed as Coronavirus Alters Care*, AP (Mar. 18, 2020), carehttps://apnews.com/c161afff751e36d0cac4b59760288eb5.

the order will temporarily burden their right to obtain abortions. But "[u]pon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905). The emergency order furthers that goal and thus should be allowed to stand.

Plaintiffs respond by questioning the wisdom of the emergency order. They see no value in postponing the procedures that they perform, and they thus ask this Court to second-guess the State Health Officer's decision not to offer abortion providers a blanket exemption from the order. But in circumstances like these, "governing authorities must be granted the proper deference and wide latitude necessary for dealing with the emergency." *Avino*, 91 F.3d at 109. Thus, the scope of this Court's review is necessarily narrow, and is "limited to a determination whether the executive's actions were taken in good faith and whether there is some factual basis for the decision that the restrictions imposed were necessary to maintain order." *Id.* (quoting *United States v. Chalk*, 441 F.2d 1277, 1281 (4th Cir. 1971) (alterations in original omitted)). Here, the State Health Officer's decision was a good faith response to an unprecedented crisis that is still unfolding, and there is strong factual basis for the postponement order. While Plaintiffs ask the Court to, in effect, craft a different order, "[i]t is no part of the function of a court . . . to determine which one of two modes [i]s likely to be the most effective for the protection of the public against disease." *Jacobson*, 197 U.S. at 30.

This Court, therefore, should dissolve the TRO and deny Plaintiffs' motion for a preliminary injunction for three reasons: (1) Plaintiffs cannot establish a likelihood of success on the merits because the State Health Officer's order was issued in good faith and is supported by facts demonstrating that the decision is necessary to protect the public health; (2) Plaintiffs cannot establish irreparable harm for this facial challenge to the Order because there is no evidence that a

pause on abortions until April 17 will render all, or even most, women who want an abortion unable to have one; and (3) the balance of the equities weigh heavily in the State's favor because the critical need to protect the public health justifies this temporary order.

## FACTS

### A.     COVID-19 Background

In December 2019, the first case of a disease caused by a novel coronavirus—now commonly referred to as COVID-19—was detected in China. Proclamation No. 9994, 85 Fed. Reg. 15,337, 15,337 (Mar. 13, 2020). Symptoms commonly include "fever, tiredness, and dry cough," with "aches and pains, nasal congestion, runny nose, sore throat or diarrhea" also potentially occurring.[6] Although many cases are mild, approximately 60% of patients may require inpatient care, including 15% of patients with "severe disease that requires oxygen therapy or other inpatient interventions" and about 5% of patients with "critical disease that requires mechanical ventilation."[7] COVID-19 spreads easily within communities, being transferred from person-to-person between those in close contact or through "respiratory droplets" coughed or sneezed out by an infected person—even if that person is not displaying symptoms.[8]

---

[6] *Q&A on Coronaviruses (COVID-19)*, WORLD HEALTH ORG. (Mar. 9, 2020), https://www.who.int/news-room/q-a-detail/q-a-coronaviruses

[7] *Operational Considerations for Case Management of Covid-19 in Health Facility and Community*, WORLD HEALTH ORG. (Mar. 19, 2020), https://apps.who.int/iris/bitstream/handle/10665/331492/WHO-2019-nCoV-HCF_operations-2020.1-eng.pdf.

[8] *How Coronavirus Spreads*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last updated Mar. 4, 2020).

On March 11, 2020, the World Health Organization (WHO) declared COVID-19 to be a pandemic.[9] "A pandemic is a global outbreak of disease."[10] Pandemics result from the emergence of new viruses, as the lack of "pre-existing immunity" facilitates worldwide spread.[11] Over the past century, four pandemics have occurred as a result of influenza viruses, but this is the first known pandemic to be caused by a coronavirus.[12]

On March 13, 2020, U.S. President Donald Trump declared a national emergency due to the outbreak of COVID-19 in the United States, citing the WHO's pandemic designation and 1,645 cases in the United States. Proclamation No. 9994, 85 Fed. Reg. at 15,337. As of March 31, 2020, less than three weeks after the declaration of national emergency, the CDC reported COVID-19 exists in every state in the U.S. with 163,539 cases and 2,860 deaths.[13] The White House coronavirus task force projects that 100,000–240,000 Americans may die as a result of COVID-19, even with mitigating measures such as social distancing.[14]

**B.      Alabama Takes Extraordinary Measures in Response to COVID-19**

Alabama's formal response to the threat of COVID-19 began on March 6, 2020, when the State Board of Health added COVID-19 to the list of notifiable diseases classified as immediate or extremely urgent and requiring report to the County or State Health Department within four

---

[9] *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020*, WORLD HEALTH ORG. (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[10] *Situation Summary*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last updated Mar. 26, 2020).

[11] *Id.*

[12] *Id.*

[13] *Cases in U.S.,* CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Mar. 31, 2020).

[14] Rick Noack, Meryl Kornfield, Derek Hawkins, Teo Armus, Adam Taylor & Marisa Iati, *White House Task Force Projects 100,000 to 240,000 Deaths in U.S., Even With Mitigation Efforts,* WASH. POST (Mar. 31, 2020), https://www.washingtonpost.com/world/2020/03/31/coronavirus-latest-news/.

hours of presumptive diagnosis. Harris Decl. ¶ 3; 03-06-2020 ADPH Emergency Rule. On March 13, 2020, COVID-19 was detected in Alabama. Harris Decl. ¶ 5. On March 13, 2020, on Dr. Harris's recommendation as State Health Officer, Governor Kay Ivey declared a state of public health emergency in the State of Alabama under the Alabama Emergency Management Act of 1955, ALA. CODE §§ 31-9-1 *et seq.* ("EMA"). Harris Decl. ¶ 8; 03-13-2020 Governor's Proclamation of SOE.

The number of confirmed COVID-19 cases in Alabama since the time it was first reported on March 13, 2020, has gone from 6 confirmed cases to 952 confirmed cases as of March 31, 2020, with 18 reported deaths attributed to the disease in Alabama and 13 confirmed deaths attributed to the disease in Alabama. Harris Decl. ¶ 5; Chart Showing Growth of COVID-19 in Alabama.

On March 16, 2020, the Jefferson County Health Officer, in response to a rapidly growing number of cases of COVID-19 being detected in Jefferson County, issued an order suspending certain public gatherings in that county. Harris Decl. ¶ 9. On March 17, 2020, Dr. Harris issued a similar order for counties surrounding Jefferson County, including Blount, St. Clair, Shelby, Tuscaloosa, and Walker Counties. *Id.* ¶ 10. On March 19, 2020, Dr. Harris issued an order, and on March 20, 2020, an amended order, of statewide application suspending certain public gatherings. *Id.* ¶ 11.

The March 19 and amended March 20, 2020 orders prohibited all non-work-related gatherings of 25 persons or more or non-work-related gatherings of any size that cannot maintain a consistent six-foot distance between persons. *See* 03-20-2020 ADPH Order, at 1. The orders also prohibited in-person instruction at schools, universities, and most daycares and prohibited on-premises consumption of food or drink at all restaurants or bars. *Id.* at 2. The orders were to remain in effect until April 6, 2020, unless otherwise extended by the State Health Officer. *Id.* The

Attorney General's Office determined that a violation of the prohibitions contained in the March 20, 2020 ADPH Order was punishable as a misdemeanor under § 22-2-14 of the Code of Alabama. *See* 03-27-2020 AG Updated Guidance for Law Enforcement.

As COVID-19 cases in Alabama continued to rise, Dr. Harris entered another order on March 27, 2020. Harris Decl. ¶ 20; 03-27-2020 ADPH Order. This order prohibited all non-work-related gatherings of 10 persons or more or non-work-related gatherings of any size that cannot maintain a consistent six-foot distance between persons. 03-27-2020 ADPH Order, at 1-2. The March 27 Order also required an enumerated list of non-essential businesses to close to non-employees. *Id.* at 2. Section 7 of the March 27 Order required medical procedures to be postponed as follows:

> 7. Effective March 28, 2020 at 5:00 P.M., all dental, medical, or surgical procedures shall be postponed until further notice, subject to the following exceptions:
>
> a. Dental, medical, or surgical procedures necessary to treat an emergency medical condition. For purposes of this order, "emergency medical condition" is defined as a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain, psychiatric disturbances, and/or symptoms of substance abuse) such that the absence of immediate medical attention could reasonably be expected by a person's licensed medical provider to result in placing the health of the person in serious jeopardy or causing serious impairment to bodily functions or serious dysfunction of bodily organs.
>
> b. Dental, medical, or surgical procedures necessary to avoid serious harm from an underlying condition or disease, or necessary as part of a patient's ongoing and active treatment.

*Id.* at 4.[15] The March 27 Order is in effect until 5:00 P.M. on April 17, 2020, unless a determination is made to extend it prior to that time. *Id.*

---

[15] Independently of Dr. Harris's orders, Governor Ivey took the extraordinary measures under the EMA of rescheduling the March 31, 2020 Primary Runoff Election until July 14, 2020, and

On March 27, 2020, the Attorney General's Office issued guidance for law enforcement stating that violations of the ADPH Order were punishable as a misdemeanor under § 22-2-14 of the Code of Alabama and that § 7 of the March 27 Order "applies to all healthcare facilities and providers, without exception," and that it "does not offer a total exemption for any specific type of provider or clinic." 03-27-2020 AG Updated Guidance for Law Enforcement. That is, § 7 requires the postponement of all medical procedures other than those falling under one of the two enumerated exceptions. *Id.*

## C.   COVID-19's Effects on the Healthcare System

The acceleration of COVID-19 has placed severe strain on the healthcare system, from the global level all the way down to the local level.[16] The WHO reports that 60% or more of COVID-19 patients may require hospitalization and that some countries have displayed doubling rates of cases every 3 days.[17] The rapid increase in cases requiring hospitalization threatens to overwhelm hospital capacity.[18]

A study conducted by the Imperial College COVID-19 Response Team, which includes participation from the WHO and other health organizations, projected that without intervention, 2.2 million Americans would die as a result of COVID-19.[19] That figure does not take into account

---

ordering all public K–12 schools to move from in-person instruction to alternative instruction methods (e.g., online classes) for the remainder of the 2019–20 school year. *See* 03-18-2020 Governor's Proclamation of SOE; 03-26-2020 Governor's Proclamation of SOE.

[16] *See* WHO, *supra* note 7.

[17] *Id.*

[18] *Id.*; *Situation Summary*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last updated Mar. 26, 2020).

[19] Neil M. Ferguson et al., IMPERIAL COLLEGE COVID-19 RESPONSE TEAM, IMPACT OF NON-PHARMACEUTICAL INTERVENTIONS (NPIS) TO REDUCE COVID-19 MORTALITY AND HEALTHCARE DEMAND, at 7 (MAR. 16, 2020), https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-fellowships/Imperial-College-COVID19-NPI-modelling-16-03-2020.pdf.

"the potential negative effects of health systems being overwhelmed."[20] Without an aggressive suppression strategy, even a mitigated epidemic "would still likely result in hundreds of thousands of deaths and health systems (most notably intensive care units) being overwhelmed many times over."[21] As of March 31, 2020, the Institute for Health Metrics and Evaluation (IHME) projected that the United States will reach peak resource usage on April 15, 2020, falling short of needed hospital beds by approximately 54,000.[22]

Additionally, "[t]he chronic global shortage of personal protective equipment is now one of the most urgent threats to our collective ability to save lives."[23] Many types of Personal Protective Equipment (PPE) should be utilized by either doctors or patients in COVID-19 treatment including gowns, gloves, respirators, and masks.[24] Indeed, the Centers for Medicare and Medicaid Services had advised that "conservation of critical resources such as ventilators and Personal Protective Equipment (PPE) is essential."[25] Many other major healthcare organizations have issued guidance to healthcare providers on treating COVID-19 with shortages of equipment.[26]

---

[20] *Id.*

[21] *Id.* at 1.

[22] *Covid-19 Projections*, INST. FOR HEALTH METRICS & EVAL., https://covid19.healthdata.org/ (last visited Mar. 31, 2020).

[23] *See* WHO, *supra* note 9.

[24] *Frequently Asked Questions About Personal Protective Equipment*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirator-use-faq.html (last updated Mar. 14, 2020).

[25] CTRS. FOR MEDICARE & MEDICAID SERVS., CMS ADULT ELECTIVE SURGERY AND PROCEDURES RECOMMENDATIONS (2020), https://www.cms.gov/files/document/31820-cms-adult-elective-surgery-and-procedures-recommendations.pdf.

[26] *See, e.g.*, *Strategies to Optimize the Supply of PPE & Equipment*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/index.html (last updated Mar. 26, 2020); *Rational Use of Personal Protective Equipment for Coronavirus Disease (COVID-19): Interim Guidance* (Mar. 19, 2020), WHO, https://apps.who.int/iris/bitstream/handle/10665/331498/WHO-2019-nCoV-IPCPPE_use-2020.2-eng.pdf.; *Infection Prevention and Control for Covid-19 in Healthcare Settings*, EUR. CTR. FOR DISEASE PREVENTION & CONTROL (Mar. 12, 2020),

The federal government has also taken various actions to respond to the medical equipment shortages caused by the pandemic, including prioritizing and allocating health and medical resources, preventing the hoarding of medical supplies, and invoking the Defense Production Act to increase the supply of healthcare equipment. *See, e.g.*, Exec. Order No. 13,909, 85 Fed. Reg. 16,227 (Mar. 18, 2020); Exec. Order No. 13,910, 85 Fed. Reg. 17,001 (Mar. 23, 2020); Exec. Order No. 13,911, 85 Fed. Reg. 18,403 (Mar. 27, 2020).

These healthcare shortages, in particular shortages of PPE, are being felt in Alabama. According to Andy Mullins, Director for the Center for Emergency Preparedness at the Alabama Department of Public Health ("the Center"), numerous healthcare facilities across Alabama are reporting shortages of PPE and other necessary equipment needed to respond to COVID-19. Mullins Decl. ¶ 4. The Center has assessed the equipment needs of healthcare facilities throughout the state for both immediate and 30-day outlook equipment needs. *Id.* The Center has attempted to supply healthcare facilities by tapping into both the State's strategic reserve of equipment and working with the federal government to access the Strategic National Stockpile. *Id.* ¶ 5. Even having accessed these sources, healthcare facilities in some instances do not have sufficient levels of PPE to meet current needs.[27] *Id.* ¶¶ 4–6; *see also* Harris Decl. ¶¶ 12–18.

**D.  The Postponement of Medical Procedures in the March 27, 2020 Order Helps the State Fight COVID-19 by Maintaining Social Distancing, Conserving Healthcare Equipment (Particularly PPE), and Conserving Hospital Capacity.**

Section 7 of the March 27, 2020 Order postpones "all dental, medical, or surgical procedures" unless they fall within one of the two enumerated exceptions. 03-27-2020 ADPH

---

https://www.ecdc.europa.eu/sites/default/files/documents/COVID-19-infection-prevention-and-control-healthcare-settings-march-2020.pdf.

[27] Just this week, nursing homes in Lee County, Alabama reported a shortage of PPE. *See* Olivia Gunn, *Nursing Homes in Lee Co. in Need of Supplies and PPE During COVID-19 Pandemic*, WSFA (Mar. 31, 2020, 10:38 PM), https://www.wtvm.com/2020/04/01/nursing-homes-lee-co-need-supplies-ppe-during-covid-pandemic/.

Order, at 4; Harris Decl. ¶¶ 20–21; 03-27-2020 AG Updated Guidelines for Law Enforcement. It is important for the public health that any medical or surgical procedure that does not meet the exception criteria be postponed because doing so avoids gatherings of people (some of whom could be asymptomatic carriers), the procedures could result in complications that put a further strain Alabama's health care system, and the procedures pose the risk of using scarce PPE that could be reserved for COVID-19 patients. Harris Decl. ¶ 21.

The postponement of all medical procedures other than those excepted by the March 27 Order is important to help maintain social distancing to slow the spread of the disease. Harris Decl. ¶¶ 16, 19, 21. Benefits of postponing dental, medical, and surgical procedures as described below include avoiding situations where the disease may spread in a waiting room or where health care workers inadvertently spread the disease as they move from patient to patient, any one of whom may be an asymptomatic carrier of COVID-19. *Id.*

The Order's postponement of medical procedures also helps conserve healthcare resources, in particular PPE. Harris Decl. ¶¶ 12–18, 21, 24. Just like many healthcare systems across the country and around the world, Alabama is experiencing a shortage of medical equipment and PPE. Harris Decl. ¶¶ 12–18; Mullins Decl. ¶¶ 4, 6. Surgical abortions require the use of PPE. Harris Decl. ¶ 24. During this pandemic, it is important that PPE be conserved to protect healthcare personnel involved in treating COVID-19 patients. Mullins Decl. ¶ 7. Without sufficient PPE, healthcare personnel run the risk of becoming infected with the virus themselves, which would render them unable to provide treatment and further strain the State's healthcare system. *Id.* If healthcare is not available to Alabama residents infected with the virus, their health and lives could be placed at risk. *Id.*

Finally, the March 27 Order conserves hospital capacity. Harris Decl. ¶¶ 14, 21, 24. While most surgical abortions are performed in abortion clinics, a surgical abortion may result in complications requiring emergency medical care that taxes the health care system during this emergency. Harris Decl. ¶ 24. While administering a medical abortion that uses medication to end a pregnancy may not itself require the use of PPE, one of the possible complications of a medical abortion is an incomplete abortion which may need to be followed by a surgical abortion, and other possible complications of a medical abortion could require emergency medical care. *Id.*

**E.      Most of the Abortions Performed at Plaintiffs' Clinics Are Surgical Abortions That Require the Use of PPE.**

Dr. Robinson states in her own declaration that in 2019, Alabama Women's Center ("AWC") performed 1,939 abortions, and that, of those, 732 were medication abortions and 1,207 were surgical abortions. Doc. 73 at 5, ¶ 14.[28] In January and February of 2020, AWC performed 360 abortions, 147 of which were medication abortions and 213 of which were surgical abortions. *Id.* at ¶ 15. In fact, abortion data for Alabama as a whole for 2018 from the Alabama Center for Health Statistics shows that of 6,484 abortions where the procedure used to terminate the pregnancy was reported, only 2,019 were medication abortions and the remaining 4,461 were surgical abortions, with 4 methods of abortion not stated. *Induced Termination of Pregnancy Statistics: 2018*, Alabama Center for Health Statistics, at 6. The data for each of the three Plaintiff abortion clinics as to the procedures used for abortions are as follows:

Alabama Women's Center for Reproductive Alternatives: 1,823 total abortions, 1,182 surgical abortions, 641 medication abortions.

Reproductive Health Services, Inc.: 1,236 total abortions, 1,283 surgical abortions, 3 medication abortions.

---

[28] Because Document 73 consists of several separately paginated attachments, pincites to page numbers refer to the page number given in the ECF header.

13

> West Alabama Women's Center: 3,371 total abortions, 1,999
> surgical abortions 1,372 medication abortions.

*Id.* at 9.

Dr. Robinson states in her own declaration that AWC uses PPE for all surgical abortions. Doc. 73 at 18, ¶ 30. For each surgical abortion, the physician performing the surgical abortion uses sterile gloves, a gown, a surgical mask and reusable eyewear, and an assistant also uses a surgical mask, gloves, and reusable eyewear. *Id.* This is the very PPE for which the State is experiencing shortages. *See* Harris Decl. ¶¶ 12–18; Mullins Decl. ¶¶ 2, 4, 6. The intent of the March 27 Order is to postpone medical procedures to conserve scarce PPE so that it can be used by healthcare personnel involved in treating COVID-19 patients. Harris Decl. ¶ 21; Mullins Decl. ¶ 7.

Finally, in 2018, about 94% of abortions (6,937 out of 7,381) took place in the fifteenth week of pregnancy (by gestational age of the fetus) or earlier. *Induced Termination of Pregnancy Statistics: 2018*, Alabama Center for Health Statistics, at 3.

## LEGAL STANDARD

To be entitled to a preliminary injunction, Plaintiffs must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest. *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002). A preliminary injunction is "an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal quotation and citation omitted). The grant of a preliminary injunction "is the exception rather than the rule." *Id.* "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305,

312 (1982). Particularly in the context of dealing with emergency situations, "governing authorities must be granted the proper deference and wide latitude necessary for dealing with the emergency." *Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996), *abrogated on other grounds*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998). For these same reasons, the Temporary Restraining Order the Court entered on March 30, 2020, should be immediately dissolved. *See* Doc. 83 at 12 (stating that the Court "will immediately begin to reconsider the temporary restraining order in light of defendants' responses.").

## ARGUMENT

I.   **Plaintiffs Fail to Show That They Are Substantially Likely to Succeed on the Merits of Their Challenge to the Order.**

   A.   **The Order is constitutional under the deferential standard of review that applies to emergency measures.**

"In an emergency situation, fundamental rights such as the right of travel and free speech may be temporarily limited or suspended." *Avino*, 91 F.3d at 109. The right to abortion is no different. Thus, while it may be the case "[u]nder usual and normal circumstances and as a general proposition" that a state may not require a woman to wait three weeks to obtain an abortion, "the circumstances existing at th[is] time [a]re not usual, nor [a]re they normal." *Id.* Rather, in an emergency situation like the pandemic we now face, "governing authorities must be granted the proper deference and wide latitude necessary for dealing with the emergency." *Id.* And that means that a court's review of the constitutionality of an emergency order promoting the public health "is limited to a determination whether the executive's actions were taken in good faith and whether there is some factual basis for the decision that the restrictions imposed were necessary to maintain order." *Id.* (quoting *United States v. Chalk*, 441 F.2d 1277, 1281 (4th Cir. 1971) (alterations in original omitted)). The State Health Officer's March 27 Order easily clears both these hurdles and thus Plaintiffs' motion to preliminarily enjoin the Order should be denied.

15

Plaintiffs never confront (nor even mention) this controlling precedent. In moving for a preliminary injunction only as to their substantive due process claim in Count I of the First Amended Complaint, docs. 73 at 3–4; 73-1 at 19–27, Plaintiffs simply assume that the constitutionality of the March 27 Order hinges on whether it places an undue burden on a woman's right to previability abortion under *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 876–79 (1992) (plurality opinion), and *Roe v. Wade*, 410 U.S. 113 (1973). But as shown in cases like *Avino* and *Jacobson*, identifying a constitutional right that is being limited is only the *beginning* of the inquiry, not its end. For "[i]n an emergency situation," such rights "may be temporarily limited or suspended." *Avino*, 91 F.3d at 109. Because the March 27 Order satisfies all constitutional requirements governing emergency measures, Plaintiffs' facial challenge to the Order fails.

During an emergency, including a public health emergency such as a pandemic, the State possesses broad powers to take actions to protect the public, including actions that infringe on constitutional liberties in a way that would not be permissible during normal circumstances. This authority flows from the State's "traditional police powers to define the criminal law and to protect the health, safety, and welfare of [its] citizens." *Gonzales v. Raich*, 545 U.S. 1, 66 (2005). As the Supreme Court explained more than a century ago, "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson*, 197 U.S. at 29.

In *Jacobson*, the "great danger" was the spread of smallpox in Cambridge, Massachusetts, and the "reasonable regulation" was a requirement by the City that all its citizens get vaccinated. *See id.* at 12–13, 27–28. One citizen, Jacobson, refused and challenged the ordinance under the

Fourteenth Amendment. He lost. *Id.* at 27. But importantly, he lost not because he was wrong that the Fourteenth Amendment guarantees an individual the right to liberty in his own body. *See id.* at 28–30. Rather, he lost because, acting "[u]pon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members"—even if that response comes at a cost to individual freedoms. *Id.* at 27.

The Supreme Court likened such a response to a nation at war. Ordinarily, the Court recognized, "[t]he liberty secured by the 14th Amendment . . . consists, in part, in the right of a person to live and work where he will." *Id.* at 29. Yet in times of war, the Court noted, that same person "may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests . . . to take his place in the ranks of the army of his country." *Id.* So it is with emergency health directives: The normal constitutional guarantees do not apply as usual, and a different balancing is performed. *See id.*; *see also Compagnie Francaise de Navigation a Vapeur v. State Bd. of Health*, 186 U.S. 380, 385 (1902) (upholding geographic quarantine of several parishes around New Orleans); *Sentelle v. New Orleans & C.R. Co.*, 166 U.S. 698, 704–05 (1897) (noting that "[n]o property is more sacred than one's home, and yet a house may be pulled down or blown up by the public authorities, if necessary to avert or stay a general conflagration"); *Hickox v. Christie*, 205 F. Supp. 3d 579, 591–94 (D.N.J. 2016) (applying *Jacobson* to uphold Ebola quarantine).

The Eleventh Circuit explicitly recognized this principle in *Avino* when rejecting a challenge to a curfew imposed in the wake of Hurricane Andrew. 91 F.3d at 109. The court recognized that "[c]ases have consistently held it is a proper exercise of police power to respond to emergency situations with temporary curfews that might curtail the movement of persons who otherwise would enjoy freedom from restriction." *Id.* (citing *Moorhead v. Farrelly*, 727 F. Supp.

193 (D.V.I. 1989); *Chalk*, 441 F.2d at 1277; *In re Juan C.*, 28 Cal. App. 4th 1093 (Cal. Ct. App. 1994)). And the court held that when a state makes decisions to respond to an emergency, it "must be granted the proper deference and wide latitude necessary for dealing with the emergency." *Id.* The court's role is limited to determining whether the response was "taken in good faith and whether there is some factual basis for the decisions that the restrictions . . . imposed were necessary to maintain order." *Id.* (quoting *Chalk*, 441 F.2d at 1281). Or as the *Jacobson* Court put it, "[t]he mode or manner in which those results are to be accomplished is within the discretion of the state, subject, of course, so far as Federal power is concerned," as long as the State acts in a manner that is not "unreasonable or arbitrary." 197 U.S. at 25, 27; *see also United States v. Ferguson*, No. 1:07-CR-70, 2007 WL 4146319, at *5 (E.D. Tex. Nov. 16, 2007); *State v. Forehand*, 542 S.E.2d 110, 113 (Ga. Ct. App. 2000); *see also ACLU of W. Tenn., Inc. v. Chandler*, 458 F. Supp. 456, 460 (W.D. Tenn. 1978) (upholding curfew because while First Amendment rights "are accorded special protection, they are not absolute" and limitations on these rights are permissible "in very unusual circumstances where extreme action is necessary to protect the public from immediate and grave danger.").

The March 27 Order is constitutional as an emergency measure under *Avino* and *Jacobson*, and thus, even assuming it *burdens* Plaintiffs' constitutional rights, it does not *violate* their rights because it merely suspends them for the duration of the emergency. First, Dr. Harris's order was "taken in good faith." *Avino*, 91 F.3d at 109. The order was taken in response to the global pandemic and the rise of cases of COVID-19 in Alabama. Dr. Harris's orders entered on March 17, 19, 20, and 27 reflect increasingly restrictive measures taken to prevent the spread of a disease that went from 6 confirmed cases on March 13 to 1,000 confirmed cases as of today. Moreover, the provision requiring the postponement of medical procedures does not specifically target

abortion providers, but instead by its plain terms applies to "all dental, medical, or surgical procedures" unless they fall into one of two exceptions. 03-27-2020 ADPH Order, at 4.

Second, there is "some factual basis for the decision that the restrictions . . . imposed were necessary to maintain order [or prevent the spread of disease]." *Avino*, 91 F.3d at 109. There is ample factual support that the specific measure taken by the March 27 Order of postponing medical procedures promotes social distancing, conserves medical equipment (particularly PPE), and conserves hospital resources. *See* Harris Decl. ¶¶ 12–25; Mullins Decl. ¶¶ 2–7. Social distancing prevents the spread of COVID-19, which is highly contagious and may be spread by infected individuals who are asymptomatic. Harris Decl. ¶¶ 16, 19, 21. Alabama is not alone in imposing social distancing measures on a statewide basis. Moreover, both judicially noticeable documents and the declarations of Dr. Harris and Andy Mullins establish that PPE is in short supply, globally, nationally, and in Alabama. Harris Decl. ¶¶ 12–18; Mullins Decl. ¶¶ 4, 6. It is especially important that limited supplies of PPE be provided to health care personnel treating COVID-19 patients for the specific period covered by the March 27, 2020 Order: March 28, 2020 to April 17, 2020. Harris Decl. ¶ 17; Mullins Decl. ¶ 7. The cases have not yet peaked, and manufacturers have not yet been able to produce PPE in sufficient quantities to cure shortages. Mullins Decl. ¶¶ 4–6. Finally, postponing medical procedures conserves hospital resources by freeing hospital personnel and equipment to treat COVID-19 patients. Harris Decl. ¶¶ 17, 21, 24.

There is also "some factual basis," *Avino*, 91 F.3d at 109, that these three interests are served specifically by postponing the procedures performed at Plaintiffs' clinics that are not covered by the exceptions of the March 27, 2020 Order. While Dr. Robinson recounts measures she has taken to maintain social distancing at AWC, she does not state in her declaration that clinic employees can maintain six feet of social distancing while performing a surgical abortion or

providing medication to a patient. Second, Dr. Robinson states in her declaration that surgical abortions require the physician and an assistant to use PPE. Doc. 73 at 18, ¶ 30. Most of the abortions performed at Plaintiffs' clinics are surgical abortions, and thus require PPE. *See* Doc. 73 at 12, ¶ 14; *Induced Termination of Pregnancy Statistics: 2018*, Alabama Center for Health Statistics, at 6, 9. Thus, most of the abortions performed at Plaintiffs' clinics over the critical time period of March 27 to April 17, 2020 will use precious PPE that could be directed towards medical personnel treating COVID-19 patients. Finally, abortions can result in complications that require further procedures or hospitalizations, thus further burdening the health care system in a time of crisis. *See* Harris Decl. ¶ 24; Doc. 73 at 11, ¶ 9. All of the interests served by the March 27 Order's postponement of medical procedures are thus also served in the specific context of abortion clinics. As a result, the March 27 Order satisfies the *Avino* test for an "emergency situation," under which "fundamental rights such as the right of travel and free speech may be temporarily limited or suspended." *Avino*, 91 F.3d at 109.

A closer look at *Jacobson* underscores the validity of the March 27 Order by showing that Plaintiffs' evidentiary attacks on the wisdom of the Order are largely immaterial to the constitutional question. In *Jacobson*, the only evidence presented by the state to support its mandatory vaccination regulation was a copy of the regulation; Jacobson, in turn, sought to introduce evidence of the ineffectiveness and dangers of vaccines, but the state trial court excluded his offers of proof. *Jacobson*, 197 U.S. at 13. The Supreme Court held that the evidence Jacobson wished to offer was *immaterial* to the question whether the regulation had a "real or substantial relation" to the protection of "public health, the public morals, or public safety." *Id.* at 31. And the Court found the State met this standard even though Jacobson's offers of proof were rejected and

the state introduced no evidence other than the judicially noticeable, commonsense proposition that smallpox vaccines were regarded as effective by the medical community. *Id.* at 34–35.

As with the evidence Jacobson wished to present, Plaintiffs' arguments that they can maintain social distancing in their clinics, or that they can properly preserve PPE during a time of shortage is immaterial to whether the March 27 Order's regulation bears a substantial relation to public safety. There is no question that it does, or else Plaintiffs would not attempt to argue they can tailor their practices to avoid the order's application. But Plaintiffs' showing does not entitle them to a blanket exception from the Order, otherwise countless businesses and individuals could seek judicially created exceptions based on their own judgments about how to best protect public health during this crisis. "[U]nder the emergency circumstances present in this case, the [Order] [i]s not constitutionally flawed because it did not include [broader] exceptions." *Avino*, 91 F.3d at 109. Rather, under *Avino* and *Jacobson*, the Order is a constitutional emergency response to the lethal threat of COVID-19.

### B.    The Order does not place an undue burden on a woman's right to a previability abortion.

Even if the Court were to review the emergency order under *Casey*'s undue burden framework (i.e., as if there were no COVID-19 emergency), a three-week postponement of some abortions in these extraordinary times does not constitute an undue burden.

Under *Casey*, a law imposes an "undue burden" when it places "a substantial obstacle in the path of a woman seeking an abortion." 505 U.S. at 878. *Casey* made clear that "[n]ot all burdens on the right to decide whether to terminate a pregnancy will be undue." 505 U.S. at 876. Yet even if state regulation "increas[es] the cost or decreas[es] the availability," or makes it "more difficult or more expensive to procure an abortion," that "cannot be enough to invalidate it" *if the law serves a "valid purpose . . . not designed to strike at the right itself." Id.* at 874 (emphasis added). Rather,

if a law amounts to a "substantial obstacle," the Court "consider[s] the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016).

The March 27 Order imposes only a temporary burden on abortion access. For three weeks,[29] physicians and clinics are prohibited from performing dental, medical, or surgical procedures unless necessary to treat an emergency condition or to avoid serious harm from an underlying condition or disease.[30] Delay of a few weeks for public health reasons does not amount to a total denial. *See Casey*, 505 U.S. at 886 (acknowledging mandatory waiting period may sometimes result in a delay of "much more than a day" but concluding that it was not an undue burden even if it increased costs and potential delays).

The March 27 Order does not single out Plaintiffs' patients. It applies to *every* physician and *every* clinic in the State of Alabama, providing any sort of medical services, so it is clearly not "designed to strike at the right itself." *Casey*, 505 U.S. at 874. It also applies to *every* medical procedure—women seeking abortions are being treated no differently than anyone else seeking any other medical procedure at this time. Unfortunately, many people across the State will not be able to have desired and important surgeries for the next few weeks because of the grave threat of COVID-19. Nationwide, stent procedures for clogged arteries; surgeries for breast, thyroid, prostate, and kidney cancer; mammograms; colonoscopies; and fertility treatments are being postponed because of the virus.[31] But these postponements are what national experts have

---

[29] Defendants recognize that the Order could be extended or modified depending on the spread of COVID-19.

[30] At the March 30, 2020 telephone hearing, Defendants argued that an abortion necessary to protect the life or health of the mother would fall within these exceptions. Defendants did not mean to suggest that these are the only circumstances where an abortion would fit within one of the two exceptions.

[31] Marilynn Marchione, *Cancer, Heart Surgeries Delayed as Coronavirus Alters Care*, AP (Mar.

recommended as we face this crisis. *See* Harris Decl. ¶¶ 18, 21. [32]

A pandemic affects all of us. The temporary burden on anyone seeking non-emergent medical procedures—including some women seeking abortion—is not undue in light of the State's compelling need to preserve limited medical resources over the next few weeks as the State's healthcare system faces unprecedented strains that could push it past the breaking point.

Plaintiffs claim that delaying an abortion a few weeks or even days may increase the risks to unacceptable levels. Doc. 73-1 at 22; Doc 79 ¶ 85. But Plaintiffs also claim that there is no need to postpone *any* abortion because the procedure is one of the "safest medical procedures in the United States." Doc. 79 ¶ 65. But if abortion really is as safe as Plaintiffs claim, that raises a question about how serious these "risks" really are. Planned Parenthood made the same argument in *Casey*, but the plurality rejected it, concluding that "in the vast majority of cases, a 24-hour delay does not create any appreciable health risk." *Casey*, 505 U.S. at 885. And any cancer patient waiting for surgery or heart patient with a blockage waiting for a stent may face some increased risk. But that alone does not invalidate a valid exercise of the State's police power to protect the public health, especially when it applies across the board to all providers.

Plaintiffs also raise concerns about women being forced to continue a pregnancy against their will or being subjected to childbirth.[33] But there is only circumstantial evidence and

---

18, 2020, 3:19 PM), https://www.usnews.com/news/health-news/articles/2020-03-18/cancer-heart-surgeries-delayed-as-coronavirus-alters-care.

[32] *See also* Vice Adm. Jerome M. Adams, M.D., *Surgeon General: Delay Elective Medical, Dental Procedures to Help Us Fight Coronavirus*, USA TODAY (Mar. 22, 2019), https://www.usatoday.com/story/opinion/2020/03/22/surgeon-general-fight-coronavirus-delay-elective-procedures-column/2894422001/; *COVID-19: Elective Case Triage Guidelines for Surgical Care,* AM. COLLEGE OF SURGEONS (Mar. 24, 2020) https://www.facs.org/covid-19/clinical-guidance/elective-case.

[33] Plaintiffs claim pregnancy and childbirth is riskier than abortion. Doc. 79 ¶ 65. But "this statement is unsupported by the literature and there is no credible scientific basis to support it." Byron Calhoun, *The Maternal Mortality Myth in the Context of Legalized Abortion*, Linacre Q.

speculation that any woman who wants an abortion will be past the legal limit in Alabama when the order is scheduled to expire on April 17, 2020. If there are any such patients, it is unlikely there are many, given that around 94% of abortions in Alabama occur at 15 weeks of pregnancy (by gestational age) or earlier. *See Induced Termination of Pregnancy Statistics: 2018*, Alabama Center for Health Statistics, at 3. And any woman so-affected could seek as-applied relief—a far narrower demand than Plaintiffs' request to exempt every single abortion from a generally applicable executive order.

By contrast, the benefits of the March 27 Order are significant. *See* Harris Decl ¶ 21. And applying it to the Plaintiff abortion clinics, as it is applied to all other medical providers in Alabama, is beneficial to the public health during this emergency.

First, restricting contact between patients, medical staff, and physicians at this time is beneficial to help prevent the spread of COVID-19, even accepting Plaintiffs' claims that they have taken steps to reduce contact. And even if Plaintiffs' claims of low PPE usage are true, Plaintiffs are still using PPE that instead could be used for healthcare workers on the front lines of caring for COVID-19 patients. Even one extra mask could save the life of a physician or nurse caring for COVID-19 patients. The same goes for hospital beds and patients. During this time of emergency, PPE should be reserved whenever possible for health care workers treating COVID-19 patients.

Second, even if the Court were inclined to think Plaintiffs' effects on the healthcare system are insignificant, small effects can add up in a public health crisis. Even a few extra patients take up resources that could otherwise be used to treat COVID-19 patients, and if the healthcare system is stretched to its breaking point, those are resources that cannot be spared. Indeed, the shortage of

---

2013 Aug. 80(3): 264-276, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6027002/.

masks is critical. The CDC told healthcare workers that they can use bandanas if nothing else is available.[34] There is no doubt that the surgical masks that Plaintiffs regularly use could help protect healthcare workers and their patients where N95 masks are unavailable. And, of course, any individual, business, or clinic could argue that its effects on the healthcare system, in isolation, are minor, but exceptions cannot be allowed to swallow the rule.

Third, regardless of PPE or hospital bed capacity, requiring Plaintiffs to comply with the March 27 Order benefits patients, the public, and Plaintiffs themselves. As the Supreme Court stated in *Roe v. Wade*, the "State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that ensure maximum safety for the patient." 410 U.S. 113, 150 (1973). During this public health crisis, "maximum safety" for patients—and medical staff—is to minimize contact with others, especially in view of PPE shortage. If Plaintiffs' facilities continue performing abortions, they will create continued close contact and encourage traveling, which could further spread the virus.

### C.   The Order is not void for vagueness.

Plaintiffs allege in Count 2 of the First Amended Complaint that the March 27 order is void for vagueness. Doc.79 at ¶ 130–31. While Plaintiffs did not move for preliminary relief on this count, it would not support such relief because the claim fails on the merits.

"To state a void-for-vagueness claim, the language of the [law] itself must be vague." *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1302 (11th Cir. 2013) (quoting *Diversified Numismatics, Inc. v. City of Orlando*, 949 F.2d 382, 387 (11th Cir. 1991)). Vagueness arises when a law either "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or

---

[34] *Strategies        for        Optimizing        the        Supply        of        Facemasks*,        CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/face-masks.html        (last        updated Mar. 17, 2020).

"is so standardless that it authorizes or even encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). "But 'perfect clarity and precise guidance have never been required.'" *Williams*, 553 U.S. at 304 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)).

A close case arising under a statute does not render it unconstitutionally vague. *Williams*, 553 U.S. at 306. One could imagine a close case "under virtually any statute." *Id.* But requiring proof beyond a reasonable doubt to support a conviction addresses any issues posed by such close cases. *Id.* Vagueness occurs not because of "the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Id.*

Further, laws that require application to real-world facts contrast significantly with the standardless statutory term held to be unconstitutionally vague in *Johnson v. United States*. *See* 135 S. Ct. 2551, 2557–59 (2015). In that case, the Supreme Court held the term "violent felony," defined in relevant part under the Armed Career Criminal Act as a crime that "involves conduct that presents a serious risk of physical injury to another," was unconstitutionally vague. *Id.* However, the central feature of the Court's vagueness analysis was that the Court's precedent required a judge to apply this definition "not to real-world facts or statutory elements," but rather "to a judicially imagined 'ordinary case' of a crime." *Id.* at 2557. The inability of a judge to consider the concrete facts of the underlying crime created a completely indeterminate standard. *Id.* at 2558. *See also Session v. Dimaya*, 138 S. Ct. 1204, 1232 (2018) (Gorsuch, J., concurring in part and concurring in the judgment) (stating with respect to a statutory definition of "crime of violence" identical to that in *Johnson* that "[t]he statute doesn't even ask for application of common experience. Choice, pure and raw, is required. Will, not judgment, dictates the result.").

The Court in *Johnson* contrasted this abstract statutory definition with statutory terms that are applied to concrete situations as follows:

> As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as "substantial risk" to real-world conduct; "the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree," *Nash v. United States,* 229 U.S. 373, 377 (1913). The residual clause, however, requires application of the "serious potential risk" standard to an idealized ordinary case of the crime. Because "the elements necessary to determine the imaginary ideal are uncertain both in nature and degree of effect," this abstract inquiry offers significantly less predictability than one "[t]hat deals with the actual, not with an imaginary condition other than the facts." *Int'l Harvester Co. of America v. Kentucky,* 234 U.S. 216, 223 (1914).

135 S. Ct. at 2561.

The requirement for a medical provider—or even specifically an abortion provider—to conduct their practice according to a general standard does not make that standard vague. In a case decided the same day as *Roe v. Wade*, the Supreme Court held that restricting abortion to only those cases that doctors determined were "necessary" was not unconstitutionally vague. *Doe v. Bolton*, 410 U.S. 179, 191–92 (1973). Likewise, the Court similarly concluded in *United States v. Vuitch* that a District of Columbia statute outlawing abortion unless "necessary for the preservation of the mother's life or health" presented no vagueness problem because "whether a particular operation is necessary for a patient's physical or mental health is a judgment that physicians are obviously called upon to make routinely whenever surgery is considered." 402 U.S. 62, 72 (1971). Additionally, citing *Bolton* and *Vuitch*, the Fifth Circuit held that a statute prohibiting doctors from dispensing controlled substances "other than in the course of his professional practice" did not

present vagueness issues. *United States v. Collier*, 478 F.2d 268, 272 (5th Cir. 1973).[35] A law is not vague merely because it requires a physician to "make a professional judgment as to whether a patient's condition is such" that it satisfies a particular standard. *Id.*

Plaintiffs' claim thus fails because the Order need not provide "perfect clarity and precise guidance," *Williams*, 553 U.S. at 304 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). Just because it may be difficult in some cases to determine whether an abortion falls into one of the two exceptions outlined in the Order does not mean that those exceptions are unconstitutionally vague. *Id.* at 306. Here, like any other procedure, an abortion fits into an exception if it is necessary to treat an "emergency medical condition," "to avoid a serious harm from an underlying condition or disease," or if it is "necessary as part of a patient's ongoing and active treatment." 03-27-2020 ADPH Order, at 4. These exceptions present an objective standard—a prosecutor would need to show beyond a reasonable doubt that the particular factual circumstances of an abortion recipient did not fall into one of those categories. Although close cases could, in theory, arise even under these exceptions, there is no question about *what* exactly needs to be shown, and therefore no vagueness. *See Williams*, 553 U.S. at 306.

Although Plaintiffs allege that the March 27 Order is vague because they may be required to exercise their own professional judgment in determining whether a particular patient's abortion would fit into one of the exceptions, "the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree" *Johnson*, 135 S. Ct. at 2557 (quoting *Nash*, 229 U.S. at 377). Plaintiffs, like the abortion providers in *Bolton* and *Vuitch* and the prescribing doctor in *Collier*, have an objective standard to apply to their treatment. *See* 410 U.S. at 191–92; 402 U.S.

---

[35] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981.

at 72; 478 F.2d at 272. Asking them to apply their own medical judgment to a particular set of facts—something doctors do every day—does not render the March 27 Order unconstitutionally vague on its face. Accordingly, Count II of Plaintiffs' First Amended Complaint fails as a matter of law.

## II.  Plaintiffs Fail to Carry Their Burden of Establishing the Remaining Elements Required for a Preliminary Injunction.

Plaintiffs cannot show irreparable harm from a three-week delay in abortions. Certainly, the clinics fail to show or even allege injury to themselves.[36] As for their patients, there is no evidence that most women would be unable to get an abortion if they want one after the expiration of the order. There is hearsay evidence from Dr. Robinson that some women in Alabama may be beyond the legal limit for abortion in Alabama when the Order is scheduled to expire, but even if that is true, such women would need to present evidence of irreparable harm *to them*. And even that evidence would not justify the facial relief that Plaintiffs request. An injunction "must be no broader than necessary to remedy the constitutional violation." *Newman v. Alabama*, 683 F.2d 1312, 1319 (11th Cir. 1982).

Conversely, public health will be harmed by continued performance of abortion procedures, so the balance of equities weighs decisively in the State's favor. COVID-19 is a serious and imminent threat to public health, and the emergency order is a necessary but temporary measure designed to prepare for an anticipated surge in COVID-19 infections over the next few days and weeks.

The public interest also weighs heavily against the grant of a temporary restraining order. Uniform compliance with the March 27 Order is essential. As explained above, when healthcare

---

[36] Defendants preserve the argument that Plaintiffs lack third-party standing to bring claims on behalf of their patients.

resources are stretched to the breaking point, every available resource helps. And allowing for exceptions defeats the purpose of the strong measures taken by the State Health Officer to protect the public. In *Jacobson*, where a plaintiff challenged a mandatory vaccination law because he disputed its safety and benefits and thus wanted an exception—much like Plaintiffs here—the Supreme Court identified the fatal flaw with that kind of argument:

> We are not prepared to hold that a minority, residing or remaining in any city or town where smallpox is prevalent . . . may thus defy the will of its constituted authorities, acting in good faith for all, under the legislative sanction of the state. If such be the privilege of a minority, then a like privilege would belong to each individual of the community, and the spectacle would be presented of the welfare and safety of an entire population being subordinated to the notions of a single individual who chooses to remain a part of that population.

197 U.S. at 37–38. In a pandemic, if even one person fails to comply with measures designed to slow the spread of the disease, devastating consequences can result. South Korea's "Patient 31" is one example. [37] She "traveled extensively through South Korea, even after doctors had suggested she isolate herself due to a high likelihood that she had been infected. The Korean Center for Disease Control found that she ultimately had contact with approximately 1,160 people."

Moreover, if Plaintiffs obtain a judge-made exemption from the Order, they won't be the last to try. *See, e.g.*, Pet. for Mandamus, *In re Hotze*, No. 20-0249 (Tex. Mar. 30, 2020) (arguing that Harris County's stay-at-home order violates First Amendment by prohibiting large groups from meeting in churches and violates Second Amendment by not exempting firearms dealers from the order). Instead of fighting the virus during the short and precious time we have before a

---

[37] *Keep Your Distance: Patient 31 Illustrates Need for Social Distancing*, PITTSBURGH POST-GAZETTE (Mar. 20, 2020, 5:00 AM), https://www.post-gazette.com/opinion/editorials/2020/03/20/Patient-31-South-Korea-social-distancing/stories/202003190019.

COVID-19 wave crests (as it is beginning to in other States), the State will be fighting to keep its rule intact in court, to the detriment of the public it is trying to protect.

Plaintiffs have thus failed to meet the exacting burden required to merit the extraordinary remedy of a temporary restraining order or preliminary injunction. The Court should reject Plaintiffs' attempt to undermine the State Health Officer's efforts to protect Alabamians in a time of unprecedented danger to public health.

## III.   The Court's Temporary Restraining Order Should Be Dissolved to Protect the Public Health and Put Alabama in the Best Position in the Fight Against COVID-19.

During the hearing on March 30, Defendants explained that Plaintiffs' challenge to the State's emergency order is governed by precedent like *Jacobson* and *Avino*, which address the State's authority to act in an emergency. (Plaintiffs failed to cite either case in their filings.) The Court entered a TRO without considering that caselaw (*see* doc. 83 at 7), finding that Plaintiffs were entitled to a TRO under the *Roe* and *Casey* framework.

Now with the benefit of a fuller picture of the law and facts, this Court should immediately dissolve its TRO. While state governments throughout the country are making difficult decisions to order restrictions, some of which temporarily suspend constitutional rights, in order to slow and manage the spread of a public health crisis, this Court's order creates a blanket exemption to one class of clinics. Such an exemption undercuts the State's ability to respond to an emergency to protect the public health. If a temporary suspension that impacts the recognized right to an abortion cannot apply to clinics simply because the restriction is an "undue burden" on the recognized right, then there is no logical reason that a theater owner could not argue that the State's orders cannot apply to him because they violate his First Amendment rights, or that a church could not argue that it must be exempted because enforcement violates the right to practice one's religion. The State's emergency powers would be severely curtailed at the moment when they are most needed.

Defendants have provided the promised record showing that a temporary postponement of dental, medical, and surgical procedures that do not fit within the order's exceptions is necessary to combat COVID-19. The State's order will save lives, and every single day matters. No one denies that we are in a public health emergency, and as explained in this brief, we must act now to conserve the resources of our health care system and slow a disease that is spreading exponentially.

With the TRO in place, though, we know from Plaintiffs' filings that the Huntsville clinic had 21 abortions scheduled on Tuesday, March 31 (the first day this Court's TRO was in place). Doc. 73 at 10, ¶ 7. Being prescheduled, there is no indication that any patient was assessed to determine whether her procedure fit within the exceptions of the March 27 Order, and it is doubtful that any physician has made the determination that any patient's individual circumstances satisfy the exceptions. Thus, presumably, 21 procedures were performed at one clinic on March 31. Any one of those individuals could have been an asymptomatic carrier of COVID-19 and spread the disease through contact with doctors, who could spread the disease to other patients. Any of those patients could have complications that require further medical care that taxes the health care system. And each procedure required the use of PPE that are in critically short supply.

Moreover, the TRO order appears to be based, at least in part, on a factual error. It states that medication abortions are "the method by which the vast majority of abortions in Alabama are conducted." Doc. 83 at 4. However, Dr. Robinson's declaration states that in 2019, surgical abortions outnumbered medication abortions at the Huntsville clinic by a count of 1,207 to 732. Doc. 73 at 12, ¶ 14. And in 2018, the three Plaintiffs' clinics performed a total of 4,464 surgical abortions compared to just 2,016 medication abortions. *See Induced Termination of Pregnancy Statistics: 2018*, Alabama Center for Health Statistics, at 9.

In addition, the TRO order assumes that the March 27 Order "is likely to *fully* prevent some women from exercising their right to obtain an abortion." Doc. 83 at 6. Defendants do not believe that there was sufficient evidence before the Court to make that determination, even on the one-sided record. However, even if the assumption were true, and if such a woman came forward, it would at most support an injunction as applied to that woman, not a facial injunction barring the application of important emergency public health regulations to an entire class of procedures. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.").

And, perhaps most importantly, the Court's order applies the wrong legal standard. As detailed above, *Jacobson* and *Avino* hold that a public emergency requires a different constitutional analysis. The issue is not simply whether an emergency order infringes upon a constitutional right. Instead, the question for the Court—and the *sole* question—is whether the emergency order that suspends a constitutional right was taken in good faith and whether there is a factual basis for the decision that the suspension is necessary to protect the public.

The State Health Officer's order meets this standard. Enjoining it for an entire class of procedures, even for a day, harms the State's fight against COVID-19 and its efforts to protect the public. Thus, for all the reasons discussed in this brief, not only should the Plaintiffs' motion for a preliminary injunction be denied, but the TRO should be immediately dissolved to protect the public health.

## CONCLUSION

For the reasons stated above, the Court's Temporary Restraining Order entered on March 30, 2020 (doc. 83) should be dissolved and Plaintiffs' Motion for a Preliminary Injunction (doc. 73) should be denied.

Respectfully submitted,

Steve Marshall,
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*
A. Barrett Bowdre (ASB-2087-K29V)
  *Deputy Solicitor General*

/s Brad A. Chynoweth
James W. Davis (ASB-4063-I58J)
Brad A. Chynoweth (ASB-0030-S63K)
Brenton M. Smith (ASB-1656-X27Q)
  *Assistant Attorneys General*

OFFICE OF ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Brad.Chynoweth@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov

***Counsel for Defendants Steve Marshall and State Health Officer Scott Harris***

**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*s/* Brad A. Chynoweth
Counsel for Defendants Steve
Marshall and State Health Officer
Scott Harris
