IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| YASHICA ROBINSON, M.D., et al., on behalf of themselves, their patients, physicians, clinic administrators, and staff, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 2:19cv365-MHT (WO) |
| STEVEN MARSHALL, in his official capacity as Alabama Attorney General, et al., | ) ) ) ) ) | |
| Defendants. | ) | |

OPINION

In December 2019, a novel coronavirus, which causes
the disease now known as COVID-19, began to spread
quickly around the world.  On March 13, 2020, the
President of the United States and the Governor of the
State of Alabama declared the COVID-19 outbreak both a
national and state emergency.  Following these
declarations, Alabama's State Health Officer issued a
series of orders suspending certain public gatherings.

One of these orders, published on March 27, mandated the postponement of "all dental, medical, or surgical procedures," with two exceptions: (a) those "necessary to treat an emergency medical condition" and (b) those "necessary to avoid serious harm from an underlying condition or disease, or necessary as part of a patient's ongoing and active treatment."   State Health Order of March 27, 2020 (doc. no. 88-1) at 6 ¶ 7.

Plaintiffs Yashica Robinson, M.D., Alabama Women's Center, Reproductive Health Services, and West Alabama Women's Center are abortion providers in Alabama.  They seek in this ongoing litigation to enjoin enforcement against them of the State Health Officer's March 27 "Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19," extended (with identical language as relevant here) on April 3.[1]  *See* State Health Order of April 3, 2020 (doc.

---

1.  This ongoing litigation was initiated in May 2019 to challenge an Alabama statute that imposed criminal liability on abortion providers for nearly all abortions, completed or attempted, regardless of fetal viability.

no. 109-1).   The defendants are Steven Marshall, the
Attorney General, and Dr. Scott Harris, the State Health
Officer.[2]

  For the reasons described below, the plaintiffs'
motion for a preliminary injunction will be granted in

---

See *Robinson v. Marshall*, 415 F. Supp. 3d 1053 (M.D. Ala.
2019) (Thompson, J.).   Because the statute contravened
clear Supreme Court precedent, the court preliminarily
enjoined enforcement of the statute as applied to
pre-viability abortion.   *See id.*   On March 30, 2020, the
plaintiffs then moved to supplement their complaint to
challenge the March 27 state health order, and the court
granted the motion.

  2.  Additional defendants are the district attorneys
of the four counties where the plaintiff clinics are
located, the Chairman of the Alabama Board of Medical
Examiners, and the Chairman of the Medical Licensure
Commission of Alabama.  *See* First Amended Complaint (doc.
no. 79) at 8-12 ¶¶ 20-28.   These defendants were named
in the original complaint in this case, *see* Complaint
(doc. no. 1) at ¶¶ 18-25, but were voluntarily dismissed
without prejudice after they agreed to abide by any
relief issued by the court as to the statute originally
challenged. *See* Orders (doc. nos. 44, 49).   They were
were added back in as parties in the amended complaint,
*see* First Amended Complaint (doc. no. 79) at 8-12
¶¶ 20-28, but have not  appeared or participated in this
phase of the litigation.   When the court refers to the
defendants in this opinion, the court is referring to
only Steven Marshall, the Attorney General, and Dr. Scott
Harris, the State Health Officer.

part, denied in part, and held in abeyance in part.[3]


## I.   BACKGROUND

In light of the ongoing COVID-19 emergency, Alabama's State Health Officer, Dr. Scott Harris, has issued a series of state health orders suspending certain public gatherings and placing limits on the performance of many medical "procedures."  How the restrictions on medical procedures apply to abortion was not immediately clear. In part because abortion providers in Alabama operate in an atmosphere of hostility, the plaintiffs sought clarification of whether the restrictions allow the continued performance of abortions.  Repeated efforts to

---

3. In light of the temporary restraining order issued in *S. Wind Women's Ctr. LLC v. Stitt*, No. CIV-20-277-G, 2020 WL 1677094 (W.D. Okla. Apr. 6, 2020) (Goodwin, J.), the motion for a preliminary injunction is held in abeyance to the extent that it seeks relief prohibiting application to *all* medication abortions of the medical restrictions of the State Health Officer's March 27, 2020 and April 3, 2020 state health orders (and to any future orders extending the application of the medical restrictions).  The court will further consider whether relief is appropriate on this issue.

4

clarify the application of the medical restrictions to abortion, including by the plaintiffs and by this court, have yielded multiple inconsistent interpretations put forth by the defendants and their attorneys.

The initial state health order, entered on March 19, 2020, delayed "all elective dental and medical procedures." State Health Order of March 19, 2020 (doc. no. 88-4) at 4 ¶ 6. On March 20, an assistant general counsel for the Alabama Department of Public Health confirmed to the plaintiffs' counsel that the department "ha[d] no plans to apply the order to the [abortion] clinics." Decl. of Pls.' Counsel (doc. no. 73) at 46 ¶ 4.

However, on March 27, the State Health Officer amended the restriction on medical procedures in the March 19 state health order, postponing "all dental, medical, or surgical procedures," with two exceptions: (a) those "necessary to treat an emergency medical condition" and (b) those "necessary to avoid serious harm from an underlying condition or disease, or necessary as

part of a patient's ongoing and active treatment."  State
Health Order of March 27, 2020 (doc. no. 88-1) at 6 ¶ 7.

Counsel for the plaintiffs reached out again to the
Alabama Department of Public Health, seeking to confirm
that the March 27 state health order would still not be
applied to the clinics.  *See* Decl. of Pls.' Counsel (doc.
no. 73) at 47 ¶ 9-10.  As the plaintiffs interpreted the
state health order, "medication abortion is not a
procedure within the terms of the order and ... surgical
abortion procedures fall within the exceptions."  *Id.* at
47 ¶ 10.  On March 29, the chief counsel to the attorney
general stated in response to the questions from the
plaintiffs' counsel that "we are unable to provide ... a
blanket affirmation that abortions will, in every case,
fall within one of the exemptions."  *Id.* at 48 ¶ 14.  In
other words, under this interpretation, the restrictions
on medical procedures may prohibit some abortions.  Given
this, the plaintiffs filed both a motion to file a
supplemental complaint and a motion for a temporary
restraining order and preliminary injunction, seeking to

6

immediately enjoin enforcement of the March 27 order against abortion providers and abortion clinics.

During an emergency on-the-record hearing on March 30, this court asked counsel for the defendants whether the State Health Officer had taken a position interpreting the revised March 27 state health order. *See* March 30, 2020, Hr'g Tr. (doc. no. 98) at 5:23-25, 21:17-22:1. Counsel for defendants represented that the State Health Officer had taken a position and had communicated that position to counsel's office. *See id.* at 6:1-7, 20:4-8, 22:2-5. Counsel explained that, per the State Health Officer's own interpretation, the March 27 state health order *did* apply to abortions and that abortions would only meet the exceptions where required to protect the life and health of the mother. *See id.* at 20:22-21:1, 22:6-10. In response to these representations, the court entered a broad temporary restraining order enjoining the application of the March 27 state health order against abortion providers and abortion clinics because the state health order, as so

7

described by defense counsel, operated as a prohibition on abortion during the pendency of the order. *See Robinson v. Marshall*, 2020 WL 1520243 (M.D. Ala. 2020) (Thompson, J.), *amended by Robinson v. Marshall*, 2020 WL 1659700 (M.D. Ala. 2020), *and appeal dismissed*, No.20-cv-11270-B (11th Cir. 2020).

As requested, the court gave the defendants 48 hours to respond to the plaintiffs' motion for a preliminary injunction and indicated that, upon receipt of the defendants' response, the court would immediately reconsider its decision. The court set the motion for a preliminarily injunction for a fast-track hearing a week later, on April 6.

Late in the day on April 1, before this court could hold a preliminary injunction hearing, the defendants filed a motion to dissolve the temporary restraining order and a motion to stay enforcement of that order pending appeal. In their briefs, the defendants advanced a new interpretation of the March 27 state health order. The defendants explained in a footnote that they actually

8

"did not mean to suggest that [protecting the life or health of the mother] are the only circumstances where an abortion would fit within one of the two exceptions" in the March 27 order.  Defs.' Br. in Support of Mot. to Dissolve (doc. no. 89) at 26 n.30.   Instead, the defendants indicated, this was just one example of a range of exceptions, though they did not affirmatively provide any other examples of how the exceptions would permit an abortion to proceed.  *See id*.   In an accompanying declaration, Dr. Scott Harris, the State Health Officer, explained that while "abortions constitute 'procedures'" under the order and that "no particular type of ... procedure categorically fits within one of the two exceptions," the determination of whether an exception applies "should be made by a doctor using reasonable medical judgment based upon his or her patient's individual circumstances."   Decl. of State Health Officer (doc. no. 88-15) at 6 ¶¶ 22-23.  But Dr. Harris still did not explain how the restrictions on medical procedures and associated exceptions in the March

9

27 order applied to abortions.  The plaintiffs and the court were still in the dark on this point.

The court held an immediate hearing on April 3 to discuss, among other things, the defendants' revision in their April 1 brief (allowable abortions *not* limited to protecting the life or health of the mother) of their prior interpretation in the March 30 hearing (abortions limited to protecting the life or health of the mother), both of which, according to defense counsel, were made after talking with State Health Officer Harris.  *See* March 30, 2020, Hr'g Tr. (doc. no. 98) at 6:1-7, 20:4-8, 22:2-5; April 3, 2020, Hr'g Tr. (doc. no. 123) at 35:9-13, 37:13-14.  During the April 3 hearing, the court understood the defendants to make four critical clarifications of the scope of the restrictions on medical procedures and its exceptions.  These clarifications, however, were not in the March 27 state health order, the defendants' brief, or Dr. Harris's declaration.  As a result, the court reduced the defendants' four April 3 clarifications to writing.

- First, "[i]n general, for an abortion, like any other procedure, a doctor should examine his or her patient, consider all circumstances, and determine whether one of the exceptions to the March 27 order applies. If they do, the procedure can go forward." *Robinson v. Marshall*, 2020 WL 1659700, at *3 (M.D. Ala. Apr. 3, 2020) (internal quotation marks, alteration, and citation omitted).

- Second, "if a healthcare provider determines, on a case-by-case basis in his or her reasonable medical judgment, that a patient will lose her right to lawfully seek an abortion in Alabama based on the March 27 order's mandatory delays ... then the abortion may be performed without delay pursuant to the exceptions in the March 27 order. The provider may examine his or her patient as needed to make the necessary determination regarding the age of the fetus." *Id.* (internal citation omitted).

- Third, "[i]f a healthcare provider determines, again

on a case-by-case basis in his or her reasonable medical judgment, that the abortion cannot be delayed in a healthy way, then the abortion may be performed without delay pursuant to the exceptions in the March 27 order." *Id.* (internal quotation marks, alteration, and citation omitted). "[A] healthcare provider may also examine his or her patient to assess whether or not an abortion can be delayed for two weeks in a healthy way...." *Id.* (internal quotation marks omitted).

- Fourth, and finally, "[t]he reasonable medical judgment of abortion providers will be treated with the same respect and deference as the judgments of other medical providers. The decisions will not be singled out for adverse consequences because the services in question are abortions or abortion-related." *Id.* (internal citation omitted).

Based largely upon these clarifications, the court found that its initial March 30 temporary restraining order "swept too broadly," as the April 3 clarifications

12

"alleviated the court's most serious concerns underlying the issuance of its temporary restraining order." *Id*. The court thus narrowed its temporary restraining order by granting the defendants' motion to stay "to the extent that the court adopts as its order the clarifications agreed upon by the defendants." *Id*. at *4. The court did not stay the temporary restraining order in full because the defendants' clarifications of the state health order were not otherwise binding.[4]

Also on April 3, in the midst of the court's resolution of the motion to stay, the State Health Officer issued a new state health order that extended the relevant restrictions on medical procedures until April

---

4.  The court did not act on the motion to dissolve the temporary restraining order because it lacked jurisdiction to do so, given that the defendants had filed an appeal from the temporary restraining order to the Eleventh Circuit Court of Appeals. *See* Notice of Appeal (doc. no. 94); *see also Robinson v. Marshall*, 2020 WL 1659700, at *1 (M.D. Ala. 2020) (Thompson, J.).  The appeal was later dismissed on April 4 pursuant to the parties' joint motion. *See* Letter from David J. Smith, Clerk of Eleventh Circuit Court of Appeals, to Clerk, Middle District of Alabama (doc. no. 122).

30.  *See* State Health Order of April 3, 2020 (doc. no. 109-1).  The restrictions on medical procedures in the March 27 order are identical to the restrictions in the April 3 order.  As a result, the defendants agreed that "to the extent that any provider could lawfully have considered the April 17 expiration date from the March 27 order, that provider can instead consider the new expiration date of April 30, 2020."  Order (doc. no. 113) at 2.

On April 5, counsel for the defendants submitted three additional written clarifications to the court's understanding of their April 3 oral clarifications.  *See* Defs.' Notice (doc. no. 120).

- First, the defendants additionally clarified that "a healthcare provider's assertion that a procedure meets one of the exceptions is not conclusive proof that the procedure meets one of the exceptions." *Id*. at 2.

- Second, the defendants additionally clarified that "any healthcare provider would still need to make an

14

individualized determination for his or her patient
as to whether losing the ability to have a procedure
performed would cause serious harm to the patient."
*Id.* at 3.

- Third, the defendants additionally clarified that
  "the exceptions require that the risk to a patient's
  health be sufficiently serious." *Id.* at 3 (internal
  quotation marks, alteration, and citation omitted).

During the April 6 preliminary injunction hearing,
however, the State Health Officer, Dr. Scott Harris, put
forth yet another interpretation of the restrictions on
medical procedures. First, although the March 19 and
March 27 state health orders had been interpreted
differently, *see* Decl. of Pls.' Counsel (doc. no. 73) at
46 ¶ 4 ("no plans to apply" March 19 order to abortion
clinics); *id.* at 48 ¶ 14 ("unable to provide ... blanket
affirmation that abortions will, in every case, fall
within one of the exemptions" to the March 27 order), Dr.
Harris explained that he meant for the two orders "to
have the same effect." April 6, 2020, Hr'g Tr. (doc. no.

15

133) at 12:17.   Second, just as the determination of whether a particular procedure was elective or not in the March 19 order was "left ... to the discretion of the provider," *id*. at 11:8, for the current restrictions on medical procedures "[t]he providers are the ones who determine whether their procedure fits in those exceptions, not the health department." *Id.* at 49:19-21. Third, a provider can consider "whatever factors they would deem ... appropriate" when making a determination of whether the exceptions in a particular circumstance have been satisfied.   *Id*. at 15:25-16:8.   Fourth, the Department of Public Health does not intend for an abortion provider to necessarily delay even a single procedure as a result of the restrictions on medical procedures. *See id*. at 50:5-14.   Fifth, and finally, the Department does not intend to review healthcare providers' decisions. *See id*. at 44:3-14.

To the extent that Dr. Harris's April 6 testimony represents the current interpretation of the restrictions on medical procedures, it reveals substantial common

16

ground between the two parties. Dr. Harris, for instance, made clear that the order was never intended to establish a blanket ban on abortions, but rather that the order contemplated "case-by-case determination[s]." *Id*. at 18:1-8. Dr. Harris further emphasized that providers, and not the Alabama Department of Health, should decide which factors to consider in deciding whether the order's exceptions apply. *See id.* at 13:18-21, 15:3-16:8. And Dr. Robinson, one of the plaintiffs in this litigation and the medical director of the plaintiff Alabama Women's Center, agreed that providers could delay abortions under certain circumstances. *See, e.g.*, *id.* at 139:20-23 (for patients presenting with COVID-19 symptoms); *id.* at 155:8-10 (acknowledging possibility that at least one abortion could be safely postponed).

Nonetheless, Dr. Robinson testified that the defendants' additional written clarifications on April 5 to the court's understanding of their representations on April 3, caused her serious concern. According to her,

17

the written clarifications "made it very clear to me that my medical judgment was not the final decision when it came to the care decisions that I was making for my patients.  I don't know who that is going to be left up to, but it made it very clear to me ... that [my medical judgment] would not be the final call." *Id*. at 125:7-13.

With all of these varying interpretations of the State's public health orders in mind, including the interpretations provided to the plaintiffs' counsel before the filing of the motion for temporary restraining order, the court now turns to the plaintiffs' motion for a preliminary injunction.


## II. LEGAL STANDARDS

For a preliminary injunction to issue, the plaintiffs must establish the following: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the preliminary injunction is not granted; (3) that the threatened injury to the plaintiffs outweighs the threatened harm that the

18

injunction may cause the defendants; and (4) that granting preliminary injunctive relief is not adverse to the public interest. *See Ferrero v. Associated Materials, Inc*., 923 F.2d 1441, 1448 (11th Cir. 1991); *Cate v. Oldham*, 707 F.2d 1176, 1185 (11th Cir. 1983). Further, where a court issues an injunction, "invalidating the statute entirely is not always necessary or justified;" rather, courts "may be able to render narrower declaratory and injunctive relief." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 323 (2006).

## III. DISCUSSION

### A. Likelihood of Success on the Merits

On March 27, 2020, the State Health Officer released an order that mandated the postponement of "all dental, medical, or surgical procedures," with two exceptions: (a) those "necessary to treat an emergency medical condition" and (b) those "necessary to avoid serious harm from an underlying condition or disease, or necessary as

19

part of a patient's ongoing and active treatment." State Health Order of March 27, 2020 (doc. no. 88-1) at 6 ¶ 7. On April 3, the State Health Officer entered a new order with identical medical restrictions that extended their expiration date from April 17 to April 30. *See* State Health Order of April 3, 2020 (doc. no. 109-1). As described above, these medical restrictions are susceptible to multiple readings. Over the course of this litigation, the defendants themselves have put forth several divergent interpretations of the medical restrictions, each with dramatically different implications for the plaintiffs.

Under one of the interpretations put forth by the defendants, for all of April, abortions can lawfully proceed without delay *only* when necessary to protect maternal life or maternal health. Based on the record that is now before the court, the medical restrictions, read pursuant to this interpretation, violate the Fourteenth Amendment. The court has no enforceable guarantee that the medical restrictions will *not* be

20

interpreted in this way by those tasked with their enforcement through 1975 Ala. Code § 22-2-14 or other mechanisms. *See* April 6, 2020, Hr'g Tr. (doc. no. 133) at 44:15-25 (Dr. Harris disclaiming knowledge of how the order might be enforced by others). The plaintiffs and the court also cannot rely on the defendants' non-binding assurances that they will not return to this interpretation. Accordingly, as explained below, the court finds that the plaintiffs have demonstrated a substantial likelihood of success on the merits.

### 1. Effects of Mandatory Postponement

On March 30, counsel for the defendants represented that, under the medical restrictions, abortions could lawfully proceed without delay only if they were necessary to protect the life and health of the mother. *See* March 30, 2020, Hr'g Tr. (doc. no. 98) at 20:22-21:1, 22:6-10. Under this reading, the medical restrictions would mandate the postponement until at least April 30 of all abortions not performed to protect maternal life

21

or maternal health.[5]

On the limited record before the court, the precise implications of the medical restrictions, interpreted in this way, remain murky.  The COVID-19 crisis leaves the court and the parties in uncharted territory.  But this much is clear: for at least some women,[6] a mandatory postponement until April 30 would operate as a

_____

5. This reading by the defendants is a plausible one. The restrictions allow medical procedures only when "necessary to treat an emergency medical condition" or "to avoid serious harm from an underlying condition or disease."  State Health Order of March 27, 2020 (doc. no. 88-1) at 6 ¶ 7.  While there are other plausible interpretations, the exception *can* be read to mandate postponement of any abortion not necessary to protect the life or health of the mother.  And while the medical restrictions also allow for procedures that are "necessary as part of a patient's ongoing and active treatment," *id.*, the meaning of this provision, and whether and how it applies to abortion, is far from clear.

6. Dr. Robinson acknowledged that, at least hypothetically, it was "possible for there to be at least one abortion that can be safely postponed in [her] judgment."  April 6, 2020, Hr'g Tr. (doc. no. 133) at 155:8-10.  But "[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects.... The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant."  *Casey*, 505 U.S. at 894.

22

*prohibition* of abortion, entirely nullifying their right to terminate their pregnancies, or would impose a substantial burden on their ability to access an abortion. The court provides examples here, though it cautions that the groups described do not constitute an exhaustive accounting of the medical restrictions' likely effects.

First, for some group of women, a mandatory postponement will make a lawful abortion literally impossible. Under Alabama law, a woman's window for seeking a lawful abortion is limited: abortion becomes illegal when the probable postfertilization age of the fetus is at least 20 weeks. *See* 1975 Ala. Code, as amended, § 26-23B-5. A mandatory postponement until April 30 could thus extend a woman's pregnancy beyond the 20-week boundary imposed by law, making an abortion illegal. *See id.*; *see also* Pls.' Mem. in Supp. of a T.R.O. (doc. no. 73-1) at 2 (describing a woman who would be "pushed past the legal limit for abortion in Alabama if she does not obtain an abortion *this week*").

23

For other women, a postponement would make securing a lawful abortion far more difficult, or even impossible, including because of major logistical hurdles. Take, for instance, abortions performed after 14 weeks. Only one clinic in Alabama can perform such abortions, *see* April 6, 2020, Hr'g Tr. (doc. no. 133) at 78:4-9, which are normally a very small minority of all abortions performed statewide. *See* Induced Termination of Pregnancy Statistics (doc. no. 88-13) at 10. But if widespread delays to abortions occur, that clinic's limited capacity will likely become a serious barrier that renders lawful abortions entirely unavailable to some women in Alabama. *See* April 6, 2020, Hr'g Tr. (doc. no. 133) at 114:7-116:1. Women in Alabama might also face difficulty traveling to a clinic, *see id.* at 92:16-19, particularly if they live in the far reaches of the State; receiving necessary time off, *see id.* at 92:11-15, or child care, *see id.* at 92:24-93:1; and affording an abortion in the first place, *see id.* at 92:5-10. (In Alabama, an abortion requires two visits, so these obstacles must be navigated

24

twice.  *See, e.g., id.* at 93:2-6.)   A mandatory delay would greatly exacerbate many of these difficulties, unseating plans in the midst of a pandemic that has yielded widespread job loss, financial difficulty, and social isolation.   *See, e.g., id.* at 113:11-13 (Dr. Robinson noting that "[w]ith each week that the pregnancy is delayed or termination of the pregnancy is delayed, that means there is an increased cost to the patient"); *id.* at 93:7-14 (noting the pandemic's impact on women seeking abortions, apart from the medical restrictions).[7] It is abundantly clear, and the court now finds, that a delay until April 30 will pose a tremendous, and sometimes insurmountable, burden for many women in Alabama.

Further, for some women, a postponement of an abortion may cause serious harm, or a substantial risk of serious harm, to that woman's health.  Dr. Robinson

_____

7. The court finds that Dr. Robinson is an expert in obstetrics and gynecology and abortion practice. *See* April 6, 2020, Hr'g Tr. (doc. no. 133) at 72:21-24.

credibly testified that, for at least some women, even a short delay can make an abortion (or the ongoing pregnancy) substantially riskier. *See, e.g.*, April 6, 2020, Hr'g Tr. (doc. no. 133) at 160:11-13 (discussing the increase in risk to patients as time passes); *id.* at 84:10-21 (discussing conditions associated with pregnancy); *id.* at 111:16-18 (noting that "each week that the abortion is delayed, it increases the risk to the patient"); *id.* at 112:18-24 (discussing risks of delay for women at risk of domestic violence or who have experienced rape); *id.* at 111:4-6 (noting that each week of delay "increases the risk of mortality"); *id.* at 107:2-11 (reading from a report concluding that, while complications are rare, the risk of serious complications increases with delay[8]); *id.* at 110:2-5 (summarizing a

---

8. Dr. Robinson read from a report admissible as a learned treatise. *See* Committee on Reproductive Health Services: Assessing the Safety and Quality of Abortion Care in the U.S., National Academies of Sciences, Engineering, and Medicine, *The Safety and Quality of Abortion Care in the United States* (2018); *see also* Fed. R. Evid. 803(18).

report concluding that "every week an abortion is delayed increases the risk [of mortality or death in the patient] by approximately 38 percent"[9]); *see generally id.* at 39:17-40:4 (Dr. Harris agreeing regarding Alabama's high rate of childbirth complications and maternal mortality). Abortion is a "very safe" procedure, *id.* at 110:24-25, but, for some patients, the relative risk can dramatically increase in a short time--and for these patients, a mandatory delay would create a substantial and serious risk of harm for many patients.

### 2. The Medical Restrictions' Constitutionality

The court finds that, in light of these effects, the plaintiffs have shown a substantial likelihood of success on the merits.  That is, it is substantially likely that the medical restrictions, when interpreted to allow only

---

9. Here, Dr. Robinson was summarizing a section of a learned treatise.  *See* Linda A. Bartlett, *Risk Factors for Legal Induced Abortion-Related Mortality in the United States*, 103 Obstetrics & Gynecology 729, 731, 735 (2004); *see also* Fed. R. Evid. 803(18).

27

those abortions necessary to protect the life and health of the mother, are unconstitutional.   First, to the extent that they are interpreted to *prohibit* certain women from *ever* obtaining a pre-viability abortion--and force them, instead, to carry their pregnancies to term--the medical restrictions are very likely unconstitutional on the record before the court.   And, second, to the extent that they impose substantial burdens upon or create serious and substantial health risks for women seeking abortions, they very likely pose an unconstitutional burden.

The plaintiffs and the defendants posit two distinct legal frameworks for this case.   The plaintiffs suggest that the substantive-due-process analysis of *Roe v. Wade*, 410 U.S. 113 (1973), *Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833 (1992), and other related cases should govern.   The defendants argue that the court should instead turn to the State's emergency powers, as set forth in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), in reviewing the

28

order.   The court need not decide which legal framework applies, and instead assumes that they can and should be applied together in these circumstances.   Under either framework, the plaintiffs have shown a substantial likelihood that, if read to effect a postponement of any abortion not required to protect the life and health of the mother, the medical restrictions are unconstitutional.

In *Jacobson*, amid a smallpox outbreak in Cambridge, Massachusetts, the City (acting pursuant to a state statute) mandated the vaccination of all of its citizens. The Court upheld the statute against a Fourteenth Amendment challenge, clarifying that the State's action was a lawful exercise of its police powers and noting that, "[u]pon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27.   Still, while *Jacobson* urges deferential review in times of emergency, it clearly demands that courts enforce the Constitution. *See id* at

28.  Indeed, *Jacobson* explicitly contemplates a backstop role for the judiciary: "[I]f a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, *a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.*" *Id.* at 30 (emphasis added); *see also Casey*, 505 U.S. at 857 (citing *Jacobson* for the proposition that "a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims").

Under *Jacobson*, therefore, a State's emergency response can still be unlawful if it impinges on a fundamental right in a "plain, palpable" way. *Jacobson*, 197 U.S. at 31.[10]  Abortion is a fundamental right.  *See,*

_____

10.  The *Jacobson* Court--writing long before the development of modern substantive-due-process jurisprudence--found no clear invasion of any fundamental right.  "Whatever may be thought of the expediency of

30

*e.g.*, *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005) (noting that "[t]he Supreme Court has recognized that fundamental rights include those guaranteed by the Bill of Rights as well as certain 'liberty' and privacy interests," which include the right "to abortion" (internal citation marks omitted)). And so *Jacobson* asks courts to protect it, even in times of emergency.

Here, the contours of the fundamental right at stake are described in *Roe*, *Casey*, and subsequent cases. As the Supreme Court has repeatedly re-affirmed, the Fourteenth Amendment protects a woman's right to terminate her pregnancy. *See, e.g.*, *Stenberg v. Carhart*, 530 U.S. 914, 921 (2000) (noting that the Supreme Court "has determined and then redetermined that the Constitution offers basic protection to the woman's right to choose").

-------------------------------------

this statute, it cannot be affirmed to be, beyond question, in palpable conflict with the Constitution." *Jacobson*, 197 U.S. at 31. Its inquiry thus ended with deference to the State's chosen policy. But here, a fundamental right is clearly at issue.

Still, the right to an abortion does have limits. As the Court recognized in *Casey*, a State may regulate pre-viability abortion to further its legitimate interests, but only if the laws in question do not place an "undue burden" on a woman's right to end her pregnancy. *Casey*, 505 U.S. at 876–79 (plurality opinion). Further, *Casey* itself held that, as applied to a *prohibition* (rather than a mere regulation) of pre-viability abortion, the State's interests *must* give way to a woman's right to terminate her pregnancy. "Before viability, the State's interests are not strong enough to support a prohibition of abortion ...." *Casey*, 505 U.S. at 846 (opinion of the Court); *see also Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) (reiterating that "[b]efore viability, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy" (internal citations and quotation marks omitted)).

It is abundantly clear that the medical restrictions in the state health order are unconstitutional to the

32

extent that they *prevent* a woman from obtaining an abortion before viability--that is, where they effect a *prohibition* on abortion.  Although *Casey* did not consider the interests presented by the defendants here (preserving healthcare resources and reducing close social contact), it plainly holds that the choice to terminate a pregnancy before viability must belong to the woman, not the State.[11]  *Casey*, 505 U.S. at 846 (opinion of the Court); *see also Gonzales*, 550 U.S. at 146.  To fully prevent this choice (by, for example, mandating that a woman's abortion be delayed until it is illegal) violates *Casey*'s central holding, and thus violates *Jacobson*, too.  *See Jacobson*, 197 U.S. at 31; *see also id.* at 25 ("A local enactment or regulation, even if based on the acknowledged police powers of a state, must

---

11. Indeed, the underlying logic of *Casey* centers on dignity and autonomy.  *See Casey*, 505 U.S. at 852 (noting that, in the abortion context, "the liberty of the woman is at stake in a sense unique to the human condition and so unique to the law").  These essential values require the court's protection, even (or, maybe, especially) in an emergency.

always yield in case of conflict ... with any right which [the Constitution] gives or secures.").   On the record before the court, even where the State's interests are reviewed with great deference, that violation is "plain, palpable," and constitutionally forbidden.[12]   *Id.* at 31.

---

12.   *Jacobson* also discusses an exception for "[e]xtreme cases," when the police power is exerted "in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression."   *Jacobson*, 197 U.S. at 38.   *Jacobson* continues: "It is easy, for instance, to suppose the case of an adult who is embraced by the mere words of the act, but yet to subject whom to vaccination in a particular condition of his health or body would be cruel and inhuman in the last degree.  We are not to be understood as holding that the statute was intended to be applied to such a case, or, if it was so intended, that the judiciary would not be competent to interfere and protect the health and life of the individual concerned."   *Id.* at 38-39.  *Jacobson* thus recognizes the need for exemptions to allow individuals to avoid serious, lasting impacts--but, unlike in the case of abortion, it did not face such an impact directly.   *See generally In re Cincinnati Radiation Litig.*, 874 F. Supp. 796, 819 (S.D. Ohio 1995) (noting that *Jacobson* "involved minimally invasive procedures with no lasting side effects").   At minimum, this exception makes clear that *Jacobson* does not give blanket authority to the State, even in an emergency.

But even where they operate as a "regulation" of abortion, and not a "prohibition," the medical restrictions, if interpreted to mandate the postponement of any abortion not necessary to protect the life and health of the mother, are very likely unconstitutional. The court finds it substantially likely that they pose an "undue burden," *Casey*, 505 U.S. at 786, that is so extreme that the restrictions effect "a plain, palpable invasion of rights secured by the fundamental law," *Jacobson*, 197 U.S. at 31.

Under the "undue burden" analysis, a regulation of pre-viability abortion cannot survive if the "burdens a law imposes on abortion access" outweigh its benefits. *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016). Put another way, "the court must determine whether, examining the regulation in its real-world context, the obstacle is more significant than is warranted by the State's justifications for the regulation." *Planned Parenthood Se., Inc. v. Strange*, 9 F. Supp. 3d 1272, 1287 (M.D. Ala. 2014) (Thompson, J.).

35

Considered in their real-world context, the medical restrictions will pose a substantial obstacle to many women in Alabama.  In general, even a brief delay causes serious challenges: a 24-hour waiting period, though upheld in *Casey*, posed a close question for the Supreme Court.  As this court later noted, the one-day wait "seems to have fallen just on the other side of the line from being a substantial obstacle."  *Planned Parenthood Se., Inc. v. Strange*, 9 F. Supp. 3d 1272, 1286 (M.D. Ala. 2014) (Thompson, J).

Here, counted from the initial imposition of the medical restrictions, a delay could exceed *one month*-- even if the restrictions are not extended--and the lengthy postponement period sweeps in many women.[13]  The

---

13. The defendants have admitted that the course of the pandemic could last three or four months, beginning in early March.  *See* April 6, 2020, Hr'g Tr. (doc. no. 133) at 37:21-22.  The medical restrictions could certainly be extended beyond April 30.  *See, e.g.*, *id.* at 104:11-14 (Dr. Robinson explaining that she understands the medical restrictions could be extended past April 30).

possible implications of a postponement, applied across the board, are varied and deeply troubling, as the court discussed above.  The medical restrictions would amplify existing challenges, pose severe health risks, and render abortions functionally unavailable for at least some women.  Most importantly, however, if the restrictions are read to delay any abortion not necessary to protect the life and health of the mother, then abortion providers would be categorically unable to even *consider* these factors in determining whether an abortion can or should be postponed.

These extensive burdens must be balanced against the interests put forth by the defendants: the preservation of healthcare resources (including personal protective equipment) and the prevention of close social contact.[14]

---

14. In *Casey* and its progeny, regulations of abortions are typically justified by two legitimate interests: "preserving and promoting fetal life," *Gonzales v. Carhart*, 550 U.S. 124, 145 (2007), and protecting the health of the woman, *see id.* at 146.  Here, the court assumes that the defendants' interests in preserving healthcare resources and preventing social

*See, e.g.*, April 6, 2020, Hr'g Tr. (doc. no. 133) at 10:19:11:1 (describing the interests motivating the restrictions); *id.* at 8:3-9:3 (describing the State's interest in conserving personal protective equipment); *id.* at 9:16-10:2 (social distancing); Decl. of State Health Officer (doc. no. 88-15) at ¶ 24 (discussing reasons for mandating delay of abortions). The court recognizes the urgency and breadth of the State's COVID-19 response. But compared to the serious burdens imposed by the medical restrictions, the benefits to the State and the public fall far short.

First, most abortions and related appointments require a limited amount of personal protective equipment (PPE), and a delayed abortion does not erase even the patient's short-term need for medical care. For instance, the defendants have stated that normal prenatal visits and mandatory pre-abortion examinations can

---

contact may legitimately support a regulation of abortion during an emergency.

proceed as scheduled under the medical restrictions. *See, e.g.*, April 3, 2020, Hr'g Tr. (doc. no. 123) at 42:4-16; *see also Robinson v. Marshall*, 2020 WL 1659700, at *3 (M.D. Ala. 2020) (Thompson, J.) (court memorializing this); Defs.' Clarifications (doc. no. 120) at 2-3 (not disputing it).

Beyond those appointments, abortions themselves require only a limited amount of PPE.[15] *See* Corr. Robinson Decl. (doc. no. 99-1) at 13 ¶ 30 (discussing the PPE required for a medication abortion); April 6, 2020, Hr'g Tr. (doc. no. 133) at 54:14-55:2 (same); Corr. Robinson Decl. (doc. no. 99-1) at 13 ¶ 30 (discussing the

---

15. Indeed, the State Health Officer conceded that administering a medication abortion "may not itself" require the use of PPE. Decl. of State Health Officer (doc. no. 88-15) at ¶ 24. He justified delaying medication abortions based on the risk of possible complications requiring a surgical abortion or emergency medical care. Decl. of State Health Officer (doc. no. 88-15) at ¶ 24. However, the rate of such complications is extremely low, a fact that Dr. Harris admitted he did not know when he made the decision that medication abortions should be postponed. *See, e.g.*, April 6, 2020, Hr'g Tr. (doc. no. 133) at 79:2-15 (discussing the rate of complications); *id.* at 55:23-56:1.

39

PPE required for procedural/surgical abortions); April 6, 2020, Hr'g Tr. (doc. no. 133) at 132:10-18 (same). Further, the risk of a serious complication of abortion is extremely low. *See id.* at 78:11-16. For some delays, therefore, some amount of PPE will be conserved; for other delays, a very small amount of PPE (if any) will be conserved; and for other delays, any PPE conserved will simply be re-routed to routine prenatal visits or, often, appointments required to address the complications of pregnancy.[16] *See, e.g., id.* at 51:6-8 (Dr. Harris's expectation that a pregnant woman should continue to receive prenatal care under the medical restrictions). Indeed, as to hospital resources more generally, the medical restrictions are very unlikely to make a significant difference: the rate of abortions that require hospitalization is extremely low. *See, e.g.,* April 6, 2020, Hr'g Tr. (doc. no. 133) at 79:2-23

---

16. With respect to any PPE that *is* conserved, the defendants have not put forward evidence regarding how it might be used or re-directed to hospitals that are experiencing shortages.

40

(discussing the rate of complications and noting that most complications can be managed in an outpatient setting). Put simply, even when measured on a very short time horizon, the benefits of the medical restrictions as applied to abortions, are limited, particularly compared to the burdens that they impose.

Further, if an abortion is delayed and then does *not* proceed, the medical restrictions may backfire over time: PPE usage will often be higher and provider-patient contact will likely increase. A typical uncomplicated pregnancy will require *multiple* prenatal appointments and delivery, each of which require PPE, even if there are no unforeseen complications. *See* Corr. Robinson Decl. (doc. no. 99-1) at 13 ¶ 32; April 6, 2020, Hr'g Tr. (doc. no. 133) at 125:19-126:5 (Dr. Robinson); *see also id.* at 51:6-8 (Dr. Harris's expectation that a pregnant woman should receive prenatal care). A complicated pregnancy would require far more. *See* Corr. Robinson Decl. (doc. no. 99-1) at 13 ¶ 32. At least some of these needs will emerge before the restrictions expire, especially if they

41

are further extended.

Thus, assuming that the defendants' interests posited here may be considered and granting them substantial deference, the court finds that the burden imposed by the medical restrictions is undue. Indeed, it is substantially and plainly undue--enough that to impose it impinges the right to an abortion in a "plain, palpable" fashion. *Jacobson*, 197 U.S. at 31.[17]

Finally, the defendants also rely upon *Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996), *abrogated on unrelated grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998), arguing that it supersedes the *Casey* framework and imposes far more deferential review. In *Avino*, reviewing an evening curfew imposed in the wake of Hurricane Andrew, the Eleventh Circuit held that, "when a curfew is imposed as an emergency measure in

---

17. As discussed above, the court assumes that *Jacobson* applies and dictates substantial deference to the state. If only *Casey* applies, the analysis here remains valid and comes to the same conclusion--albeit even more firmly, because the defendants' stated interests would be considered with greater scrutiny.

42

response to a natural disaster, the scope of review in cases challenging its constitutionality is limited to a determination whether the [executive's] actions were taken in good faith and whether there is some factual basis for the decision that the restrictions ... imposed were necessary to maintain order." *Avino*, 91 F.3d at 109 (internal citations, alteration, and quotation marks omitted). But unlike the instant case, *Avino* addressed only temporary, partial restrictions on certain fundamental rights, *see id.*, and explicitly addressed times "when a *curfew* is imposed ... in response to a *natural disaster*." *Id.* (emphasis added). This court declines to extend it beyond those contexts.[18]

---

18. Further, in arguing that *Avino* should be extended to state actions that impact fundamental rights in other contexts, including where such rights may be permanently denied, the defendant's argument proves too much. In an emergency, the defendants suggest, a reviewing court may investigate only "whether the executive's actions were taken in good faith and whether there is some factual basis for the decision that the restrictions imposed were necessary to maintain order." *Avino*, 91 F.3d at 109 (internal citations, alteration, and quotation marks omitted). But under this logic, with only "good faith" and "some factual basis," government actors in any

Notably, the court's conclusions come despite the substantial deference to the State that *Jacobson* and *Avino* recommend.  In light of the ongoing emergency, the court gives great weight to the State's interests: preventing social contact, preserving personal protective equipment, and preserving other healthcare resources.  But the court must nonetheless intervene.  A fundamental right is at stake; that right, for some women, is subject to a possible *permanent denial*, not a mere delay or temporary denial; and, based on the Supreme Court's clear holdings on the right to an abortion, the State's asserted interests, even when viewed with a tremendous degree of deference, cannot support the accompanying deprivation of a Fourteenth Amendment right.

---

emergency could permanently curtail nearly *any constitutional right.  Id.*  That assertion, which flows directly from the State's argument, is extreme, and plainly false; *Avino* should not be read to stand for such a broad proposition.  *Compare id.* (asserting that fundamental rights may be "temporarily limited or suspended" in emergencies, citing *Korematsu v. United States*, 323 U.S. 214 (1944)) *with Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) (noting that "*Korematsu* was gravely wrong the day it was decided").

The plaintiffs have, therefore, demonstrated a likelihood of success on the merits.

### 3. Appropriate Remedy

Still, the medical restrictions' constitutional problems do not justify the plaintiffs' requested remedy: an injunction of the medical restrictions, as applied to abortion providers, in their entirety. The court declines to use a sledgehammer where a scalpel will do. *Cf. Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 323 (2006) (holding that "invalidating the statute entirely is not always necessary or justified" when "lower courts may be able to render narrower declaratory and injunctive relief"). Accordingly, rather than enjoin the medical restrictions in full, the court will enjoin them only to prevent those applications of the medical restrictions that are inconsistent with the mandates of the Constitution, as described above.

The defendants have put forward multiple interpretations of the medical restrictions. Based upon

the defendants' most recent clarifications, the medical
restrictions grant substantial leeway to providers acting
in their reasonable medical judgment (in contrast to the
previous interpretation, described above, which was far
more restrictive).   For instance, the defendants have
clarified that the medical restrictions allow providers
to consider a range of factors in determining whether a
procedure can lawfully proceed as scheduled.   When asked
*which* factors, Dr. Harris pointed only to providers'
clinical judgment.   "[T]he clinician should use their
clinical judgment and consider *whatever factors they
would deem would be appropriate* to make that
determination [of whether a procedure falls within one
of the order's exceptions]."   April 6, 2020, Hr'g Tr.
(doc. no. 133) at 16:3-5 (testimony of Dr. Scott Harris)
(emphasis added).   Ultimately, "[t]he providers are the
ones who determine whether their procedure fits in [the
order's] exceptions, not the health department."   *Id.* at
49:19-21.

By the State Health Officer's telling, then, an

46

abortion provider is permitted to consider all of those factors that he or she reasonably deems relevant in deciding whether an abortion can be delayed.  As Dr. Robinson credibly testified (and as the court now finds), an abortion provider might reasonably consider many factors, including: whether the woman's abortion would become riskier because of a substantial delay, *see* April 6, 2020, Hr'g Tr. (doc. no. 133) at 105:22-23; the patient's "socioeconomic factors, her medical history, [or] the circumstances surrounding her decision to proceed with an abortion," *id.* at 158:21-23; and the "logistics of getting back to the clinic, taking the time off of work, [and] coordinating care for their children," *id.* at 114:1-2.  Where these considerations (or others) are relevant to a provider's determination under the medical restrictions, that provider may lawfully consider them, and  Dr. Harris explicitly disclaimed any interest in second-guessing those decisions.  *See* April 6, 2020, Hr'g Tr. (doc. no. 133) at 44:3-10.

The court assumes that, if they were only read in

47

this way, the medical restrictions *would not* constitute an unlawful prohibition of any woman's abortion. Rather, they would allow a provider to consider whether a patient's abortion must proceed as scheduled because that patient will not, or likely will not, be able to terminate her pregnancy if it is postponed.

Still, the plaintiffs have expressed a lingering reticence to trust the representations of the defendants, particularly with respect to non-binding interpretations that emerged after multiple days of litigation. The court finds these concerns warranted: "Mid-litigation assurances are all too easy to make and all too hard to enforce, which probably explains why the Supreme Court has refused to accept them." *W. Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310, 1328 (11th Cir. 2018) (affirming an injunction despite a non-binding clarification from the State), *cert. denied sub nom. Harris v. W. Alabama Women's Ctr.*, 139 S. Ct. 2606 (2019); *see also Stenberg v. Carhart*, 530 U.S. 914, 940 (2000) (cautioning against accepting an Attorney General's

non-binding interpretation of a state law). Despite the defendants' most recent clarifications, therefore, an injunction must issue.

A clear, enforceable standard is especially essential given the long history of anti-abortion sentiment in Alabama and nationwide. *See, e.g., Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1334 (M.D. Ala. 2014) (Thompson, J.), *as corrected* (Oct. 24, 2014), *supplemented*, 33 F. Supp. 3d 1381 (M.D. Ala. 2014), *and amended*, No. 2:13-cv-405-MHT, 2014 WL 5426891 (M.D. Ala. Oct. 24, 2014). Said history is no secret to any abortion provider in Alabama--it is evident "when she opens the newspaper, drives by a group of protesters at a clinic, or learns that another piece of legislation concerning abortion has been enacted." *Id.*[19] As the court noted, this observation "does not imply that such

---

19. Just last year, this court preliminarily enjoined a law that imposed a "near-total ban on abortion." *Robinson v. Marshall*, 415 F. Supp. 3d 1053, 1055 (M.D. Ala. 2019) (Thompson, J.).

activities are illegal, improper, or morally wrong; indeed, the right to express deeply held beliefs is of the utmost importance." *Id.* But these events have inarguably yielded a "climate of violence, harassment, and hostility," *id.*, that pervades the day-to-day work of abortion providers in Alabama.[20]

---

20. These challenges clearly persist. As one example, Dr. Robinson regularly receives threatening and harassing messages online and in person because she is an abortion provider, including a recent social media message expressing "hope" that she contracts COVID-19. *See* Suppl. Robinson Decl. (doc. no. 110-1) at 3 ¶ 8; Attachment 2 (doc. no. 110-2). Anti-abortion advocates, including another physician, have also filed complaints against Robinson with the Board of Medical Examiners. *See* Suppl. Robinson Decl. (doc. no. 110-1) at 3 ¶ 8-9; April 6, 2020, Hr'g Tr. (doc. no. 133) at 168:20-169:13. Although these complaints have never been substantiated, they have triggered investigations, which Dr. Robinson must now report each time she renews her medical license. *See* Suppl. Robinson Decl. (doc. no. 110-1) at 3 ¶ 8; April 6, 2020, Hr'g Tr. (doc. no. 133) at 169:14-19. Protesters have also filed complaints against AWC with the Alabama Department of Public Health, which reliably lead to investigations of the clinic, disrupting the clinic's practice though never leading to a finding of any wrongdoing. *See id.* at 122:13-25. Dr. Robinson testified that these tactics of protesters "keep[] me and my staff constantly feeling on edge, I mean, wondering from day to day what the next attack is going to be and how effective they will be." *Id.* The court finds Dr. Robinson's testimony credible.

In this environment, a provider might reasonably fear that prosecutions under the medical restrictions will proceed despite the defendants' on-the-record interpretations.[21] But to proceed with lawful abortions, providers must be *confident* that their exercise of reasonable medical judgment will not be met with unconstitutional or bad-faith prosecution. That is, physicians acting lawfully cannot be left to "the tender mercies of a prosecutor's discretion and the vagaries of a jury's decision," *W. Alabama Women's Ctr.*, 900 F.3d at 1329, or wrongly deterred from performing lawful procedures in the first place. *See generally Colautti v. Franklin*, 439 U.S. 379, 396 (1979) ("The prospect of

---

21. These fears are justified by, among other things, recent events. Dr. Robinson testified that, since the medical restrictions went into effect, protestors have called the police asking them to "come and check on us," "thinking that we were supposed to be shut down" and urging investigations from the police and the Department of Public Health. April 6, 2020 Hr'g Tr. (doc. no. 133) at 121:3-21. The police have responded in person at least once since the pandemic began. *See id.* at 121:22-122:9. In general, these efforts (and others like them) keep Dr. Robinson and her staff "constantly feeling on edge." *Id.* at 122:23.

such disagreement, in conjunction with a statute imposing strict civil and criminal liability for an erroneous determination ..., could have a profound chilling effect on the willingness of physicians to perform abortions near the point of viability in the manner indicated by their best medical judgment.").

Given these realities, guaranteeing practical, reliable flexibility to abortion providers requires an injunction.  But the court's injunction will be limited in scope.  It will essentially reduce to an order the most recent representations made by the defendants (and, in particular, by Dr. Scott Harris), rendering them enforceable and locking them into place.  To the extent that the state health order is applied in a fashion inconsistent with this mandate, and *only* to that extent, it will be enjoined.

## B. Irreparable Harm

The plaintiffs have demonstrated that the medical restrictions, if left in place, would result in imminent,

irreparable harm to some, though not all, of their patients. The medical restrictions are clearly susceptible to an interpretation that would permanently prevent or impose plainly undue burdens upon abortions for some women, denying those women their fundamental right to privacy. As the Eleventh Circuit has held, any denial of that right constitutes "irreparable injury." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990). The effects of such a denial are particularly severe in the abortion context: the Seventh Circuit recently noted that a "delay in obtaining an abortion can result in the progression of a pregnancy to a stage at which an abortion would be less safe, and eventually illegal." *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 796 (7th Cir. 2013). For those women approaching 20 weeks of pregnancy, such harms are especially acute. As described above, in the instant case, these harms include an increase in medical risk, *see* April 6, 2020, Hr'g Tr. (doc. no. 133) at 105:19-23,

53

106:17-107:11, 109:20-25, and serious logistical
challenges, *id.* at 112:25-114:4, including substantial
travel, *see, e.g.*, *id.* at 92:16-19.

Moreover, the plaintiffs have demonstrated that,
despite the defendants' clarifications stated on the
record, they remain at serious risk of prosecution,
including because, without an injunction, the defendants
would retain the option to revise their interpretation
of the medical restrictions. Such enforcement also poses
a threat of imminent harm.


## C. The Balance of Hardships

The plaintiffs have shown that, with no injunction
in place, some women would very likely be forced to carry
their pregnancies to term; others would face serious
obstacles that render obtaining an abortion very
difficult. Further, they have demonstrated a meaningful
risk of unwarranted prosecutions that deter abortion
providers and, in turn, create a substantial obstacle for
women seeking abortions. These injuries are substantial.

54

In contrast, the state health order, as applied to abortion providers, contributes relatively little to the State's efforts to preserve healthcare resources and prevent close personal contact. (The court describes and weighs these benefits in detail above.) As importantly, the court's injunction is narrow, minimizing harm to the defendants by embracing recent clarifications made on the record by the State Health Officer. In sum, the court finds that the balance of hardships tips towards the plaintiffs.


### D. The Public Interest

The court also finds that a narrow preliminary injunction serves the public interest. The defendants have described serious and urgent conditions--conditions that merit an equally serious and urgent response. But, based on the current record, the defendants' efforts to combat COVID-19 do not outweigh the lasting harm imposed by the denial of an individual's right to terminate her pregnancy, by an undue burden or increase in risk on

patients imposed by a delayed procedure, or by the cloud of unwarranted prosecution against providers.

Still, the court recognizes the demands of the ongoing crisis. By issuing a narrowly tailored injunction, the court simultaneously insists, on the one hand, that abortion providers shoulder some of the burden of the State's widespread response--and protects, on the other, the right to privacy guaranteed by the United States Constitution.

***

In accordance with this opinion, the court will issue an appropriate injunction separately. The bond requirement of Fed. R. Civ. P. 65(c) will be waived.

DONE, this the 12th day of April, 2020.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE